## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEMBROKE PINES FIREFIGHTERS & POLICE OFFICERS PENSION FUND and the CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | CLASS ACTION |
| v. | **JURY TRIAL DEMANDED** |
| ADOBE INC., SHANTANU NARAYEN, JOHN MURPHY, DANIEL DURN, DAVID WADHWANI, and JONATHAN VAAS, | |
| Defendants. | |

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The Pembroke Pines Firefighters & Police Officers Pension Fund and the City of Hollywood Police Officers' Retirement System ("Plaintiffs"), by and through their undersigned counsel, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and for all other allegations based upon the investigation undertaken by Plaintiffs' counsel, which included, but was not limited to, the review and analysis of: (i) public filings made by Adobe Inc. ("Adobe" or the "Company") with the SEC; (ii) press releases and other public statements issued by Adobe and the other Defendants named herein; (iii) securities and financial analysts' research reports; (iv) media and news reports related to Adobe; and (v) transcripts of Adobe's earnings and other investor conference calls.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action that Plaintiffs bring on behalf of themselves and a class consisting of all persons and entities that purchased or otherwise acquired the common stock of Adobe between July 23, 2021 and September 15, 2022, inclusive (the "Class Period"). Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants Adobe, Shantanu Narayen, John Murphy, Daniel Durn, David Wadhwani, and Jonathan Vaas (collectively, "Defendants"). Defendants Narayen, Murphy, Durn, Wadhwani, and Vaas are collectively referred to as the "Individual Defendants."

2.    Adobe is a software company that offers tools on a subscription basis for, among other things, sharing documents, editing pictures, and designing web pages.

1

3.     During the Class Period, Defendants repeatedly downplayed the competitive pressure Adobe was experiencing from companies like Figma, which provides a simple web-based tool for designing user interfaces.  Figma's success was exploding, as it reached a $10 billion valuation just before the beginning of the Class Period.  Despite this, Defendants cast Figma as merely a "point" player in the wider digital design market, and maintained that Figma's customers would eventually graduate (and switch) to Adobe's more advanced products.  In that vein, Defendants wrongly led investors to believe that Figma's only potential threat was as a minor disruption of Adobe's funnel for new paying customers, and they described Adobe's "Express" app—which focuses on video and photo editing—as a simple product that was successfully filling that role.  Meanwhile, Defendants concealed that Adobe's own user-interface design app, "XD," was the true competitor to Figma but was failing to gain traction with customers.

4.     In light of these misstatements, investors were stunned when, on September 15, 2022, Adobe announced that it would acquire Figma for $20 billion—double Figma's valuation from just one year prior and at a multiple of 50 times Figma's revenues.  With this announcement, investors learned for the first time that they had been misled:  Adobe management, in fact, saw Figma as not only a major competitor, but as an existential threat, and Adobe's own in-house products were not effectively serving their intended purpose.  The market sent Adobe's stock down nearly 17% and wiped out billions of dollars of investor value in a single trading day.

5.     Analysts quickly panned the deal as defensive and expensive.  One analyst noted that it was the highest revenue multiple ever paid for a software-as-a-service company, and another analyst opined that it was evidently better for Adobe to buy Figma than allow them to "create a bigger beachhead in the enterprise."  Yet another analyst said the deal was expensive even considering Figma's revenue growth.

6.     More recently, the U.K.'s Competition & Markets Authority (the "CMA") issued a report on August 7, 2023 confirming that Adobe viewed Figma as a competitive threat throughout the Class Period and that at the same time its own user-interface design product was a failure. Specifically, the report indicated that Figma competes directly with Adobe XD (not Express), is a clear market leader in design software, and is several times larger than any other supplier of "all-in-one" screen design software.  The report also found that Adobe shifted resources out of XD in favor of a new tool that, according to internal documents, encompassed a range of functionalities designed to compete directly with Figma and that Adobe had a large team of engineers working on the development of this tool until it was cancelled shortly before the announcement of the merger.  Further, the CMA report shows that Adobe's efforts in product-development were motivated, at least in part, by a desire to compete with Figma.  In that vein, the report noted that "Adobe's internal documents regularly reference competing with Figma and compare planned features to those offered by Figma."  As a result, the CMA determined Adobe and Figma to be "close competitors" in all-in-one screen design and that this competition would be lost as a result of the merger.

7.     As set forth herein, Plaintiffs and class members purchased Adobe common stock at artificially inflated prices created and/or maintained by Defendants' materially false or misleading statements and omissions throughout the Class Period.  When the truth concerning the Company was belatedly revealed to the market, Plaintiffs and class members suffered monetary damages.  This action seeks to recover those damages.

## II.    JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject

matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business in this District and a significant portion of the damages due to Defendants' misconduct were suffered within this District. Adobe also has office locations within this District at 1540 Broadway, 18th Floor New York, NY 10036 and 100 Fifth Avenue, New York, NY 10011. Further, Adobe's common stock trades on the NASDAQ, located within this District.

10.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

11.    Plaintiff Pembroke Pines Firefighters & Police Officers Pension Fund ("Pembroke Pines") is a public pension fund based in Pembroke Pines, Florida that provides firefighters, police and their families with income and benefits upon retirement.  Pembroke Pines was first established in 1981 by city ordinance.  As set forth in the certification attached to this complaint, Pembroke Pines purchased or otherwise acquired Adobe common stock during the Class Period and was damaged thereby.

12.    Plaintiff City of Hollywood Police Officers' Retirement System ("Hollywood Police") is a pension fund providing benefits to eligible police officers in Hollywood, Florida. Hollywood Police was created by the Board of Trustees of the Police Officers' Retirement System, which was first established in 1991 by city ordinance.  As set forth in the certification attached to

this complaint, Hollywood Police purchased or otherwise acquired Adobe common stock during the Class Period and was damaged thereby.

**B.    Defendants**

13.    Defendant Adobe is a Delaware corporation headquartered in San Jose, California. It currently has a public float of 454.3 million shares of common stock which trade on the NASDAQ under the ticker "ADBE."

14.    Defendant Shantanu Narayen is, and at all relevant times has been, Adobe's Chairman and Chief Executive Officer.  As described herein, Narayen made false and misleading statements during the Class Period.

15.    Defendant John Murphy was Adobe's Chief Financial Officer during the Class Period until October 18, 2021.  As described herein, Murphy made false and misleading statements during the Class Period.

16.    Defendant Daniel Durn is, and since October 18, 2021 has been, Adobe's Chief Financial Officer.  As described herein, Durn made false and misleading statements during the Class Period.

17.    Defendant David Wadhwani is, and at all relevant times has been, the President of Adobe's Digital Media reporting segment.  As described herein, Wadhwani made false and misleading statements during the Class Period.

18.    Defendant Jonathan Vaas is, and at all relevant times has been, Adobe's Vice President of Investor Relations.  As described herein, Vaas made false and misleading statements during the Class Period.

## IV.    COMPANY BACKGROUND

19.    Adobe creates software for document sharing and design.  The Company is perhaps best-known for creating the "portable document format" (or "PDF") file format and the "Acrobat" application for PDF editing, as well as for its "Photoshop" application for picture editing.

20.    The Company also has a suite of applications for various uses in design and video editing, including Express (for editing photos and videos), XD (for creating user interfaces in mobile and web applications), Illustrator (for vector graphics editing), InDesign (for desktop publishing and page layout design), Dreamweaver (for web development), and Premier (for video editing).  Adobe operates on a subscription model, selling access to its applications for a monthly fee.  It also bundles its design applications into a single "Creative Cloud" subscription.

21.    Adobe's Express and XD products, which are central to the allegations herein, fall under Adobe's Digital Media reporting segment.  At all relevant times, Defendant Wadhwani was (and continues to be) the President of Adobe's Digital Media business.

22.    Adobe faces competition from companies such as Canva and Figma.  Canva offers a graphic design platform for creating social media graphics and presentations.  Figma offers a web application that allows multiple users to view and edit user interfaces (sometimes referred to as "user experience design") in real time.  Figma's valuation exploded in recent years based on multiple rounds of funding, reaching $2 billion in April 2020 and $10 billion in June 2021.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

23.    During the Class Period, Defendants falsely downplayed competition from Figma and misleadingly suggested that Adobe's existing offerings were adequate to counter any harms the Company may have otherwise faced due to Figma's growing market position.

24.    The Class Period begins on July 23, 2021.  At a public investor question-and-answer session hosted by Scotiabank on that day, Jonathan Vaas, Adobe's Vice President of Investor Relations, stated:

> *For the creative business, there's not a competitor, a single competitor that has anything approaching the set of content creation apps across all of these different categories and media types that we have.*  So the answer to the question will be kind of drilling down into the particular point products and asking what are the other alternatives there.
>
> I think of -- in a general way, I would say if you look at competition in terms of every photograph that's taken in the world and how that photograph is edited, there's an ecosystem of free tools that people can use, and that kind of gets them started. That gets them interested in being content creators.  And those are -- from simple cropping and editing apps that are within an iPhone, for example, or simple editing apps that are on some web-based platforms.
>
> But once they're interested in being able to do more and take their content creation to the next level, they come to Adobe. Other competitors that monetize the tools -- so one place that we played in for years is the video editing space. That's one where Adobe Premiere is the clear leader.  Apple has been a competitor with a final product, not as much in the Pro segment anymore, but in the Hobbyist segment.
>
> * * *
>
> In terms of -- a newer category is experience design.  We think experience-led thinking, experience design product development is a paradigm that's going to continue to grow that category.  And that's a newer category where there's some other point solution providers, like InVision and Sketch and Figma.  I could go on and on.  *But effectively, in that business, a few of our products tend to have a few point players that compete with us.  But end-to-end, there's not really a major competitor.*

25.    On September 29, 2021, Adobe filed on Form 10-Q its quarterly report for the period ended September 3, 2021.  Therein, the Company stated:

> *Our competitive position and results of operations could be harmed if we do not compete effectively.*

7

The markets for our products and services are characterized by intense competition, new industry standards, evolving distribution models, limited barriers to entry, disruptive technology developments, short product life cycles, customer price sensitivity, global market conditions and frequent product introductions (including alternatives with limited functionality available at lower costs or free of charge). Any of these factors could create downward pressure on pricing and gross margins and could adversely affect our renewal and upsell and cross-sell rates, as well as our ability to attract new customers. Our future success will depend on our continued ability to enhance and integrate our existing products and services, introduce new products and services in a timely and cost-effective manner, meet changing customer expectations and needs, extend our core technology into new applications, and anticipate emerging standards, business models, software delivery methods and other technological developments. Furthermore, some of our competitors and potential competitors enjoy competitive advantages such as greater financial, technical, sales, marketing and other resources, broader brand awareness and access to larger customer bases. As a result of these advantages, potential and current customers might select the products and services of our competitors, causing a loss of our market share. In addition, consolidation has occurred among some of our competitors. Further consolidations in these markets may subject us to increased competitive pressures and may harm our results of operations.

* * *

**If we cannot continue to develop, acquire, market and offer new products and services or enhancements to existing products and services that meet customer requirements, our operating results could suffer.**

26.    The September 29, 2021 10-Q included certifications from Defendants Narayen and Murphy asserting that the report did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" by the report.

27.    On January 5, 2022, at an event hosted by Evercore ISI, Vaas again discussed competition from Figma in the following exchange:

[Analyst:] When you think about Canva or Figma, how do you -- how should investors sort of frame that? I mean, like, to me, they seem like market expander, sort of they're helping you all expand the market. I don't get the sense that these are competitors and sort of the enterprise or even the sort of group part of your business. . . .

Vaas: Yes. I think there's definitely -- when you look overall in the ecosystem in software, there are some things that other companies are doing that validate the explosiveness of these markets that we're competing in, right? And if you look at the TAM for Creative, that -- it's built up of Creative professionals where we said that's growing to $25 billion by 2024. That shows you how much runway there is just in that top end of the Creative professional market.

In the communicators bucket, that's growing now to north of $30 billion, and that's due to a number of things, but a lot of knowledge workers -- and like I said, people that just aren't expert in creativity, but have a story to tell, they're turning to creative tools rather than maybe -- they might have turned up to something like PowerPoint before for office presentations. And there are other companies that are expanding the market and kind of validating the enthusiasm and the spending potential for people that want to create content is very real out there.

I think until Creative Cloud Express was launched, we saw -- it was definitely more of a complementary situation where we would see people start out on simpler tools. And then when they're ready to do more and advance to high-fidelity content creation, they'd come over to Adobe. We've seen that since Microsoft Paint. We've seen that with simple content editors in social media platforms and on phones and some of these start-ups out there in the world.

I think with Creative Cloud Express, Adobe is making more of a strategic decision now to take all of the science that we've built and go down market and really compete, not just be the place they turn to when they're ready to do more, but the place they learn and start as well. And then we're building bridges from the point of entry, making it extremely simple to get started, all the way through much more complex creation like with Video and Premier and After Effects.

28.    Days later at an event hosted by Bank of America on January 11, 2022, Vaas once

more downplayed competition from Companies such as Figma or Canva:

[Analyst:] There's some high-profile private companies facing capital at high valuations, Canva and Figma. Have you seen these

2 offerings in the marketplace? When you think about the competitive landscape here, what are Adobe's strengths general? And maybe specific to those 2, how do you see those 2?

Vaas: Sure. Yes. When you look at a $63 billion TAM, I think more than any other company, that's Adobe's opportunity. There are definitely other point solution players, who have, I think, had a role in expanding that TAM as we see millions of new people really interested in content creation. Certainly, some other companies validating the secular tailwinds that are driving expansion in that market. *I would say almost to the company that I could think about, everyone else we see as a point solution provider*. They're a single product company that's found a niche with a growing universe of users. And there's some companies that have good momentum in that space.

*** 

With Creative Cloud Express, you can see that we now have democratized our own tools to the level that we want people to get started and begin their journey with Adobe. *And the big differentiation from us, this applies, you mentioned Figma, any other company, there are some competitors in video editing, for example. But they're all point solutions.*

*Whereas we have this cloud connected collaborative system of applications that all work together and we say creativity is a multiplayer sport.* And from the file types they use, to color templates and fonts, we have it all connected together in a way where there's bridges we build between creators and journeys for people to break out of simple templates and do more and do more.

*And so I don't see a competitor that sort of has anything approaching that end-to-end strategic position that Adobe does, but there's definitely other companies that are seeing the global enthusiasm around content creation. And I think overall, that's a good thing for Adobe and it's a good thing for the expanding market.*

29.    On January 20, 2022, David Wadhwani, Adobe's Digital Media President, spoke

at an industry event hosted by Wolfe Research, where he stated the following:

[Analyst]: [L]et's go with where the video kind of ended, which is Creative Cloud Express creativity for everyone. . . . And the #1 question I get, and I'm sure Mr. Vaas gets from most investors right now, particularly in light of the last quarter, really the second half of

last year, what about the competition?  What about Canva and Figma?  And aren't they -- for the first time -- not for the first time, the first time in recent memory Adobe has real competition, and they're taking share.  So let's talk about the key elements.  Both of you, VC backgrounds, not that long ago, saw these companies in the markets.   What is the competitive environment?   What is the answer? If it's an answer or if let's say an opportunity?  I want both of you individually to address this topic because I think it's one that's near and dear to investor hearts.

Wadhwani: Yes. . . . So at a high level, I think you have to look at, first of all, look at just the fundamentals of Adobe's business.  I mean we ended last year with adding almost $2 billion of net new ARR. So clearly, the foundation and the tailwind that's been driving us is there and has been consistently there for a long time.

Secondly, we guided our highest guide ever for FY '22 in the digital media business.  And that's the foundation of how we think about where we're going.  It's very consistent with the kinds of guides we've given historically and it gives you a sense of where we're going now.  Some of this, I think it's worth just sort of addressing directly comes from questions that we've had in the second half of the year and associated with sort of how people are interpreting the results we had.  And there is some episodic activity that is harder to predict with the pandemic.  We've talked a bunch about in the past things associated with summer travel.  We've talked about sort of some changes in terms of holiday season buying behavior.  But those are 2 episodic events that when you look at it in the context of the performance last year and you look at the -- in the context of the guide, really underscores how confident we are about the market opportunity ahead, right?

We also talked about recently how we're thinking about the market, which is different than what we've thought about before.  We really look at the creative professional market as one that's accelerating and growing very quickly.  We see this new creator economy for communicators coming out, and we said that's about a $30 billion, $34 billion market, I believe we said.  And we have a Document Cloud business that's also playing into this big TAM.  You add all that together, you have a $100 billion TAM that we're going after.

Now as a company like Adobe historically was playing in a smaller TAM and had a very large presence in that TAM.  As this TAM explodes, you should expect to see some competition participating in parts of that TAM.  ***The surface area is so significant, we should expect to see other entrants playing in and around similar areas. But I'm going to go back to where Scott was leaving off.  If you***

> *think about it in that context of the professional base, when you look at the fact that there are more creative pros needed in companies than ever before, that's obviously a big tailwind for us*.

30.    On January 21, 2022, Adobe filed on Form 10-K its annual report for the fiscal year ended December 3, 2021, in which the Company made the same statements about competition as those in its September 29, 2021 10-Q, as set forth above.  The January 21, 2022 10-K also included certifications by Defendants Narayen and Durn asserting that the report did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" by the report.

31.    On March 30, 2022, Adobe filed on Form 10-Q its quarterly report for the period ended March 4, 2022, in which the Company made the same statements about competition as those in its September 29, 2021 10-Q, as set forth above.  The March 30, 2022 10-Q also included certifications by Defendants Narayen and Durn asserting that the report did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" by the report.

32.    During Adobe's earnings call on June 16, 2022, Wadhwani stated:

> Where we see Express filling in is that Express is additive and broadens the reach in that new communicator base because of exactly what you're saying, the freemium business model, the zero-friction onboarding.  It's clearly showing that we're able to attract millions of new users into the franchise.  And we're able to do it very efficiently by optimizing how we onboard customers from search terms that typically were not ones that we focused on in the past.  We also look at the ability to onboard those users and differentiate the offering with the integration of these amazing features that we get from the desktop applications like Adobe Magic.  And all of this helps differentiate what we're doing with Express.

And if we take a step back and look at it from a business perspective, we feel very confident that Adobe Express and the way we actually pull people into that funnel is additive to the market opportunity that we're playing. So we are really emphasizing the ability to add more capabilities there and differentiate there.

I do also want to remind folks that Express is also available to core Creative Cloud customers. And by integrating some of those features into Express, we're enabling workflows between the core Creative Cloud products and also Express, and we believe that's going to have a strong retentive value on the core base. And we just had, in fact, a great quarter with very strong retention for Creative Cloud as well.

33.    On June 30, 2022, Adobe filed on Form 10-Q its quarterly report for the quarter ended June 4, 2021, in which the Company made the same statements about competition as those in its September 29, 2021 10-Q, as set forth above.  The June 30, 2022 10-Q also included certifications by Defendants Narayen and Durn asserting that the report did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" by the report.

34.    The statements in ¶¶ 23-33 above were materially false and misleading because they failed to disclose that:

(a)    Figma was growing its market share and was becoming a leader in user experience design;

(b)    Figma was in direct competition with Adobe on user experience design;

(c)    Adobe's product "Express" was not an effective counter to Figma's growing market share in bringing new customers to Adobe's paid offerings;

(d)    Adobe's other offerings were not succeeding in competing with Figma on user experience design; and

(e)     Adobe was losing market share to Figma.

## VI.    THE TRUTH IS REVEALED

35.     On September 15, 2022, Adobe announced that it had entered into an agreement to acquire Figma for $20 billion in cash and stock.  Analysts and the market recognized the deal for what it was: "defensive" (as stated by Evercore), "expensive" (as stated by Credit Suisse), and a contradiction of the Company's Class Period statements downplaying Figma's competitive position.  Evercore wrote in a report that day that Adobe was evidently "losing some momentum to Figma and it was better to buy them out and combine forces" than to allow Figma "to create a bigger beachhead in the enterprise."  Credit Suisse observed in its own report that the deal was priced so high, it represented the highest revenue multiple ever paid for a scaled software-as-a-service company.  BMO Capital Markets also noted that the deal is expensive "even considering Figma's ~100% ARR growth this year."  Yet another market commentator said that the price is "way above any rational valuation of Figma" and that the deal reflects management's desire to remove a "strategic threat in the making."

36.     On news of the deal, the price of Adobe stock fell $62.39 per share, or nearly 17%, from a close of $371.52 per share on September 14, 2022, to close at $309.13 on September 15, 2022.  That drop caused the Company's market capitalization value to fall a massive $28.9 billion.

37.     After the end of the Class Period, on August 7, 2023, the CMA issued a damning report showing that Adobe lied throughout the Class Period about Figma and Adobe's failed attempts to compete.  The report explained that Adobe viewed XD—not Express—as its answer to Figma, as both XD and Figma "offer all-in-one screen design."  However, by October 2021, Adobe had removed more than one hundred positions from Adobe XD (constituting the "vast majority" of XD's engineering resources), and in February 2022 it placed XD into "maintenance mode" (Adobe's "process for deprioritizing products until they eventually become deprecated, lose

14

their customer base, or are phased out").  The majority of employees removed from Adobe XD were moved to "Project Spice," Adobe's next generation web-based screen design software which was created specifically to "challenge Figma's market leading position."  Even with the added resources, however, Project Spice suffered from "significant delays" and in early September 2022—only a week before the Figma deal was announced—Adobe internally communicated its decision to abandon Project Spice altogether.

## VII.    SCIENTER

38.    Defendants acted with scienter because they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Adobe, and their control over and/or receipt and/or modification of Adobe's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

39.    Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

40.    The Individual Defendants, because of their positions with Adobe, controlled the contents of Adobe's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause

it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of Adobe corporate statements and is, therefore, responsible and liable for the representations contained therein.

41.     As the CMA report also makes clear, Defendants knew that Figma was gaining a "leading market position" but Adobe's products were failing to effectively compete.  Early in the Class Period in October 2021, the Company moved more than one hundred employees from Adobe XD, which the Company internally viewed as its chief product in competition with Figma.  Months later, the Company began phasing XD out altogether.  Adobe also secretly set up "Project Spice," an initiative created specifically to challenge Figma, but abandoned that project too before announcing its decision to buy Figma.  Meanwhile, Defendants spoke repeatedly during the Class Period about Figma, its competitive role, why it did not pose a serious challenge to Adobe, and how Express was Adobe's answer to companies like Figma.  By speaking about these issues with such frequency and depth, Defendants evidenced their own intimate understanding of the underlying facts.  Relatedly, Defendants, as Adobe's top executives, would have been uniquely aware of the Company's internal views on Figma as a competitor, and Adobe's strategy for responding to Figma's rising position in the market.  Even so, Defendants proffered the false narrative that Figma was not a significant competitive threat to Adobe, and that Adobe's own products were succeeding in funneling new customers to Adobe's paid offerings.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

42.     Plaintiffs and other Class members were damaged as a result of Defendants' fraudulent conduct as alleged herein.  During the Class Period, Defendants engaged in a scheme

to deceive investors by issuing a series of material misrepresentations and omitting material facts, trends, commitments and uncertainties required to be disclosed, relating to, *inter alia*: (i) Figma's increasing market share; and (ii) Adobe's failure to effectively compete with Figma.

43.     As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of Adobe's common stock was artificially inflated throughout the Class Period.

44.     Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Adobe stock at artificially inflated prices on the NASDAQ.   But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiffs and other Class members would not have purchased Adobe stock at the artificially inflated prices at which it traded during the Class Period.

45.     The truth regarding Defendants' fraud was revealed in a corrective disclosure and/or materialization of concealed risk that occurred on September 15, 2022.  In response to this corrective disclosure, Adobe's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct was removed from Adobe's stock price.

46.     The decline in Adobe's stock price following the corrective disclosure is directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

47.     Plaintiffs and other Class members suffered economic losses as the price of Adobe's stock fell in response to the corrective disclosure and/or the materialization of concealed risks.  It was foreseeable that such disclosure would cause Adobe's stock price to decline.  Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members.

IX.    **PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE**

48.    At all relevant times, the market for Adobe common stock was open and efficient for the following reasons, among others: (i) Adobe common stock met the requirements for listing on, and was listed and actively traded on, the NASDAQ under the ticker symbol "ADBE"; (ii) as a registered and regulated issuer of securities Adobe filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) Adobe regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iv) Adobe was followed by numerous securities analysts employed by major brokerage firms, including Deutsche Bank, RBC, Credit Suisse, Barclays, and UBS, who wrote reports that were distributed to the customers of their respective brokerage firms; (v) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Adobe's common stock; and (vi) without knowledge of the misrepresented or omitted facts, Plaintiffs and Class members purchased or otherwise acquired Adobe common stock between the time Adobe made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of Adobe's common stock was artificially inflated by Defendants' material misrepresentations and omissions.

49.    As a result of the foregoing, the market for Adobe common stock promptly digested current information regarding Adobe from all publicly available sources and the price of Adobe's stock reflected such information.  Based upon the materially false or misleading statements and omissions of material fact alleged herein, Adobe common stock traded at prices in excess of its true value during the Class Period.  Plaintiffs and other Class members purchased or otherwise

acquired Adobe common stock relying upon the integrity of the market price of Adobe common stock and other market information relating to Adobe.

50.     Under these circumstances, Plaintiffs and other Class members, as purchasers or acquirers of Adobe common stock at artificially-inflated prices during the Class Period, suffered similar injuries and a presumption of reliance under the fraud-on-the-market doctrine applies.

51.     Further, at all relevant times, Plaintiffs and other Class members relied on Defendants to disclose material information as required by law.  Plaintiffs and other Class members would not have purchased or otherwise acquired Adobe common stock at artificially inflated prices if Defendants had disclosed all material information as required by law.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## X.     THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

52.     The Private Securities Litigation Reform Act's statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

53.     None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

54.     To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof.  As set forth above, given the then-

existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

55.    To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of Adobe who knew that the forward-looking statement was materially false or misleading.

## XI.    CLASS ACTION ALLEGATIONS

56.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Adobe between July 23, 2021 and September 15, 2022.

57.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Adobe, members of Adobe's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of Adobe.

58.    The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Adobe's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class. Class members may be identified

from records maintained by Adobe or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

59.     Plaintiffs' claims are typical of Class members' claims, as all Class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

60.     Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

61.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about Adobe's business, operations, and management; (iii) to what extent Class members have sustained damages; and (iv) the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    CAUSES OF ACTION

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

63.     Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This claim is brought against Defendants pursuant to Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

64.    During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiffs; (ii) cause the market price of Adobe common stock to trade above its true value; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire Adobe common stock at artificially inflated prices that did not reflect the stock's true value during the Class Period.  In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

65.    While in possession of material adverse non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Adobe common stock, in violation of Section 10(b) and Rule 10b-5.  Defendants are alleged as primary participants in the wrongful conduct alleged herein.

66.    Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein in that they failed to disclose such facts, even though such facts were readily available to them, if not known.  Defendants' material

misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding Adobe's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

67.     As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already in the market price of Adobe common stock during the Class Period.  Relying directly or indirectly upon the materially false or misleading statements made by Defendants and on the efficiency and integrity of the market in which the Company's common stock trades, and upon the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed by Defendants, Plaintiffs and other Class members purchased or otherwise acquired Adobe common stock during the Class Period at artificially inflated prices.  As the previously misrepresented and/or concealed material facts eventually emerged, the price of Adobe common stock substantially declined, causing losses to Plaintiffs and other Class members.

68.     At the time of the material misrepresentations and omissions alleged herein, Plaintiffs and other Class members were not aware of their falsity and believed them to be true. Had Plaintiffs and other Class members known the relevant truth regarding Adobe's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiffs and other Class members would not have purchased or otherwise acquired Adobe common stock at artificially-inflated prices.

69.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

70.    Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This claim is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

71.    Prior to and during the Class Period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning Adobe, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

72.    In their respective roles, the Individual Defendants had regular access to non-public information about Adobe's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of Adobe's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

73.    Each of the Individual Defendants was a controlling person of Adobe within the meaning of Section 20(a), as alleged herein.  By virtue of their high-level positions, their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiffs allege were materially false or misleading.

74.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Adobe common stock during the Class Period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) set forth above.  The scheme: (i) deceived the investing public regarding Adobe's operations and the true value of Adobe's common stock; and (ii) caused Plaintiffs and other Class members to purchase Adobe common stock at artificially inflated prices, which plummeted in value as the truth concerning Adobe's competitive challenges was revealed.

75.     The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Plaintiffs allege were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be corrected.  In particular, the Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein and exercised the same.

76.     As set forth above, Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Section 10(b) and Rule 10b-5, the Individual Defendants are liable under Section 20(a).  As a direct and proximate result of the Individual Defendants' culpable conduct, Plaintiffs and other Class members suffered damages in connection with their transactions in Adobe's common stock during the Class Period.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, including:

1.    Certification of this action as a class action;

2.    Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

3.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

4.    Awarding Plaintiffs their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

5.    Awarding such other and further relief as may be just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: October 20, 2023                    Respectfully submitted,

*/s/ Daniel L. Berger*
**GRANT & EISENHOFER, P.A.**
Daniel L. Berger
Caitlin M. Moyna
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8501
dberger@gelaw.com
cmoyna@gelaw.com

*Counsel for Plaintiffs and Proposed Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
7080 NW 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

*Additional counsel for Plaintiffs*

## CERTIFICATION OF PEMBROKE PINES
## FIREFIGHTERS & POLICE OFFICERS PENSION FUND

I, James Fisher, on behalf of the Pembroke Pines Firefighters & Police Officers Pension Fund ("Pembroke F&P") certify pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4 as follows:

1.     I am the Administrator of Pembroke F&P and I have reviewed the complaint and am duly authorized to make this certification.

2.     Pembroke F&P did not purchase or acquire Adobe, Inc. common stock at the direction of counsel or in order to participate in any private action.

3.     Pembroke F&P is willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

4.     Attached as Schedule A to this Certification is a list of Pembroke F&P's transactions during the period of July 23, 2021 through September 15, 2022, inclusive, in the common stock that are the subject of the above-captioned action.

5.     During the three-year period preceding the date of this certification, Pembroke F&P has sought to serve as a representative party on behalf of a class asserting claims under the federal securities laws as follows:

- *Gen Ret. Sys. of the City of Detroit v. Verizon Communications*, 3:23-cv-5218 (D.N.J.)
- *Pembroke Pines F&P v. Integra Life Sciences*, 23-cv-20321 (D. N.J.)
- *Jastram v. NextEra Energy, Inc. et al.*, 23-cv-80833 (S.D. Fla.)
- *Pembroke Pines F&P v. Abbott Laboratories*, 22-cv-4661 (N.D. Ill.)
- *Failee Jr. v. AdaptHealth Corp.*, 21-cv-3382 (E.D. Pa.)
- *In re Citigroup Sec. Litig.*, 20-cv-9132 (S.D.N.Y.)
- *City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.,* 2:19-cv-5530 (E.D.N.Y.)
- *Plymouth County Ret. Sys. v. Patterson Companies, Inc.*, 18-cv-871 (D. Minn.)

6.     Pembroke F&P will not accept any payment for serving as a representative party on behalf of the proposed class beyond their pro rata share of any recovery, except as ordered or approved by the court.

1

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 20 day of October, 2023.

_____
James Fisher, Administrator
*Pembroke Pines F&P Officers' Pension Fund*

## Adobe, Inc. -- Schedule A
## Pembroke Pines Firefighters & Police Officers Pension Fund

**Cusip:**          00724F101
**Ticker:**          ADBE
**Class Period:**   July 23, 2021 through September 15, 2022

**Beginning Holdings:** 0 shares

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| **Trade Date** | **Quantity** | **Price** | | **Trade Date** | **Quantity** | **Price** |
| 10/07/21 | 1,824 | $578.50 | | 12/16/21 | 1,824 | $582.26 |
| 01/12/22 | 2,110 | $534.77 | | 03/16/22 | 1,189 | $437.52 |
| 01/27/22 | 1,107 | $486.50 | | 06/15/22 | 914 | $378.28 |
| 03/16/22 | 5,744 | $436.75 | | | | |
| 03/23/22 | 244 | $423.12 | | | | |
| 03/24/22 | 315 | $428.30 | | | | |
| 03/25/22 | 366 | $430.90 | | | | |
| 03/28/22 | 412 | $444.24 | | | | |
| 03/29/22 | 489 | $458.88 | | | | |
| 03/29/22 | 43 | $457.15 | | | | |
| 03/30/22 | 403 | $461.49 | | | | |
| 05/04/22 | 89 | $400.88 | | | | |
| 07/12/22 | 1,112 | $388.21 | | | | |

## CERTIFICATION OF THE CITY OF HOLLYWOOD
## POLICE OFFICERS' RETIREMENT SYSTEM

I, David Strauss, on behalf of the City of Hollywood Police Officers' Retirement System ("Hollywood Police") certify pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4 as follows:

1.       I am Chairman of the Hollywood Police and I have reviewed the complaint and am duly authorized to make this certification.

2.       Hollywood Police did not purchase or acquire Adobe Inc. common stock at the direction of counsel or in order to participate in any private action.

3.       Hollywood Police is willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

4.       Attached as Schedule A to this Certification is a list of Hollywood Police's transactions during the period of July 23, 2021 through September 15, 2022, inclusive, in the common stock that are the subject of the above-captioned action.

5.       During the three-year period preceding the date of this certification, Hollywood Police has sought to serve as a representative party on behalf of a class asserting claims under the federal securities laws as follows:

- *Jastram v. NextEra Energy, Inc. et al.*, 23-cv-80833 (S.D. Fla.)
- *City of Hollywood Police Officers v. Citrix Systems, Inc.*, 21-cv-62380 (S.D. Fla.)

6.       Hollywood Police will not accept any payment for serving as a representative party on behalf of the proposed class beyond their pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 20th day of October, 2023.

_____
David Strauss, Chairman
*City of Hollywood Police Officers' Retirement System*

**Adobe, Inc. -- Schedule A**
**City of Hollywood Police Officers' Retirement System**

**Cusip:** 00724F101
**Ticker:** ADBE
**Class Period:** July 23, 2021 through September 15, 2022

**Beginning Holdings:** 0 shares

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Trade Date | Quantity | Price | | Trade Date | Quantity | Price |
| 10/07/21 | 1,580 | $578.50 | | 12/16/21 | 1,580 | $582.26 |
| 01/12/22 | 1,828 | $534.77 | | 03/16/22 | 1,031 | $437.52 |
| 01/27/22 | 960 | $486.50 | | 04/20/22 | 100 | $431.25 |
| 05/04/22 | 71 | $400.88 | | 06/15/22 | 757 | $378.28 |
| 07/12/22 | 907 | $388.21 | | | | |