UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re ADOBE INC. SECURITIES
LITIGATION

————————————————————

This Document Relates To:

    ALL ACTIONS.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:23-cv-09260-JGK

<u>CLASS ACTION</u>

DEMAND FOR JURY TRIAL

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

I.      NATURE OF THE ACTION ............................................................................1

II.     JURISDICTION AND VENUE .....................................................................9

III.    PARTIES .........................................................................................................10

        A.      Lead Plaintiff Menora and Lead Plaintiff PPF ..................................10

        B.      Defendants .........................................................................................10

                1.      Adobe .....................................................................................10

                2.      The Individual Defendants......................................................10

IV.     SUBSTANTIVE ALLEGATIONS ...............................................................12

        A.      The Digital Media Segment Drives Adobe's Revenues and Reflects the
                Importance of Creative Products—Including Adobe XD, Photoshop and
                Illustrator—to Adobe's Performance and Prospects..............................12

        B.      Realizing that UI/UX Digital Design Represents A Unique Opportunity,
                Adobe Retools Its Flagship Products—Photoshop and Illustrator—and
                Promotes Adobe XD in an Attempt to Compete in that Market...........14

                1.      Adobe Publicly Recognized the Importance of the UI/UX Digital
                        Product Design Industry to Its Current and Future Business....................14

                2.      Adobe Privately Recognized that Figma Competed Not Just with
                        XD, but Also with Photoshop and Illustrator.............................16

        C.      Defendants Downplay Competition from Figma—Characterizing It as a
                "Point Player"—While Implementing Plans to Wind Down XD, Divert
                Resources to Project Spice, and Retool Photoshop and Illustrator in Direct
                Response to the Figma Threat.................................................................23

                1.      Defendants Misrepresented and Concealed Material Information
                        Regarding Adobe's Competitive Position and the Threat Figma
                        Posed to the Digital Media Business .........................................23

                        a.      Scotiabank's July 23, 2021 Question-And-Answer Session..........23

                        b.      The October 26, 2021 Belsky Interview, 2021 Adobe MAX
                                Conference, and XD Ecosystem Update........................................27

                                (1)     *The Verge's* October 26, 2021 Interview of Belsky ..........27

                                (2)     The 2021 Adobe MAX Conference....................................30

                                (3)     The MAX 2021 XD Ecosystem Update ............................31

(4) The October 26, 2021 Representations Were False and Misleading for the Same Reasons ...............................32

c. The 3Q21 Form 10-Q, filed September 29, 2021 .........................33

d. The December 13, 2021 Press Release ...........................35

e. The December 16, 2021 Form 8-K, 4Q21 Earnings Press Release, Presentation Materials, and Conference Call .................36

f. The January 5, 2022 Evercore ISI Institutional Equities Bus Tour Conference Call....................................................43

g. The January 11, 2022 Bank of America Software New Year Bus Tour Conference Call .............................................45

h. The January 20, 2022 Wolfe Research Fireside Chat Conference Call ......................................................47

i. The 2021 Form 10-K, filed January 21, 2022...............................50

j. The March 22, 2022 1Q22 Earnings Conference Call..................52

k. The 1Q22 Form 10-Q, filed March 30, 2022................................54

l. The April 8, 2022 Bernstein Conference Call ..............................55

m. The May 23, 2022 Bloomberg Interview of Narayen...................56

n. The June 16, 2022 2Q22 Earnings Conference Call.....................57

o. The 2Q22 Form 10-Q, filed June 29, 2022..................................59

p. The August 25, 2022 *CNBC* Statements........................................60

q. The September 15, 2022 Press Releases, Presentation and Earnings and Merger Conference Call...........................................60

2. Adobe Misleadingly Promoted XD as a Viable and Developing Product During the Class Period Despite Defendants' Decision to Disinvest and Knowledge It Could Not Compete With Figma ................65

3. SEC Filings that Described the Most Significant Risks Facing Adobe Falsely and Misleadingly Portrayed as Hypothetical Issues That Were Then Affecting the Company.....................................................70

D. Wadhwani's Involvement in Greylock Led to Adobe's Latest and Only Successful Offer to Acquire Figma, Elevating His Profile at Adobe While Offering Greylock Extraordinary Investment Returns ...........................................76

E.     The Announcement of the Figma Transaction Exposes Adobe's Inability to Organically Compete with Figma and Figma's Competitive Threat to Adobe's Core Products, Decimating Adobe's Stock Price and Erasing Billions of Dollars in Market Capitalization...........................................................80

     1.     Analysts Viewed the Transaction as Adobe's Effort to Eliminate Competition from Figma and Compensate for a Lack of Organic Growth in the Market that Figma Dominated............................................82

     2.     Like Analyst Reports, Media Reports Also Confirm that Adobe Pursued the Merger Because It Could not Effectively Compete Against Figma and Sought to Insulate Its Flagship Applications.............88

F.     After Announcing the Merger, Defendants and Other Adobe Executives Reveal that Adobe Ceased Developing XD Long Ago and Confirm that It Had No Program to Compete With Figma, Causing Further Stock Price Declines As Defendants Try to Assuage Analyst and Investor Concerns............91

G.     The Artificially Inflated Stock Price Enables Insiders, Including Some Individual Defendants, to Reap Millions of Dollars in Benefits, As Adobe Plans to Fund Half of the Merger Price—$10 Billion—With Its Stock...............96

H.     As Regulatory Scrutiny of the Merger Intensifies, Adobe Admits that It Could Not Compete with Figma, and XD Failed, During the Class Period........101

     1.     The DOJ Conducts an Extensive Investigation as Rumors Swirl that It, and Possibly Also the FTC, May Try to Block the Merger..........102

     2.     The CMA's Investigation Proves that Adobe Misled Investors About Competition from Figma and the Status of Adobe XD................104

     3.     The EC and JFTC Also Investigate the Merger's Possible Impact on Competition, With the EC Focusing on Adobe XD..........................110

V.     ADDITIONAL SCIENTER ALLEGATIONS................................................................111

VI.     LOSS CAUSATION AND ECONOMIC LOSS............................................................117

VII.     A PRESUMPTION OF RELIANCE APPLIES ...........................................................118

VIII.     NO PROTECTION INSULATES DEFENDANTS FROM LIABILITY ......................119

IX.     CLASS ACTION ALLEGATIONS ..............................................................................119

X.     CLAIMS ..........................................................................................................................121

     A.     COUNT ONE: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ...........................................................121

    B.      COUNT TWO: Violation of Section 20(a) of the Exchange Act Against
the Individual Defendants ........................................................................122

XI.     PRAYER FOR RELIEF ................................................................................123

XII.    JURY TRIAL DEMAND ..............................................................................124

Lead Plaintiffs Menora Mivtachim Insurance Ltd. and Menora Mivtachim Pensions & Gemel Ltd. (collectively, "Menora") and Lead Plaintiff Stichting Philips Pensioenfonds ("PPF"), by and through the undersigned counsel, allege the following based on personal knowledge as to themselves and their own acts, and for all other allegations based upon the investigation undertaken by Lead Counsel, which included, but was not limited to, reviewing and analyzing: (a) public filings made by Adobe Inc. ("Adobe" or "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and other public statements issued by Adobe and other Defendants named herein; (c) materials prepared and made available publicly by regulators outside of the United States, including the European Commission ("EC") and United Kingdom Competition and Markets Authority ("CMA"); (d) securities and financial analysts' research reports and media and news reports on Adobe, media reports on Figma, Inc. ("Figma"), and reports on the user interface and user experience ("UI/UX") software design tools industry; and (e) transcripts of Adobe's earnings and other investor and analyst conference calls. Menora and PPF believe that substantial additional evidentiary support exists for the allegations set forth herein, which further support will be uncovered after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This putative securities class action is brought on behalf of all persons and entities who purchased or otherwise acquired Adobe common stock between July 23, 2021 and September 22, 2022, inclusive ("Class Period"), and asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5, against Adobe and Shantanu Narayen ("Narayen"), John Murphy ("Murphy"), Daniel Durn ("Durn"), David Wadhwani ("Wadhwani"), Scott Belsky ("Belsky"), and Jonathan Vaas ("Vaas") (collectively, the "Individual Defendants," and with Adobe, "Defendants").

2.      This action involves Defendants' fraudulent scheme to conceal the competitive threat Adobe faced from Figma.  Privately, Defendants feared the significant threat Figma posed not just to Adobe's UI/UX design tool, Adobe XD, but also to its flagship products, Photoshop and Illustrator. To address this threat, Defendants secretly worked throughout the Class Period to acquire Figma, offering a shocking $20 billion—the highest price ever paid in a deal of its kind—after two recent overtures were rejected.  The announcement of the proposed merger destroyed $30 billion of market capitalization as Adobe investors began to realize the true scope of Figma's competitive threat and the Company's inability to organically gain share in Figma's expanding market.

3.      Adobe is a software company that offers a range of productivity and digital design applications on a subscription basis for, among other things, sharing documents, editing pictures, and designing webpages.  Over the years, Adobe transitioned its business from developing and selling perpetual licenses for standalone applications into offering a bundled suite of "cloud"-based tools, available with paid subscriptions, for casual and professional designers.  Although Adobe continued to offer one-off applications for subscription, its focus during the Class Period was—and even today, is—promoting its so-called Creative Cloud subscription bundle of applications.

4.      By the start of the Class Period, however, Defendants understood that Adobe's efforts to lead the market for UI/UX design tools were failing.  Smaller specialized companies, like Canva and Figma, were pulling market share away from Adobe and dramatically growing their user-bases, as their cutting-edge and unbundled offerings—some of which were browser-based and available for free—enticed paid Adobe subscribers with simplicity, functionality, and lower or nonexistent costs. Figma also competed with Adobe's flagship products, Illustrator (a vector editing tool) and Photoshop (a raster editing tool).  Indeed, Defendants understood that Figma's strong position in the UI/UX design tools market and potent combination of web-based access and superior collaborative

functionality—both of which Adobe lacked—posed a significant threat to the continued success of Illustrator and Photoshop.

5.      Yet Adobe represented that Canva and Figma were not threats to its business, going so far as to describe Figma as a "point" player—*i.e.*, a developer whose program performs a limited or singular function—while downplaying competition and embellishing the success of two of its main design offerings, Adobe Express and Adobe XD.  These representations artificially inflated Adobe's stock price, allowing insiders—including some Individual Defendants—to sell more than $130 million in stock.  Adobe's artificially inflated trading price also exponentially increased the value of the stock it planned to use as consideration—$10 billion worth—to fund half of the purchase price of Figma in the merger.

6.      In truth, Adobe saw the writing on the wall years earlier as its Adobe XD product was faltering, privately offering to acquire Figma no less than twice before in recent years—first in early 2020, and again in early 2021.  Indeed, Adobe had even tried to buy Figma years before that, shortly after Figma debuted a competing design program.  But Figma rebuffed those efforts, electing to stay independent and privately owned.  That all changed after Wadhwani joined Adobe in June 2021 as Chief Business Officer and Executive Vice President of its Digital Media business—and soon after, in December 2021, became President of Digital Media and the third highest-paid executive at Adobe (and also a named executive officer described in SEC filings).  Unbeknownst to Adobe shareholders, Wadhwani was then also (and even now, is) a Venture Partner at Greylock Partners ("Greylock")—a significant financial backer and preferred shareholder of Figma—where he identified, negotiated, and structured investment opportunities for himself and Greylock.

7.      Contrary to their favorable Class Period representations regarding Adobe's ability to compete in the industry and the success of its Express and XD products, Wadhwani and the other Defendants knew Adobe required a transformative acquisition to shore up its design applications

business, particularly for UI/UX tools. Acquiring Figma offered that opportunity, which was so important that Adobe agreed to overpay for it substantially: instead of building their own successful product, they would buy it and, in doing so, eliminate the competition. In September 2022, Adobe announced plans to acquire Figma—plans that Wadhwani set in motion several months earlier when he contacted Figma co-founder and CEO, Dylan Field, whom he met through Greylock. By then, Defendants had already decided to decommission XD, privately "disinvesting" it in October 2021 and quietly placing it in "maintenance mode"—a status signaling the end of development—in February 2022, shortly after Wadhwani joined Adobe and months before announcing the Figma deal.

8.    Yet Adobe continued to publicly promote XD as an active and successful product—even issuing tweets from an "Adobe XD" account on Twitter to (falsely) establish its viability—and downplayed the threat from Figma during that period, despite the fact that Adobe internally adopted a policy no later than March 2022 to "actively discourage" use of XD. Moreover, Adobe had long internally acknowledged the significant threat Figma posed to Illustrator and Photoshop. In fact, during the Class Period, but concealed from investors, Adobe undertook a detailed analysis of Figma's competition with Illustrator and Photoshop, developed web-based versions of these flagship products, and even began developing a replacement for XD in the form of an entirely new web-based design product with vector and raster editing capabilities called "Project Spice"—all of which were direct responses to the intensifying threat from Figma's web-based product. Nonetheless, as noted above, Adobe unabashedly characterized Figma as a mere "point player" to publicly minimize the competitive threat from Figma that it so privately feared.

9.    Reflecting the significance of the transaction, Adobe agreed to pay $20 billion in cash and stock, split evenly, to acquire Figma—*i.e.*, nearly 12% of Adobe's market capitalization, double Figma's valuation as recently as its 2021 funding round at the height of the tech bubble, and about 50 times Figma's annual recurring revenue. This was by far the largest transaction in Adobe's 40-

year history, exceeding the value of its next-largest deal by a multiple of four and breaking from the Company's history of conservative, smaller acquisitions. The deal reportedly solidified Wadhwani's status as heir-apparent to the CEO and no doubt elevated his status (and possibly his financial stake) at Greylock. But the price of the merger attracted immense attention, with one commentator calling it "unconscionable" and describing it as "way above any rational valuation of Figma."

10.    Investors and analysts quickly saw the expensive and defensive deal for what it was: they realized that Adobe viewed Figma as a major competitor whose acquisition was necessary to mitigate slipping market share in the design industry and the failing XD UI/UX design tool, while protecting Adobe's flagship products by defending against a loss of market share to Figma on that front also. This realization caused the stock price to plummet to $309.13 per share—a $62.39, or nearly 17%, decline—on September 15, 2022 on extraordinarily high volume of over 27.8 million shares traded. The selloff erased $30 billion dollars in Adobe's market capitalization, making it the worst-performing trading day for the Company since 2010 and qualifying the Company as the worst-performing company in the S&P 500 that day.

11.    Immediately after the announcement, analysts expressed concern over the price and implications of the transaction, which represented a dramatic departure from Adobe's prior merger-and-acquisition activity ("M&A"), and they recognized it would eliminate competition in the UI/UX design tools industry. In reports on September 15, 2022, for example: (a) Evercore ISI wrote that "it feels like Adobe was losing some momentum to Figma and it was better to buy them" to "remove[] the only real competitive threat to Adobe"; (b) BMO Capital Markets noted "the deal price, dilution and timing raise more questions about competition and durable growth potential of Creative Cloud," prompting it to "explor[e] how much overlap there is between Figma and current Adobe assets such as XD, Frame, and Workfront"; (c) Credit Suisse wrote that the deal "represents the highest multiple ever paid for a scaled SaaS company"; and (d) Jefferies said "[t]he high price . . . rais[ed] questions

about whether ADBE was compelled to make a defensive move due to cracks in the core and about how long it will take to reach payback." Other analysts acknowledged that "investors were stunned" and "skeptical" about Figma's valuation, which strongly suggested that the deal—which was a "big surprise"—was "defensive."

12.     Analysts continued to comment on the merger on September 16, 2022, prompting further declines in Adobe's stock price. In reports issued that day, for example: (a) Bank of America recognized that "the steep valuation . . . suggests that Figma was a formidable competitive threat"; (b) Deutsche Bank said the "negative market reaction . . . reflects concerns around the core Creative business in light of the timing and multiple" and the deal "appears more defensive than offensive"; (c) Morgan Stanley noted that the "high-priced . . . take out of an emerging competitor stoked latent investor concerns around organic growth, and that "[d]espite assets like XD" and others, "Adobe likely struggled to get into the space organically"; and (d) Evercore ISI observed that "it is difficult to justify the price" when "software valuations are dropping almost daily." On September 16, 2022, as analysts and investors digested news about the merger and the Company's inability to compete against Figma, the stock price declined by $9.63 per share—an over 3% drop—to $299.50 per share, on elevated volume of almost 15 million shares traded.

13.     As Defendants mounted a vigorous public defense of the proposed merger in the days following its announcement, they further revealed the extent of XD's failure and Adobe's inability to compete in the design tools market, sending Adobe's stock price down even further. On September 17, 2022, an article in *The Verge* reported that the Company "has been winding down its investment in Adobe XD"—a fact that Defendants had not previously revealed, which the article attributed to Belsky. In the article, Belsky confirmed Adobe's belief that Figma's addressable market "'was a big opportunity'" and thus important to the Company, but revealed for the first time that Adobe then had only a "'tiny team' supporting XD for its existing customers." In response to this news, which was

widely reported, Adobe's stock price declined further: on September 19, 2022 (the next trading day), the price dropped by $3.44 (or 1.15%) to close at $296.06; on September 20, 2022, the price dropped by $5.00 (or 1.69%) to close at $291.06; and on September 21, 2022, the price dropped by $4.76 (or 1.64%) to close at $286.30.

14.     On September 23, 2022, *Axios* published an article entitled "Adobe defends its $20 billion deal for Figma," in which Adobe General Counsel Dana Rao ("Rao") conceded that "XD just wasn't cutting it" because it lacked "cloud-based tools for real-time multi-user collaboration." According to Rao: "After seven years of investment, Adobe XD was bringing in just $15 million in annual recurring revenue on a standalone basis—a minuscule fraction of Figma's $400 million annual recurring revenue." He also revealed that "Adobe has essentially put XD on ice, assigning just 20 employees to the product in what it sees as 'maintenance mode.'" As the article reported, Figma, by contrast, "has more than 800 people." As the market digested this information, Adobe's stock price declined further, dropping $2.50 per share (nearly 1%) on September 23, 2022 (when it closed at $284.56) and $7.60 per share (2.67%) on September 26, 2022 (the next trading day, when it closed at $276.96).

15.     The transaction also roiled regulators, foreign and domestic, who believed the deal might stifle competition in the market for digital design applications. Among those regulators were the CMA, EC, Japan Fair Trade Commission ("JFTC"), U.S. Department of Justice ("DOJ"), and Federal Trade Commission ("FTC"). Based on an extensive investigation involving internal Adobe and Figma documents and testimony from their executives, the CMA issued provisional conclusions that the proposed transaction would harm competition in the global market for all-in-one product design software for professional users (*i.e.*, Adobe XD's supposed core market), the global market for vector editing software (*i.e.*, Illustrator's core market), and the global market for raster editing software (*i.e.*, Photoshop's core market). The months-long CMA investigation also resulted in a

finding that Adobe management privately viewed Figma as a significant competitive threat to its core business. The CMA set forth its findings in a 460-page Provisional Findings Report, dated November 28, 2023 ("November 2023 Report").

16.    Specifically, the November 2023 Report indicated that, unbeknownst to the market, Adobe was decommissioning XD as early as October 2021. At the same time, Adobe diverted more than 100 employees and major engineering resources from XD to "Project Spice"—the internal project to develop a new product, modeled after Figma, which Adobe abandoned in September 2022 as negotiations were coming to a close on the Figma deal. As the November 2023 Report indicated, Adobe staffed only 18 employees on XD during 2022—a fact that Rao himself admitted shortly after the deal's announcement. Adobe even told the CMA that XD was never a viable competitor to Figma's tools and that it had no plans to enter what it called the "product design space" absent the merger—a decision no doubt involving the Individual Defendants. Citing internal documents and testimony from senior Adobe executives (including certain Individual Defendants), the November 2023 Report reported that Adobe perceived Figma as a threat to Illustrator and Photoshop long before the merger—and continued to consider Figma a threat to these core products until the merger was agreed upon.

17.    Faced with the CMA's findings and following a meeting with high-level officials from the DOJ, Adobe was forced to terminate the transaction and to make a $1 billion payment to Figma for doing so. But the damage was already done: investors learned that Adobe's core products were vulnerable to competition from Figma, and Adobe's abandonment of XD after eight years of major investment was an explicit concession of defeat. Having scrapped plans to buy Figma or promote XD, Adobe has found itself at a crossroads without an effective foothold in the burgeoning UI/UX design tool space. As Adobe conceded to the CMA: "[w]ith the failure of XD, Adobe has missed the market for product design" and "has neither the technical capabilities nor the commercial

incentives to enter the product design market organically." Thus, Adobe failed to develop an effective product to compete with Figma and admittedly deceived investors during the Class Period about its success in having done so. Adobe also concealed that competition from Figma posed a serious threat to its core business, including established programs like Photoshop and Illustrator.

18.    This action seeks to recover damages for investors who were harmed by Defendants' fraudulent scheme during the Class Period.

## II.    JURISDICTION AND VENUE

19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa, and personal jurisdiction exists over each Defendant.

20.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b) because the Company conducts a substantial amount of business in this District and a significant portion of the damages due to Defendants' misconduct were suffered in this District. Adobe also has offices located in this District at 1540 Broadway, 18th Floor, New York, New York 10036, and 100 Fifth Avenue, New York, New York 10011, and Adobe's common stock trades on the NASDAQ, and at all relevant times traded on the NASDAQ, in this District.

21.    In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, U.S. mails, interstate telephone communications, and facilities of the national securities markets, and the situs of this action accordingly lies within this District.

III.     **PARTIES**

A.     **Lead Plaintiff Menora and Lead Plaintiff PPF**

22.     Lead Plaintiff Menora is an institutional investor.  According to its Certifications (filed December 19, 2023, ECF No. 16-3), Menora engaged in substantial purchases of Adobe common stock during the Class Period and was damaged thereby.  Menora had no further purchases or sales of Adobe stock during the Class Period.

23.     Lead Plaintiff PPF is an institutional investor.  According to its Certification (attached hereto as Exhibit A), PPF engaged in substantial purchases of Adobe common stock during the Class Period and was damaged thereby.

B.     **Defendants**

1.     **Adobe**

24.     Defendant Adobe is a Delaware corporation headquartered in San Jose, California. Founded in 1982, Adobe describes itself as one of the largest diversified software companies in the world.  It offers a line of products—in the form of desktop computer and mobile applications—and services, all of which are used by creative professionals, businesses and other consumers.  It offers many programs via a software-as-a-service model or a managed services model (both of which are referred to as hosted or cloud-based), as well as through term subscription and pay-per-use models. During the Class Period, the Company had over 450 million shares of common stock issued and outstanding.  At all relevant times, its common stock was publicly traded on the NASDAQ under the ticker symbol "ADBE."

2.     **The Individual Defendants**

25.     Defendant Narayen is Adobe's Chairman and Chief Executive Officer ("CEO").  He became Chairman of the Board of Directors in 2017 and CEO in 2007.  Before that, he was President and Chief Operating Officer, positions he assumed in 2005.  He was Vice President and General

Manager of the Engineering Technology Group when he joined the Company in 1998. As alleged herein, Narayen made false and materially misleading statements during the Class Period.

26.     Defendant Murphy was Adobe's Chief Financial Officer ("CFO") and Executive Vice President from April 2018 until October 18, 2021. He joined the Company in 2017 as its Chief Accounting Officer and Corporate Controller. As alleged herein, Murphy made false and materially misleading statements during the Class Period.

27.     Defendant Durn is Adobe's CFO and Executive Vice President, Finance, Technology Services and Operations, positions he has held since October 18, 2021, when Murphy departed. According to his Executive Biography, he "oversee[s] Adobe's company-wide operations," leveraging "expertise in global strategy, financial planning and operations and mergers and acquisitions" and involvement in the technology industry. As alleged herein, Durn made false and materially misleading statements during the Class Period.

28.     Defendant Vaas is Adobe's Vice President of Investor Relations and Assistant General Counsel. According to his Executive Biography, Vaas "oversees all aspects of Adobe's investor relations program, working closely with the executive team to manage the company's relationship with the investment community, in addition to leading [the] corporate legal team." He purportedly has over "15 years of experience as a corporate attorney," with "expertise" in "securities and public reporting," "mergers and acquisitions," "capital markets," "corporate governance," and other areas. According to Adobe, he has worked at the Company for over 10 years and "has contributed significantly to the company's growth and transformation" during that time. As alleged herein, Vaas made false and materially misleading statements during the Class Period.

29.     Defendant Wadhwani is the President of Adobe's Digital Media business segment, a position he has held since December 2021, reporting directly to CEO Narayen. Before that, he was the Chief Business Officer and Executive Vice President of Digital Media, a position he held since

June 2021.  In 2019, he joined Greylock as a Venture Partner, responsible for sourcing, negotiating and structuring investments exclusively for himself and Greylock, where he remains involved—a current and material affiliation that Adobe's SEC filings do not make clear.  His relationship with Greylock began in 2015, when it recruited him (from Adobe, no less) as CEO of AppDynamics, Inc.—a company that Greylock backed.  As alleged herein, Wadhwani orchestrated and negotiated Adobe's proposed acquisition of Figma, was involved in Adobe's decision to "disinvest" XD months before the Class Period and to place it in maintenance mode during the Class Period, and made false and materially misleading statements during the Class Period.

30.     Defendant Belsky is Adobe's Chief Strategy Officer and Executive Vice President of Design & Emerging Products, positions he has held since March 2023, reporting directly to CEO Narayen.  From December 2017 to March 2023, he was Chief Product Officer and Executive Vice President, Creative Cloud, also reporting directly to Narayen.  As alleged herein, Belsky made false and materially misleading statements during the Class Period.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Digital Media Segment Drives Adobe's Revenues and Reflects the Importance of Creative Products—Including Adobe XD, Photoshop and Illustrator—to Adobe's Performance and Prospects

31.     Although Adobe has traditionally offered a broad array of products and services, it now focuses on two areas of strategic growth, both of which are reportable segments: (a) Digital Media, consisting of products and services that increase productivity and allow consumers to create and publish content, centered around Adobe's Creative Cloud; and (b) Digital Experience, which provides an integrated platform and set of applications and services through the Adobe Experience Cloud that enable brands and businesses to create, manage and monetize customer experiences.

32.     Adobe's third reportable business segment is Publishing and Advertising, consisting of legacy products and services, including printing software and technology, and a platform for

managing advertising called Adobe Advertising Cloud.  Adobe generates revenue in this segment by licensing technology to software developers and printer and other device manufacturers, as well as through usage-based advertising offerings.

33.    In Adobe's Annual Report on Form 10-K for the fiscal year ended December 2, 2022, filed with the SEC on January 17, 2023 ("2022 Form 10-K"), Adobe emphasized the importance of the Digital Media business.  Indeed, that segment contributed approximately two-thirds of Adobe's total revenue during the Class Period.

34.    Accordingly, the Digital Media segment was responsible for the substantial majority of Adobe's revenue before and during the Class Period.  To ensure the sustainability and growth of these revenues, it was thus exceedingly important for the Company to develop digital offerings that could compete strongly with other industry products.  An important opportunity in digital media that Adobe identified was in the UI/UX design space, and by the start of the Class Period, the Company engendered the impression that it was well-positioned to compete in that industry.

35.    As explained below, Adobe developed Adobe XD—also known as Adobe Experience Design—to capitalize on a new opportunity for the Digital Media business.  Of course, Photoshop and Illustrator were already key product offerings within the Digital Media segment.  For example, although the Company does not disclose revenues by product, these two products are the first and second identified under the "Principal Products and Services" section of the 2022 Form 10-K, and Adobe specifically identifies Photoshop as a "flagship" product.  Further, the 2022 Form 10-K notes that the Digital Media segment "is centered around Adobe Creative Cloud and Adobe Document Cloud, which include Adobe Express, Photoshop, Illustrator," and other products, and that "[t]his is the core of what we have delivered to users for decades[.]"

36.    Adobe also emphasized the importance of all three of these applications together, grouping them in a December 16, 2021 fourth-quarter earnings presentation under the heading

"Advance every creative category across desktop, web & mobile," which reflected the Company's

ongoing promotion of its digital offerings.  On that page, Adobe promised to "Continue to invest in

Adobe magic across flagship applications" and to "Connect designers and stakeholders with XD,

Photoshop web and Illustrator web[.]"  The relevant excerpt of this page follows:

**Continue to invest in Adobe magic across flagship applications**

- Accelerate imaging, video & design workflows through Adobe Sensei

- Drive immersive experiences with Premiere, Substance 3D & Aero

- Connect designers and stakeholders with XD, Photoshop web and Illustrator web

- Deliver creative system across desktop, web and mobile apps

37.      Accordingly, the Digital Media segment drove Adobe's revenues before and during

the Class Period, and the Company emphasized the importance of its Creative digital products—such

as Adobe XD and flagship products Photoshop and Illustrator—when discussing current operations

and future plans.

**B.      Realizing that UI/UX Digital Design Represents A Unique Opportunity, Adobe Retools Its Flagship Products—Photoshop and Illustrator—and Promotes Adobe XD in an Attempt to Compete in that Market**

**1.      Adobe Publicly Recognized the Importance of the UI/UX Digital Product Design Industry to Its Current and Future Business**

38.      In March 2016, Adobe introduced Adobe XD for all-in-one digital product design—

initially in response to a company called Sketch, which released the first dedicated product design

tool in 2010.  A computer desktop-based program, XD brought a realm of new capabilities to users

in the UI/UX design space and became available to the public in late 2016—around when Figma

publicly released its own design tool, Figma Design.

39.     In 2018 and 2019, Adobe significantly increased the resources it allocated to XD, bringing employee headcount to 200 and then 250, respectively, as the Company sought to introduce collaboration capabilities to the application.  Eventually, the Company integrated Adobe XD into its Creative Cloud suite of applications, allowing users to share and collaborate on local files—*i.e.*, files resident on the computer itself—synced to the cloud.

40.     By the start of the Class Period, XD was available for purchase as part of the Creative Cloud All Apps subscription bundle, which included other applications such as flagship products Photoshop and Illustrator.  XD was also offered to new customers as a standalone application until April 3, 2023, but as discussed herein, Adobe's interest in promoting and further developing XD had by then completely evaporated.  As the CMA recognized, XD was one of the three largest suppliers of design software—despite its significantly smaller market share than Figma—while all remaining suppliers were substantially smaller than Figma and XD.

41.     Photoshop and Illustrator were (and remain) participants in the UI/UX design tools market, even prior to the advent of dedicated tools like Sketch, Figma, and XD, because these tools create images used in UI/UX design.  Adobe recognized that this market was particularly important to the future development and monetization of creative tools in general.  For example, at a January 20, 2022 Fireside Chat hosted by Wolfe Research, Wadhwani and Belsky recognized the importance of this market to the design application industry.  In response to a direct question about competition from Figma, Wadhwani had this to say:

> We also talked about recently how we're thinking about the market, which is different than what we've thought about before.  We really look at the creative professional market as one that's accelerating and growing very quickly.  We see this new creator economy for communicators coming out, and we said that's about a $30 billion, $34 billion market, I believe we said.

42.     Echoing Wadhwani's thoughts about the expansive opportunity that market offered, Belsky added: "it is exciting that VCs [venture capital firms] see the same thing we're seeing.  And

5-plus years ago, you didn't see any material dollars going into creative tools. I think now everyone sees that everyone wants to stand out creatively."

43.     Embracing the opportunity to capitalize on the burgeoning UI/UX design market, Adobe always appreciated that XD competed directly against Figma as Figma quickly gained market share. But Adobe privately feared that Figma was also making inroads on market share that its age-old stalwarts, Photoshop and Illustrator, had typically commanded.

### 2.     Adobe Privately Recognized that Figma Competed Not Just with XD, but Also with Photoshop and Illustrator

44.     Prior to and throughout the Class Period, Defendants understood and privately feared that Figma competed not only with XD, but also with flagship products Illustrator and Photoshop—the Company's vector and raster editing tools, respectively—and Defendants viewed Figma as a significant threat to the continued success of these lucrative products. Figma quickly dominated the UI/UX design tools market, taking share not only from XD, but also from Photoshop and Illustrator, and positioned itself to compete with Adobe on a broader scale in the process.

45.     Certain Figma features in particular, such as its web-based model and collaborative functionality, allowed the "startup" company to quickly displace desktop-based Adobe tools such as XD, Photoshop, and Illustrator in the UI/UX design tools market. For example, *The Verge* reported on June 22, 2023:

> Figma was Adobe XD's biggest competitor prior to the acquisition. It's a more popular service for a myriad of reasons: It's web-based, has a free-to-use membership tier, and some designers argue that it's simply a more flexible and powerful tool for prototyping designs. According to one study from UX Tools, Figma was dominating a whopping 77 percent of the UI design market back in 2021—and its popularity has only grown since that point.

46.     The 2022 UX Tools survey, which occurred in September 2022, examined Figma's rise and Adobe's fall in the UI/UX design tools market as Figma increasingly took share from Adobe products, which lacked the web-based interface and collaborative functionality consumers prized in

- 16 -

Figma.  The following chart from the survey, which was published in December 2022, illustrates this

trend, also showing that Figma had far surpassed Sketch in popularity and usage:



47.    As the survey presciently noted: "Almost all Photoshop and Illustrator usage is listed

as 'secondary,' which is a heavy decline from previous years.  They're likely used for the photo and

vector editing capabilities not yet possible in Figma."

48.    Users particularly valued Figma's collaborative functionality, which allows multiple

users to edit a file simultaneously and to view each other's work in real-time.  For example, CMA's

November 2023 Report, which included information from customer surveys conducted by CMA

itself, notes:

> Several customers told us they value collaborative/co-editing functionality and would
> like to see larger uptake across design software. . . .  One customer told us that "co-
> creation has become this new sort of key feature that people are relying on for
> remote-work acceleration and collaboration". . . .  An employee in a marketing
> agency told us "Every single designer/agency would love every single program they
> have to have the same functionality that Figma has where you can [have] multiple
> people in the same file making edits…  The same with assets, if Photoshop said,
> 'You can lay out all the art boards in Photoshop and you could have multiple people
> in it at the same time making edits, would that be amazing?'  Yes, of course it would,
> it would be great."

49.     Similarly, a September 21, 2022 article in *The Verge* noted that Figma's collaboration capabilities were among its most celebrated functions:

> Figma has been hailed as an underdog success story, having been designed from the bottom up with approachability and teamwork in mind. It offers premium features such as real-time collaboration on a free-to-use basis and browser-based accessibility that allows entire teams of people to work together across platforms from potentially any device. It's also one of the strongest rivals to Adobe XD, Adobe's own UX/UI design application, which hasn't been able to keep pace with Figma's innovations.

50.     As the November 2023 Report would later confirm, Defendants were concerned that Figma's lead in the UI/UX design tools market positioned it to further displace Adobe's flagship products in the vector and raster editing tools markets and the creative tools market more generally. Vector editing uses mathematical equations, lines, and curves with fixed points on a grid to create logos, icons, or other images digitally. Raster editing is used to create or edit images built of pixels, such as digital photographs. During the Class Period, Adobe controlled over 70% of the vector editing tools market with its Illustrator product and over 80% of the raster editing tools market with its Photoshop product.

51.     Figma also had vector and raster editing capabilities, which overlapped with features in Photoshop and Illustrator, during the Class Period. Indeed, Figma had an entire engineering team dedicated to vector editing. In fact, one of Figma's earliest innovations was introducing "vector networks," which improved how vector files—used to create images—function. Figma co-founder Evan Wallace explained in a February 9, 2016 blog post:

> The pen tool as we know it today was originally introduced in 1987 [by Adobe] and has remained largely unchanged since then. We decided to try something new when we set out to build the vector editing toolset for Figma. Instead of using paths like other tools, Figma is built on something we're calling vector networks which are backwards-compatible with paths but which offer much more flexibility and control.

52.     In a November 2019 article, one design professional described the limitations to the vector paths model used in Illustrator and the appeal of Figma's vector networks:

The cube is the quintessential example for demonstrating Vector Networks.  Via traditional paths, you would have to create at minimum 3 different paths to describe this shape.  This creates a lot of friction for a seemingly simple and common shape. To modify the cube, you would have to modify two or three different paths.  But with Vector Networks you can simply grab an edge and move it around, and the shape behaves like you would expect. . . .  This is the big selling point for Figma's Vector Networks.  Ease of use.

53.    An August 9, 2022 article in *DesignLab* compared Figma's vector network editing capabilities favorably to Adobe's vector paths model: "This is where Figma really stands out, with vector drawing options that are extremely flexible and remain fully customizable. . . .  Figma is the clear winner in this category, with more flexible vector design tools that can create complex shapes and elements without requiring Boolean operations."  Adobe's customers were frustrated by Figma's superiority in this key functionality, and even requested that Adobe upgrade its Illustrator product to keep pace, as this April 2021 post in the Adobe Illustrator community forum demonstrates:



54.    Figma's raster editing capabilities are less advanced, but include the ability to crop or resize raster images and to adjust exposure, contrast and saturation (*e.g.*, changing an image from color to black-and-white).  This capability is further enhanced by an extension architecture launched in 2019: third-party "plugins" providing raster editing capabilities beyond those currently developed by Figma itself.

55.    Given Figma's accelerated development and successful implementation of editing features and capabilities similar to those in Photoshop and Illustrator, Adobe executives—including the Individual Defendants—saw Figma as a competitive threat to Adobe's business beyond XD.  The CMA's provisional conclusions set forth in the November 2023 Report bear this out:

> In relation to the document evidence, this shows that Adobe perceived Figma as a threat to its core markets for vector and raster editing, and its flagship products Illustrator and Photoshop.  We note particularly that Adobe undertook detailed analysis of the threat posed by Figma over a period between September 2021 and March 2022 and concluded that Figma posed a risk.  Other internal documents consistently show concerns by Adobe management over the threat from Figma in relation to professional users until August 2022, a few weeks before the Merger was announced (on 15 September 2022).  Third-party customer evidence also indicates that Figma Design is already an alternative for some customers to Illustrator, and—to a lesser extent—Photoshop, at least for certain use cases related to product design.

56.    The November 2023 Report specifically tied Adobe's competitive concerns regarding Figma to the younger company's web-based interface and strong position in the UI/UX design tools market, finding "there is evidence that Adobe considers that its historically desktop-based ecosystem is facing an increasing competitive threat from non-desktop-based services.  Adobe appears to have felt that its Creative Cloud suite, and Photoshop in particular, were . . . at risk . . . from web-based competitors, particularly Figma," and, "Adobe considered Figma's growing presence in the adjacent product design market to be a particular threat.  Adobe perceived product design as a point of disintermediation between how customers access its creative design products more widely."

57.    Similarly, the CMA found in its November 2023 Report that "the strength of Adobe's Illustrator and Photoshop products depends in part on Adobe's position in product design," such that Figma's dominating performance in the UI/UX design tools market was necessarily a threat to the continued strength of Illustrator and Photoshop.  Indeed, as detailed in the November 2023 Report's section concerning Figma's competition with Illustrator and Photoshop, the CMA found that Adobe internal documentary "evidence shows that Adobe perceived Figma as a threat before [Wadhwani]

(Adobe, President of Digital Media) returned to Adobe in June 2021. . . .  After [Wadhwani] (Adobe, President of Digital Media) returned to Adobe in June 2021, Adobe's staff continued to express concerns regarding Figma."

58.    Defendants were so concerned about the threat from Figma that in September 2021, Adobe launched dedicated studies regarding Figma's competitive threat to Photoshop and Illustrator. As the CMA noted in the November 2023 Report, "internal [Adobe] documents show that [its] staff indicated that they had considered the study likely to show that Figma was a threat," and that the study "was commissioned in the first place indicates that Adobe perceived Figma as a threat, as Adobe does not commission surveys on its competitors[.]"  The November 2023 Report goes on to further note "that Adobe's executive team and senior management expressed concerns about the threat from Figma around the same time as the two in-depth analyses" in "early 2022."

59.    Additionally, the November 2023 Report reveals that Defendants held a "Photoshop quarterly business review" meeting in February 2022 (Narayen, Wadhwani, and Belsky attended), at which "similar concerns" related to Figma were discussed.  The November 2023 Report notes that "Adobe's concern regarding the threat from Figma continued to appear in internal documents from April 2022 to August 2022, a few weeks before the Merger was announced (on 15 September 2022)."  The CMA concluded: "Based on the above, we consider that the internal documents above, which include the views of senior levels of Adobe, represent strong evidence that Adobe considered Figma a threat to both Illustrator and Photoshop until at least June 2022."

60.    In fact, belying Defendants' Class Period statements that Figma was a "point player" that only competed with XD, the CMA's November 2023 Report revealed that Defendants' concerns about competition with Figma actually drove the Company's development of web-based versions of Photoshop and Illustrator, and its development of a potential new product, "Project Spice."  The CMA found:

- 21 -

The evidence also shows that Adobe took actions to mitigate the threat from Figma. Adobe's competitive response to Figma included product development which sought to defend Adobe's wider Creative Cloud suite. This specifically included the development of web versions of Illustrator and Photoshop, but also the prioritisation of certain features in the desktop versions. Furthermore, Project Spice envisaged the inclusion of both vector and raster editing functionality within a web-based app also providing product design functionality for professional users. Both the wider Project Spice and the inclusion of vector and raster editing functionality in it specifically appear to have been a direct response to the threat from Figma.

61.     The November 2023 Report makes clear that even before the Class Period, Adobe's development of its Creative Cloud products was influenced by the competitive threat from Figma. For example, citing a November 2020 Adobe internal document, the CMA found "Adobe's CEO considered Photoshop Web a response to a threat from Figma." The reaction to Figma within Adobe only grew throughout the Class Period, as the CMA noted "Adobe's internal documents show that the progress of these projects [*i.e.*, Photoshop Web and Illustrator Web] continued to be driven by Figma." The CMA also "identified evidence that Adobe prioritised certain features of Illustrator and Photoshop (not only their web versions) in response to the threat from Figma." These actions—*i.e.*, retooling Adobe's core products and moving to defend the flagship Creative Cloud suite in "direct response to the threat from Figma"—prove that Defendants appreciated the seriousness of Figma's competitive threat during the Class Period.

62.     Adobe conceived of Project Spice in 2020 as a product that could effectively compete with Figma. According to the CMA's November 2023 Report, in "October 2021 and February 2022, Adobe reduced its engineering resourcing of Adobe XD and shifted these resources to Project Spice in order to accelerate its development." But Project Spice was much more than a successor to XD; indeed, it was a defensive move intended to address Figma's competitive threat not just to XD, but also to Illustrator and Photoshop. As the November 2023 Report explains:

The evidence shows that Adobe's competitive response to Figma included product development which would defend its whole Creative Cloud suite. This in turn would defend Adobe's flagship products (Illustrator and Photoshop) from competition. . . .

Throughout the above evidence, there are many references showing that Figma influenced the product development of Project Spice to help defend Adobe's position in vector and raster editing software. There is also direct evidence that Project Spice would have included vector and raster editing functionality, and thus would have competed in these markets. . . . Adobe's internal documents also directly reference Figma when discussing how much vector and raster functionality should be included in Project Spice, further indicating that this product development in vector and raster editing functionality was driven by Figma.

63.      Accordingly, before and during the Class Period, Defendants privately acknowledged the competitive threat that Figma posed and took steps to counter it: they studied the threat; created Project Spice to more effectively compete on Figma's terms; shifted resources away from the failed XD application; prioritized improvements to the desktop versions of Photoshop and Illustrator; and developed web-based versions of those two flagship products.

**C.      Defendants Downplay Competition from Figma—Characterizing It as a "Point Player"—While Implementing Plans to Wind Down XD, Divert Resources to Project Spice, and Retool Photoshop and Illustrator in Direct Response to the Figma Threat**

**1.      Defendants Misrepresented and Concealed Material Information Regarding Adobe's Competitive Position and the Threat Figma Posed to the Digital Media Business**

**a.      Scotiabank's July 23, 2021 Question-And-Answer Session**

64.      The Class Period begins on July 23, 2021. On that date, Scotiabank Global Markets and Research hosted an investor question-and-answer session relating to Adobe, with Andrew Chan, Program Manager of Investor Relations, and Defendant Vaas, Vice President of Investor Relations, participating. Scotiabank analyst Paul Steep, who moderated the session, tried to orient the audience by asking for detail on Adobe's "key markets" and view of "competitors," as the following excerpts of his questions reflect:

Maybe one thing just to sort of help the audience overall because Adobe's so broad, maybe position where Adobe sits in the key markets of who you'd actually think about as competitors or how investors should think you're competing against various people?

- 23 -

And obviously, it's a massive product set. But if you wanted to just take the big segments, who would somebody want to be looking at and paying attention to or . . . .

65.    In response, Vaas represented that no competitor had Adobe's breadth of content in the digital creation space, characterizing digital media competitors—including Figma, specifically—as "point solution providers," which conveyed that those companies had developed single-function applications that could not (or did not) effectively compete with the Company's offerings beyond their discrete market.  Indeed, as he represented, "end-to-end, there's not really a major competitor" in "experience design product development . . . ."  He also claimed that once users familiarize themselves with competing, free applications and want to "take their content creation to the next level, they come to Adobe."  The following excerpts of Vaas's comments reflect these statements (emphasis added):

> For the creative business, ***there's not a competitor, a single competitor that has anything approaching the set of content creation apps*** across all of these different categories and media types that we have. So the answer to the question will be kind of ***drilling down into the particular point products*** and asking what are the other alternatives there.

> I think of -- in a general way, I would say if you look at competition in terms of every photograph that's taken in the world and how that photograph is edited, there's an ecosystem of free tools that people can use, and that kind of gets them started. That gets them interested in being content creators. And those are -- from simple cropping and editing apps that are within an iPhone, for example, or simple editing apps that are on some web-based platforms.

> ***But once they're interested in being able to do more and take their content creation to the next level, they come to Adobe.*** Other competitors that monetize the tools -- so one place that we played in for years is the video editing space. That's one where Adobe Premiere is the clear leader. Apple has been a competitor with a final product, not as much in the Pro segment anymore, but in the Hobbyist segment.

> Avid has had an offering for years in the editing space, and there's some newer upstarts there. So there are a few point products, but you'll find that editing is closely associated with all kinds of motion graphics and other assets, content creation. And in terms of being able to connect them on the cloud, nobody can touch what we've built.

In terms of -- a newer category is experience design. We think experience-led thinking, experience design product development is a paradigm that's going to continue to grow that category. ***And that's a newer category where there's some other point solution providers, like InVision and Sketch and Figma***. I could go on and on. ***But effectively, in that business, a few of our products tend to have a few point players that compete with us. But end-to-end, there's not really a major competitor***.

66.     These representations were false or misleading for several reasons, including that Defendants already knew by then that Figma dominated the creative and digital design market for UI/UX product development and Adobe had identified Figma's strong position in that industry as a threat to legacy products like Photoshop and Illustrator.  For example:

a.      The representation that "[f]or the creative business, there's not a competitor, a single competitor that has anything approaching the set of content creation apps across all of these different categories and media types that we have," misleadingly conveyed that Adobe did not view any competitor—most notably Figma—as a threat to its business, merely because they did not have a broad portfolio of content-creation applications like Adobe did.  But Figma's single application— Figma design—was already leading the market for UI/UX digital design software and functionality. Indeed, Figma offered vector and raster editing functionalities that competed with Illustrator and Photoshop such that, by June 2021, Defendants already viewed Figma as a competitive threat not just to XD, but also to Illustrator and Photoshop.

b.      The representation that Adobe was actively converting to paying subscription-based customers those users who experimented with the "ecosystem of free tools" also downplayed the Company's loss of customers to Figma's free version of Figma Design, which casual and even professional users by and large preferred to Adobe's own XD offering.  In this respect, Figma—not Adobe—benefited from offering free tools (as Defendants knew), and it was materially false or misleading to imply that the Company was capitalizing on bringing users of competing products on board to its paid offerings.

c.      Representations that Adobe competitors offered "particular point products," that "experience design product development" was "a newer category where there's some other point solution providers, like InVision and Sketch and Figma," and that "end-to-end, there's not really a major competitor," were materially misleading because they downplayed Figma's superior all-in-one offering in product design and its threat to Adobe's other product lines.  A "point solution provider" offers an application performing a single function or addressing a particular, often narrowly-defined, need.  According to the CMA, which later examined the issue, InVision, Sketch and Figma offered all-in-one, end-to-end products, but Figma was far superior, including in 2021: Figma had 40-50% market share based on booked revenue globally and was quickly adding users, while InVision had about 30-40% market share and Sketch, which operated only on Mac operating systems, had 5-10% market share.  By contrast, Adobe's competing offering, XD, had less than 5% market share in 2021.

d.      Moreover, characterizing Figma as a point player was materially misleading because its functions overlapped with several of Adobe's offerings, including XD, Photoshop and Illustrator, and Defendants viewed Figma as a competitive threat to Adobe's commanding market position in several markets, including the UI/UX design tools market and Adobe's core markets for vector and raster editing, served by Illustrator and Photoshop, respectively.  Indeed, the CMA later found—based on nonpublic materials and testimony from Adobe and Figma representatives—that Figma was not a point player and that Defendants had significant concerns over Figma's competitive threat to the Company's flagship products.

67.     During the July 23, 2021 Scotiabank question-and-answer session, the moderator also asked about Adobe's capital allocation and plans to use cash, pointing out that the Company "ended last quarter with $1.1 billion in net cash in Q2 . . . ."  In response, Chan first said Adobe would focus on deploying cash to fund substantial stock buybacks, but then downplayed the prospect of a large

acquisition in the absence of extraordinary circumstances, representing that "small tuck-in[s]," which merely "augment our products," would remain the priority for mergers and acquisition transactions:

> Second to that, we always like to keep a little bit of powder dry just for tuck-in M&A. We often do a lot of M&A that you probably -- if we didn't have to file anything, you probably would never hear about it or even notice it because we've integrated these products into our products so well that it's just another small tuck-in M&As that we do to go and augment our products. So that's our focus.

> Obviously, we've made some large acquisitions over the last several years, and that's because we were just looking at things that could help augment the business and those were opportunistic. They fit into what we were trying to do. But our focus is always going to be around tuck-in. And then depending on the appetite, depending on how transformation all those assets that we're looking at are going to help us in our TAM ["Total Addressable Market"] expansion, we'll go and look at larger deals. We are hyper-focused on growing the business, and that's how we grow that business by looking at these assets.

68. Representing that Adobe's "focus is always going to be around tuck-in" acquisitions that "you probably would never hear about" "or even notice" implied that the Company was not then interested in pursuing a large acquisition—certainly not magnitudes larger than it ever had before—and saw no need to do so anytime soon. By then, however, Adobe had already approached Figma—valued at around $10 billion—regarding a potential transaction, and that was the second time it had done so in two years. And as the CMA later found, Adobe was acutely aware by mid-2021 that XD had neither the user base nor the functionality to succeed and that Figma posed a competitive threat even to Adobe's flagship, successful offerings.

>           b.    **The October 26, 2021 Belsky Interview, 2021 Adobe MAX Conference, and XD Ecosystem Update**

>                 (1)    *The Verge's* **October 26, 2021 Interview of Belsky**

69. On October 26, 2021, *The Verge's* Decoder Podcast broadcast an interview of Belsky, which *The Verge* also published online. The release of the interview was timed to coincide with Adobe's 2021 MAX Conference, an annual conference—taking place the same day—that Adobe

hosts for the creative community to discuss its existing portfolio of products, enhanced features and functionality, and new products and developments.

70.    In the interview, Belsky discussed how Adobe XD originated, explaining that Adobe developed the product to provide functionality and ease-of-use in screen design after users found that Photoshop's features added complexity to the design process.  He also referenced Sketch—which was a pioneer in screen design and the first program designed for that purpose—in explaining that the Company developed XD to provide users with a competing alternative that did not simply retool Photoshop.  The following excerpt of the *The Verge's* edited transcript reflects these representations (emphasis added):

> It's really about, it will sound cliche, but ***it's very much anchoring [ourselves] in the customer and understanding where they are going***.  So, look back to the days when Photoshop was used to make every website.  There was a subset of customers that were focusing so much on websites and only using a few specific tools in Photoshop. ***They struggled, amidst all the rest of the power of Photoshop, to be able to do that*** in a smooth and efficient way.  ***And then products like Sketch came around that basically took those specific tools out of Photoshop and kind of flanked the product*** with a new produt [sic] that was ***dedicated to screen design.  Now we have Adobe XD, and of course others have emerged in the space as well***.  That's an example of being very customer-centric.
>
> Now, we could have just said, "Oh, let's make Photoshop better and better and better and better for the screen designer."  But actually, the customer was saying that they don't want all the other stuff in there.  They want a vector-centric editing capability that vertically integrates prototyping.  ***At the time people were using third-party services to prototype the things that they made in Photoshop and places like Sketch. So we had to listen and say, "Okay, we need a vertically integrated screen design solution."***  And now that is collaborative by default.  That's the playbook.  And whenever we're sitting in a meeting and we're pontificating as people around a table, I'm like, all right, we got to end this meeting right now.  What are customers struggling with and how are their behaviors going to impact our roadmap?

71.    The interviewer also inquired about Figma—calling it the "elephant in the room"—and sought Belsky's view on how Adobe viewed Figma's competitive position and success, posing the following question (emphasis added):

*There's an elephant in the room. You keep talking about the other companies that have gotten there first. Obviously Figma is right there*, they're a very successful company. They're a startup, they were web-based from the start, they now have a $10 billion valuation. *Adobe's a big company, do you wait for the small company to come and prove out the idea?* Was that, oh man, we got to get there? *Was that a competitive pressure for you?* Or was it, man, I had this idea, but we had to serve the customers first, and now we can get there because customers are using Figma and they're saying, "Why aren't you doing this?"

72.     In response, Belsky downplayed Figma's advantage in getting to market first with a web-based screen design product, explaining that as "a market leader" Adobe focuses "on what the majority of [our] customers need, which is never something at the edge," and that users "willing to withstand frictions of web creation three to five years ago were a very small group of people." As he claimed earlier in the interview to explain Adobe's failure to develop a web-based version of XD initially, the Company's users purportedly refused to "trade performance and precision for ease of collaboration" (emphasis added):

*And I'll ask myself this tough question since you're not asking it, should XD have been on the web by default in the beginning?* Hey, listen, *we have a customer base that was never willing to trade performance and precision for ease of collaboration*. And when we went to customers and said, "Well, if we bring some of this stuff to the web, you're going to have a bit of a laggy experience and sometimes bandwidth is going to get in the way of you want to do, and you're going to feel constrained by whatever happens to be the case at Verizon today." They would've said, "Heck no, give me the power and precision. I want faster and faster and faster. And when Apple comes out with their new chips, I want it to be even faster."

So the idea of going to the web was actually sort of crazy at first. And kudos to the companies that took the risk and also managed the years of frustration of customers because they weren't delivering on the performance side that was required to be in business.

73.     These comments led to Belsky's positive portrayal of Adobe's delay in developing web-based applications, saying "there's some advantage. I actually believe that by beginning our web journeys more recently, we're going to be able to capitalize on some very fundamental new technology." And he expressed zero concern for competition from Figma (or others):

But the market signals itself, right?  Everyone sort of elevates, hopefully, and this all serves the customers at the end of the day.  Everyone elevates everyone else's game. What I like about the creative space right now is that there are so many new technologies coming in.  So many smart people thinking, at the end of the day, this is going to serve customers regardless.

74.    The interviewer later turned back to Figma, noting "a lot of designers use Figma . . . on Chromebooks" and asking if "Photoshop will still need a bunch of local processing power[.]" Acknowledging that Photoshop "take[s] advantage of local processing power," Belsky said Adobe declined to offer a version of Photoshop streaming from a server "because we think that people need to be able to have agile, local operations."

### (2)    The 2021 Adobe MAX Conference

75.    Additionally, on October 26, 2021, Adobe held its Adobe MAX Conference, which is widely attended by thousands of participants, usually in person and virtually.  In 2021, Adobe held the MAX conference virtually because of ongoing concerns relating to the COVID-19 pandemic.  At the 2021 MAX Conference, Narayen and Belsky were among the main speakers.  In his presentation, Belsky emphasized Adobe XD's functionality:

Design is such a powerful force today.  It shapes how we interact with nearly everything. From the apps we use to the websites we visit to the companies we do business with.  From Accenture to T-Mobile to Carnegie Hall—more and more organizations are designing compelling experiences with Adobe XD—our free-to-use product for experience design and prototyping.

76.    He then introduced Khoi Vinh ("Vinh"), Senior Director of Design at Adobe leading the design team for Adobe XD, "to show how XD is making it easier to work together and add new kinds of content to your designs and prototypes."  Describing Adobe XD as "the all-in-one UI/UX tool that's tightly integrated into Photoshop, Illustrator and the rest of Creative Cloud," Vinh walked through "new features" and instructed users on how to leverage functions to create and improve their work.  Later, Belsky added: "Adobe XD keeps getting better and better."

### (3)    The MAX 2021 XD Ecosystem Update

77.    Also on October 26, 2021, Aubrey Cattell, Adobe's Vice President of Creative Cloud Developer Platform, authored a post on the official Adobe blog regarding the MAX Conference. The article, entitled "MAX 2021: Creative Cloud ecosystem update," mentioned XD a total of 12 times and unambiguously represented that the Company would continue to develop that product and further integrate it with other products in the Creative Cloud suite.  For example:

a.    The post discussed Creative Cloud's augmented capabilities and evolving and "open ecosystem," emphasizing as one of four bulleted points the "[g]rowth of the Photoshop and XD ecosystems":

> As we bring more Creative Cloud desktop capabilities to the web and unveil new collaborative surfaces and features, we are deeply committed to our vision of an open ecosystem. But we're just getting started. Expect Adobe to continue to invest in these new capabilities by making each of them embeddable and extensible going forward.
>
> At Adobe MAX this year, we are excited to announce:
>
> • Continued investment in the marketplace
> • Enhanced collaboration capabilities
> • Growth of the Photoshop and XD ecosystems
> • More support for our developer community

b.    The post also discussed "[m]ore Photoshop and Adobe XD plugins," detailing the continued development of plugins to augment XD's functionality, as follows:

> ## More Photoshop and Adobe XD plugins
>
> A hallmark of Adobe is the thousands of plugins that add features and supercharge your creative workflows, all powered by CEP, our common extensibility platform. More recently we've been building Creative Cloud's new unified extensibility platform (UXP), a shared technology stack that delivers a unified, modern JavaScript engine that is even more performant, reliable, and secure. We started rolling out UXP-powered plugins for Adobe XD in 2018 and for Photoshop last year. With UXP, developers can build even better plugins to help designers create, refine, and share their work seamlessly, working with the best third-party tools on the market.

c.    Additionally, the post discussed the "Adobe XD ecosystem," representing that, "[w]ith more than 300 plugins, the Adobe XD ecosystem also continues to grow":

- 31 -

**Adobe XD ecosystem**

With more than 300 plugins, the Adobe XD ecosystem also continues to grow. We're unlocking additional workflows to help web and app design teams collaborate better, like Smartsheet's plugin for XD and Toki Chat for real-time messaging right in XD. This also includes UI Copy, which helps you generate and insert suggested copy into designs, and the LottieFiles plugin, which gives you access to thousands of Lottie animations so you can easily bring them into your designs.

    d.    And the post discussed Adobe's plans to provide "[m]ore support for our developer community," noting the Company "supported all-star plugin developers to bring powerful tools to XD" in 2021:

**More support for our developer community**

Creative Cloud's developer community of innovators and makers are working tirelessly to improve workflows for the creative community. We are thrilled to support many of these developers through the Adobe Fund for Design. In 2021, we supported all-star plugin developers to bring powerful tools to XD — these include, among others, Walter Kimaro's Fancy Maps (a plugin to create and import custom maps), Mighty Alex's UI Copy (which provides common text strings), and Simon Widjaja's Yumtastic Hero (which helps users create everything from high-quality animated banner ads to animated infographics and interactive storytelling right from XD).

    e.    Lastly, the post represented that Adobe would continue to improve these productions: "You can expect Adobe to invest in making these solutions embeddable and extensible, supporting our commitment to an open ecosystem, and enabling collaboration across all creative tools—inside and outside Adobe."

### (4)    The October 26, 2021 Representations Were False and Misleading for the Same Reasons

78.    The October 26, 2021 representations detailed above—from the Belsky interview, 2021 Adobe MAX Conference, and XD ecosystem update—falsely and misleadingly conveyed that Adobe regarded XD as a viable product subject to continued development, when that was not true. Indeed, privately, Adobe had already reallocated most of XD's resources and reduced the number of employees working on the product to fewer than 20—reflecting management's undisclosed plan to "disinvest" in XD, which signaled its end of life.

- 32 -

79.     Additionally, Belsky's interview responses conveyed that Adobe was not concerned with competition from Figma, as he continued to speak positively about XD as a continuing product. His comments also discounted Figma's threat to the Company's flagship products like Photoshop, even as he recognized that Photoshop traditionally required more "local" processing power—based on expensive computer hardware itself—than Figma's web-based design software, which operated on low-powered and less costly Chromebooks.

### c.      The 3Q21 Form 10-Q, filed September 29, 2021

80.     On September 29, 2021, Adobe publicly filed with the SEC its Form 10-Q for the third fiscal quarter ended September 3, 2021 ("3Q21 Form 10-Q"). In the 3Q21 Form 10-Q, Adobe stated that its "competitive position and results of operations could be harmed if we do not compete effectively," noting that competitive and other factors "could create downward pressure on pricing and gross margins and could adversely affect our renewal and upsell and cross-sell rates, as well as our ability to attract new customers." The 3Q21 Form 10-Q also represented that competitors may have "advantages" that could "caus[e] a loss of our market share," stating, in pertinent part:

> [S]ome of our competitors and potential competitors enjoy competitive advantages such as greater financial, technical, sales, marketing and other resources, broader brand awareness and access to larger customer bases. As a result of these advantages, potential and current customers might select the products and services of our competitors, causing a loss of our market share.

81.     Under the heading "***If we cannot continue to develop, acquire, market and offer new products and services or enhancements to existing products and services that meet customer requirements, our operating results could suffer***," the 3Q21 Form 10-Q also represented that the delayed development or enhancement of existing products could adversely affect the Company's "ability to attract new customers" and weaken its "competitive position":

> [A]ny delay in the development, acquisition, marketing or launch of a new offering or enhancement to an existing offering could result in customer attrition or impede

our ability to attract new customers, causing a decline in our revenue, earnings or stock price and weakening our competitive position.

82.     The 3Q21 Form 10-Q also referred readers to the Annual Report on Form 10-K for the fiscal year ended November 27, 2020, filed publicly with the SEC on January 15, 2021 ("2020 Form 10-K"), for information on competition facing Adobe: "*For additional information regarding our competition and the risks arising out of the competitive environment in which we operate, see the section entitled "Competition" contained in Part I, Item 1 of our Annual Report*." The 3Q21 Form 10-Q thereby incorporated by reference that portion of the 2020 Form 10-K, including the following representations (emphasis added):

> No single company has offerings that match the capabilities of our Adobe Creative Cloud products and services, but ***we face collective competition from a variety of point offerings***, free products and downloadable apps. Our competition includes offerings from companies such as Apple, Autodesk, Avid, Corel, Microsoft, Affinity and others, as well as from many lower-end offerings. We believe our greatest advantage in this space is the performance and scope of our integrated solutions, which work together as part of Creative Cloud. With Creative Cloud, we compete favorably on the basis of features and functionality, ease of use, product reliability, value and performance characteristics.

> \*     \*     \*

> Applications and tools for experience and interface design and prototyping are still emerging and evolving as adoption of these tools by designers, design teams and larger organizations grows. ***Competitors to Adobe XD include Figma***, InVision and Sketch. Partnerships and integrations between these companies and third parties create an increasingly competitive landscape in this space.

83.     The representations in the 3Q21 Form 10-Q regarding Adobe's competitive position, ability to attract new customers, customer attrition, loss of market share, and failure to develop or enhance existing products, were all materially misleading without disclosure that: (a) the Company had already lost market share and customers to Figma in the UI/UX digital design space; (b) XD was failing and prompting concerns within Adobe that would soon cause Defendants to divert resources to developing other products that could compete more effectively with Figma; and (c) the Company had no plans to further develop or enhance XD—its existing, and only, all-in-one UI/UX digital

product design tool—because of its inferior functionality and position in the market as compared to Figma, having maintained 5% or less of market share based on revenue in that industry.

84.     Additionally, the representations in the 2020 Form 10-K, which the 3Q21 Form 10-Q referenced and incorporated, were materially misleading because Figma was not a point offering that provided a single type of functionality or completed solely against XD, but dominated the all-in-one UI/UX design market and threatened the Company's flagship products, such as Photoshop and Illustrator. Thus, these representations were materially misleading for precisely the same reasons as Vaas's similar statements at the July 23, 2021 Scotiabank question-and-answer session.

85.     As the signature page to the 3Q21 Form 10-Q recited, Adobe "caused" Murphy, the "Principal Financial Officer" as Adobe's CFO, to sign the SEC filing, which he did, "[p]ursuant to the requirements" of the Exchange Act. Additionally, Murphy and President and CEO Narayen signed Certifications, attached to the 3Q21 Form 10-Q, attesting that they had "reviewed" the filing and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" therein.

86.     In this respect, Murphy and Narayen vouched for the accuracy, completeness, and truthfulness of the information set forth in the 3Q21 Form 10-Q, including the statements, detailed above, regarding competition, market share, and the development or enhancement of existing products. In truth, however, the 3Q21 Form 10-Q was false and materially misleading because it failed to disclose material information that grossly undermined and contradicted those statements. Accordingly, the Certifications were also false and materially misleading.

### d.     The December 13, 2021 Press Release

87.     On December 13, 2021, Adobe issued a press release announcing the introduction of Creative Cloud Express, described therein as a "[n]ew unified web and mobile product." The press

release stated that Creative Cloud Express would allow users to create and share multimedia content. The press release included the following comment from Wadhwani (emphasis added):

> "***With Creative Cloud*** and Creative Cloud Express, ***we are meeting the demands of all creators and catalyzing the creator economy***," said David Wadhwani, chief business officer and executive vice president, Adobe. "Creative Cloud Express is the start of a brand-new journey to introduce first-time creators to Adobe creative tools while adding significant value to our current Creative Cloud subscribers."

88.     The representation that the Company was "meeting the demands of all creators and catalyzing the creator economy" with Creative Cloud was materially misleading because that suite of design applications, including Adobe XD, was unable to provide the robust web-based functionality that Figma offered to users.  In fact, weeks earlier, Defendants had purposely depleted XD of almost all engineering resources and staffed only a skeleton crew on the product.  Thus, by December 2021, Defendants had already concluded internally that XD was unable to meet the needs of creators and had essentially outlived its usefulness.

### e.     The December 16, 2021 Form 8-K, 4Q21 Earnings Press Release, Presentation Materials, and Conference Call

89.     On December 16, 2021, Adobe issued a press release, included as an attachment to a Form 8-K, reporting its financial results for the 2021 fourth fiscal quarter ("4Q21") and fiscal year ended December 3, 2021.  Durn signed the Form 8-K as CFO, having replaced Murphy in October 2021.

90.     The earnings press release—which bore a title proclaiming that the Company would outline its strategy for the next decade of growth—listed Vaas as an investor relations contact and emphasized favorable statements from Durn and CEO Narayen.  While Narayen lauded "Adobe's vision, category leadership, ground-breaking technology and large and loyal customer base," Durn talked about Adobe's market opportunities, stating: "With an estimated $205 billion addressable

market, we are well positioned for significant growth in the years ahead with our industry-leading products and platforms."

91.     But these representations were only half true, and therefore materially misleading by omission.  Unbeknownst to the public, and as Adobe later admitted to the CMA, Adobe management had decided to disinvest in Adobe XD months earlier, in October 2021, when it reassigned the "vast bulk of its workforce."  Disinvestment was the first step in decommissioning XD and meant that the Company would no longer actively develop the product, placing XD on the path to the end of its life. In fact, XD had been steadily losing market share to Figma for quite some time and could not attract users from Figma, which meant that XD was not a growth engine for Adobe and was incapable of capturing a material aspect of the "estimated $205 billion addressable market" that Durn mentioned. Indeed, as Narayen later revealed (when announcing the merger), Figma's total addressable market (TAM) opportunity—across design, whiteboarding and collaboration—was $16.5 billion by 2025. As explained herein, however, XD had historically held less than 5% in market share for end-to-end UI/UX design tools based on booked revenue globally, with Figma holding 20% and above in 2020 and up to 50% in 2021.  It was materially misleading for Defendants to provide a partial, favorable portrayal of Adobe's business and total addressable market opportunity given these undisclosed yet adverse material facts.

92.     After issuing the December 16, 2021 press release and Form 8-K, the Company held a conference call for investors and analysts and published written presentation materials discussed on the call.  Defendants Narayen, Durn, Wadhwani, Belsky, and Vaas participated in the call, joined by Ann Lewnes, Chief Marketing Officer ("CMO") and Executive Vice President of Corporate Strategy and Development, and Anil Chakravarthy ("Chakravarthy"), who had been promoted to President of the Digital Experience business at the same time that Wadhwani was promoted to President of the

Digital Media business.  Nine analysts covering Adobe attended the call, which was videorecorded and later made available on Adobe's website along with the presentation materials.

93.    Narayen spoke first, describing Adobe's 2022 financial targets as an indicator of the strength of the Company's business, representing: "I think what we've done is provided 2022 targets that demonstrate the strength of the underlying business. 3 incredibly large-growing opportunities across our clouds, continued focus on execution based on the current economic climate."  He then invoked the "addressable market opportunity" that Durn's statement in the earnings press release, issued earlier that day, concerned:

> Today is really sharing about Adobe's tremendous growth story and how we're going to be driving the next decade of growth because that's really what underpins our growing over $200 billion addressable market opportunity.

94.    Narayen also emphasized the importance of increasing the Company's user base of creatives, "from consumers to creative pros to first-time creators," by leveraging its leading position in the creative space—what he referred to colloquially as the "5 key pillars":

> As you'll hear throughout the day from our leadership team, our growth is anchored across these 5 key pillars: our proven track record and our focus on creating and leading categories; the ever-increasing expanding set of customers that we serve, from consumers to creative pros to first-time creators to small and medium businesses to the largest enterprises in the world; our ability to deliver incredible technology platforms that enable whole new classes of applications and accelerate our innovative cadence; the important shift we continue to make from building applications to enabling new business models apps, services, artificial intelligence and platforms that's paying dividends; and last but not least, an incredible global ecosystem of partners that spans the entire customer life cycle, from experience creation and marketing, to delivery and ongoing support.

95.    In concluding his opening remarks, he left no doubt about the message management intended to convey to investors (emphasis added):

> I think the message for you as investors is across every dimension, across every business, our aspirations are higher, and we're thinking bigger.  There's this incredible once-in-a-lifetime expansive opportunity in front of us, and ***I think we're uniquely positioned to capture it***.

- 38 -

96.    Narayen's statements about the "addressable market," and Adobe's ability to leverage its leading position to capture much of it, were materially misleading for precisely the same reasons as Durn's similar statements in the earlier earnings press release: they failed to account for Adobe's internal decision months earlier to discontinue XD, Adobe's best and only answer to Figma.  This meant that XD's ability to capture any meaningful portion of the addressable market opportunity—which Narayen later estimated for Figma would expand to $16.5 billion in 2025, including all-in-one UI/UX tools—was virtually nil, and, in fact, XD's market share was likely to further decline from its historical height of about 5% of booked revenue globally.  The absence of a viable participant in the UI/UX all-in-one digital design industry able to compete on Figma's level was anathema to Adobe's publicly stated mission and inconsistent with Narayen's representations.

97.    For his part, Wadhwani discussed Adobe's new addition to the digital media business, Creative Cloud Express—a repurposed version of Adobe Express, offered on the Creative Cloud platform, to entice creators to adopt Adobe technology in ways that XD did not provide.  He also said that Adobe "introduced Photoshop and Illustrator for [the] web," indicating that Adobe had finally offered customers the ability to access its flagship products not just from a desktop, but also in a web-based format.  And he emphasized the importance of collaboration to the Company's suite of product offerings, stating: "Collaboration is another big area of focus for us. We're putting—we're integrating collaboration directly into our apps and existing creative workflows."

98.    Likewise, Belsky emphasized the importance of collaboration, addressing Creative Cloud—of which XD was part—in describing the functionality of Digital Media's product offerings (emphasis added):

> In terms of product differentiation for Creative Cloud, I mean what a year we had. We delivered some of the mind-blowing Adobe Magic throughout our actual Pro products, neuro filters in Photoshop, for example, a lot of the collaboration features. And we really made a proclamation that Creative Cloud going forward will be as much about collaboration as it is about creativity, which if you think about it, invites

*many more stakeholders of creativity into the fold. And **that's what we're seeing across all of our enterprise as well as small businesses**.*

99.    Along these lines, Belsky even pointed out the shortcomings of some other Adobe products, like Spark and Photoshop, in explaining how developing the collaborative capabilities of the Company's Creative Cloud offerings would provide functionality that the Company's flagship products had traditionally failed to offer:

> [O]ne of the very exciting things that we've learned over the last few years is really around the distinct customer needs that were just not covered, frankly, by Spark or Photoshop Express, other things we were doing or other kind of competitive tools out there. And I just wanted to share a few of those because I think they're really relevant.
>
> I mean first of all, we're seeing a lot of these customers that come in, wanting to make something with a template. They want to be able to go further. So our product team is actually very excited about the prospect of a customer being able to make something and then take it to the next level using one of our more pro-ish applications like Photoshop or Illustrator.

100.    What Wadhwani and Belsky failed to say, however, was that a predominant reason why XD had failed was its inability to facilitate collaboration, a lack of functionality that Defendants recognized doomed the application. Collaboration was central to the new digital reality Adobe was promoting, where users could share ideas and designs seamlessly across platforms and file formats. Yet XD was inferior to Figma's flagship application, Figma Design, and lacked collaborative functionality that was highly desired by users of all skill levels. By emphasizing other applications, such as Adobe Express, Defendants continued to conceal XD's inadequacies and ignored its failings for the sake of promoting other, more lucrative offerings. By then, Adobe had already concluded that XD could not reach a critical mass of users sufficient to justify its continued development, but no one from Adobe discussed XD on the call or the problem that Adobe was then experiencing as a result of these inadequacies.

101.    Narayen also diverted attention away from Adobe's failed XD offering, telling an analyst: "when you take a step back and think about what we've accomplished, we created the digital marketing category, and we said there's a much larger opportunity as it relates to this customer experience management."  And when asked to describe the "levers in your business" going forward, he told the analyst to review the presentation "deck," providing as an example the digital experience business where "you're seeing just some tremendous adoption of our solutions in that.  Digital is only going to go up and to the right, and I think Adobe is incredibly well positioned."  In Digital Media, he was just as positive:

> And certainly, Creative Cloud, the heritage of the company, this notion of everyone who has a story to tell, I actually tend to think of it as the web's now come alive. The web's now come alive.  And perhaps one of the things we didn't talk about, the biggest asset, even on the web, is Adobe's file formats.  So the ability to deal with the Photoshop file format.  The ability to deal with Illustrator for logos.  The ability to deal within Design [with InDesign], if you want to create these flyers.  And actually for the creative community to participate in this massive community that's being created, we've done all the heavy lifting that now makes that magic possible. And we have a broader set of offerings than ever before in terms of being able to target people.  Wherever you are in the world, we have pricing flexibility, and we have a DDOM [data-driven operating model] that allows us to do it.

102.    These representations were also materially misleading because they did not reveal any information regarding the battle raging within Adobe to forestall Figma's ever-increasing dominance in the digital design space, which limited the Company's ability to convert customers to paying apps and maintain the engaged customer base Defendants frequently mentioned during the conference call.  These and other representations during the call were also materially misleading in light of the accompanying presentation materials, which themselves were misleading and which portrayed XD as a viable application that would contribute to the Company's mission to improve collaboration for creators.

103.    For example, a page of the presentation entitled "Content is powering the creator economy" in Wadhwani's "Digital Media Opportunity" section continued to list XD as an app that

contributed to Creative Cloud's success along with Photoshop and Illustrator (among others), as the following excerpt demonstrates:



104.    On a page entitled "Adobe Creative Cloud," the XD application was also listed as a desktop application in Adobe's suite of programs, as the following excerpt shows:



105.    Similarly, on a page entitled "Advance every creative category across desktop, web & mobile," Adobe said it would "[c]ontinue to invest in Adobe magic across flagship applications," listing XD, as the following excerpt reflects:

**Continue to invest in Adobe magic across flagship applications**

- Accelerate imaging, video & design workflows through Adobe Sensei

- Drive immersive experiences with Premiere, Substance 3D & Aero

- Connect designers and stakeholders with XD, Photoshop web and Illustrator web

- Deliver creative system across desktop, web and mobile apps

106.     Grouping XD together with Photoshop and Illustrator and describing how all of these "flagship applications" would connect creators was materially misleading because, by then, neither Adobe nor the other Defendants intended to "[c]ontinue to invest" in XD or regarded it as a viable competitor in the UI/UX design space.  Rather, the inclusion of XD in the presentation without any disclosure of Adobe's plans to disinvest concealed material adverse information within Defendants' possession about the Company's competitive position and loss of market share to Figma.

### f.     The January 5, 2022 Evercore ISI Institutional Equities Bus Tour Conference Call

107.     On January 5, 2022, Vaas participated in a conference call, hosted by Evercore ISI, on behalf of Adobe.  During the call, an Evercore analyst asked Vaas about Adobe's view of Canva and Figma, and whether the Company perceived them as competitors.  Vaas deflected, claiming that competition from companies like Canva and Figma "validate[d]" the importance of the digital design market.  The following was the entire exchange on this issue (emphasis added):

> **Stewart Kirk Materne Evercore ISI Institutional Equities, Research Division - Senior MD & Fundamental Research Analyst**
> Yes, roll out over time.  Okay, that's helpful.  I guess the other question comes up more, obviously, is some of the up-and-coming vendors and sort of the lower end of the market per se.  ***When you think about Canva or Figma, how do you—how should investors sort of frame that?***  I mean, like, to me, they seem like market expander, sort of they're helping you all expand the market.  ***I don't get the sense***

*that these are competitors* and sort of the enterprise or even the sort of group part of your business.

So can you just talk about that a little bit?  Because obviously, that's been—I think people are trying to draw conclusions that the ARR performance in the quarter has something to do competitively when *I don't think the 2 things are necessarily related*.

**Jonathan Vaas Adobe Inc. - VP of IR**
Yes. I think there's definitely—when you look overall in the ecosystem in software, *there are some things that other companies are doing that validate the explosiveness of these markets that we're competing in*, right?  And if you look at the TAM for Creative, that—it's built up of Creative professionals where we said that's growing to $25 billion by 2024.  That shows you how much runway there is just in that top end of the Creative professional market.

In the communicators bucket, that's growing now to north of $30 billion, and that's due to a number of things, but a lot of knowledge workers—and like I said, people that just aren't expert in creativity, but have a story to tell, they're turning to creative tools rather than maybe—they might have turned up to something like PowerPoint before for office presentations.  And *there are other companies that are expanding the market and kind of validating the enthusiasm and the spending potential* for people that want to create content is very real out there.

I think until Creative Cloud Express was launched, we saw—it was definitely more of a complementary situation where we would see people start out on simpler tools.  And then when they're ready to do more and advance to high-fidelity content creation, they'd come over to Adobe.  We've seen that since Microsoft Paint.  We've seen that with simple content editors in social media platforms and on phones and some of these start-ups out there in the world.

I think with Creative Cloud Express, *Adobe is making more of a strategic decision now to take all of the science that we've built and go down market and really compete, not just be the place they turn to when they're ready to do more, but the place they learn and start as well*.  And then we're building bridges from the point of entry, making it extremely simple to get started, all the way through much more complex creation like with Video and Premier and After Effects.

108.    These representations led the market to believe that Adobe viewed competition from Canva and Figma as beneficial, because it validated the Company's focus on digital design software.  In truth, Figma was taking market share away from Adobe, led the market in the all-in-one UI/UX design space, and posed a significant competitive threat to Photoshop and Illustrator.  It was also misleading for Vaas to represent that users gravitated to Adobe products after experimenting with

offerings from Canva and Figma, because Canva and Figma both had offerings that many users, including professional users, preferred—particularly Figma, which had long ago surpassed XD as the program of choice for UI/UX design.

> **g.    The January 11, 2022 Bank of America Software New Year Bus Tour Conference Call**

109.    On January 11, 2022, just several days later, Vaas participated in a conference call, hosted by Bank of America, on behalf of Adobe. During the call, a Bank of America analyst asked Vaas about competition in the digital design business, asking for Vaas's view on Canva and Figma and how Adobe was competing against them. In response, Vaas characterized Canva and Figma as "point solution players," downplaying the competitive threat they posed despite Figma's superior product offering and omitting to mention Defendants' awareness of the threat Figma posed to some of Adobe's core markets. The following was the entire exchange on this issue (emphasis added):

**Bradley Hartwell Sills BofA Securities, Research Division - Director, Analyst**
Yes. Makes a ton of sense. Okay. Why don't we shift just before we move on to Experience Cloud, just on the Creative Cloud. ***There's some high-profile private companies facing capital at high valuations, Canva and Figma. Have you seen these 2 offerings in the marketplace?*** When you think about the competitive landscape here, what are Adobe's strengths general? ***And maybe specific to those 2, how do you see those 2?***

**Jonathan Vaas Adobe Inc. - VP of IR**
Sure. Yes. When you look at a $63 billion TAM, ***I think more than any other company, that's Adobe's opportunity. There are definitely other point solution players***, who have, I think, had a role in expanding that TAM as we see millions of new people really interested in content creation. Certainly, some other companies validating the secular tailwinds that are driving expansion in that market. I would say ***almost to the company that I could think about, everyone else we see as a point solution provider. They're a single product company that's found a niche with a growing universe of users***. And there's some companies that have good momentum in that space.

You mentioned Canva, and I think that's one that has done a good job of getting all kinds of new content creators interested and even willing to pay for those simple kinds of tools. There's—***since the beginning of Adobe's creative business, there's always been free and simple tools in the world where people get started and then when they're ready to do more, they come to Adobe***.

Microsoft Paint, the simple photo editors in your—the phone we all carry around in our pocket, for example, simple—there was Flickr, there's Facebook and Instagram. And *Canva has been part of that sort of that world of where beginners get started before they come to Adobe*.

With Creative Cloud Express, you can see that we now have democratized our own tools to the level that we want people to get started and begin their journey with Adobe. And *the big differentiation from us, this applies, you mentioned Figma, any other company, there are some competitors in video editing, for example. But they're all point solutions*.

Whereas *we have this cloud connected collaborative system of applications that all work together* and we say creativity is a multiplayer sport. And from the file types they use, to color templates and fonts, we have it all connected together in a way where there's bridges we build between creators and journeys for people to break out of simple templates and do more and do more.

*And so I don't see a competitor that sort of has anything approaching that end-to-end strategic position that Adobe does*, but there's definitely other companies that are seeing the global enthusiasm around content creation. *And I think overall, that's a good thing for Adobe and it's a good thing for the expanding market*.

110.    Vaas's representations were false and materially misleading because they concealed and otherwise misrepresented the magnitude and implications of competition from Figma, which challenged Adobe's traditional market-leading position with Photoshop and Illustrator. Indeed, Figma was not a "point solution player" or "provider" that offered a "single product" with limited reach in a "niche" business. Further, Vaas's statement that free alternatives to Adobe products have always existed reinforced the misleading message that Figma did not pose a unique and significant competitive threat.

111.    Likewise, it was materially misleading to represent that Adobe converted users from free-application providers and benefited from competition, because the Company was losing users to Figma as a result of Figma's superior offerings—for example, products that enabled collaboration on levels that Adobe's products, to that point, could not.

112.     Again, by January 2022, Defendants had decided to disinvest XD and transferred the

bulk of its resources, including engineering personnel, for the purpose of countering the threat that

Figma posed.  Vaas's statements glossed over these facts and suggested just the opposite: that Adobe

had no concerns regarding Figma's competitive threat.

**h.      The January 20, 2022 Wolfe Research Fireside Chat
Conference Call**

113.     On January 20, 2022, Wadhwani and Belsky participated in a conference call hosted

by Wolfe Research.  During the call, Wadhwani spoke about his experience at Greylock—without

mentioning it by name—in the past tense, representing that before he returned to Adobe, he "spent

the last few years investing."  He then addressed the opportunity for Adobe based on the "incredible

rise of the creator economy," claiming "Adobe is incredibly well positioned for that":

> The second thing that was clearly happening is clearly happening is this incredible
> rise of the creator economy.  Today, there are 100 million small businesses in the
> world, and the majority of them say that their digital presence is more important than
> their physical presence.  And when you think about that, and this is really the point of
> that video, this creator economy—these noncreative professionals need to have ways
> to engage their base, and they need to do it through creative content that helps them
> stand out from everything else.  And that was another thing I kept looking at saying,
> well, Adobe is incredibly well positioned for that.

114.     Belsky also emphasized the rise of the creator economy, similarly representing that

Adobe was well positioned "on the near term" to capitalize on demand for digital design software:

> And then on the near term, on the very near-term opportunity, which is we're making
> inroads every day is really around bringing creativity to all and making creativity
> more accessible.  We can make our core customers, our pros in their first mile
> experience of our products, more successful by teaching them by giving them things
> to start using from the onset and those move the needle.  It helps obviously retain
> customers, but it also helps customers feel successful, which leads to them telling
> other people to join the franchise and the opportunity around Creative Cloud
> Express, making sure that every other person that either comes into our funnel or
> should, but doesn't yet is able to succeed using our products.

115.     During the call, the issue of competition from Canva and Figma arose yet again—the

third time in an analyst call that month—reflecting the central importance of the issue to analysts and

investors.  Noting that Canva and Figma are "the first time in recent memory [that] Adobe has real competition," the analyst probed about the "competitive environment":

> **Aleksandr J. Zukin Wolfe Research, LLC - MD & Head of the Software Group**
> Perfect.  Well, let's take it up a notch.  And let's go with where the video kind of ended, which is Creative Cloud Express creativity for everyone. Some—you threw out a little bit if we wanted people to create flyers and invites.  And the #1 question I get, and I'm sure Mr. Vaas gets from most investors right now, particularly in light of the last quarter, really the second half of last year, what about the competition?  What about Canva and Figma?  And aren't they—for the first time—not for the first time, the first time in recent memory Adobe has real competition, and they're taking share. So let's talk about the key elements.  Both of you, VC backgrounds, not that long ago, saw these companies in the markets.  What is the competitive environment? What is the answer?  If it's an answer or if let's say an opportunity?  I want both of you individually to address this topic because I think it's one that's near and dear to investor hearts.

116.     As the following excerpt of his response reflects, Wadhwani emphasized the market opportunity for Adobe and its purported "tailwinds" in the creative design space while characterizing competitors as mere market "entrants playing in and around similar areas" (emphasis added):

> We also talked about recently **_how we're thinking about the market_**, which is different than what we've thought about before.  **_We really look at the creative professional market as one that's accelerating and growing very quickly.  We see this new creator economy for communicators coming out, and we said that's about a $30 billion, $34 billion market_**, I believe we said.  And we have a Document Cloud business that's also playing into this big TAM.  You add all that together, you have a $100 billion TAM that we're going after.
>
> Now as a company like Adobe historically was playing in a smaller TAM and had a very large presence in that TAM.  As this TAM explodes, you should expect to see some competition participating in parts of that TAM.  **_The surface area is so significant, we should expect to see other entrants playing in and around similar areas_**.  But I'm going to go back to where Scott was leaving off.  If you think about it in that context of the professional base, **_when you look at the fact that there are more creative pros needed in companies than ever before, that's obviously a big tailwind for us_**.
>
> When you look at it in the context of video and the explosion of video, we have this long tail of video production now happening.  If you look at any of the streaming companies, they've got this massive base of people creating long tail content, but you also see this incredible rise in terms of people that are creating content for YouTube. You see this incredible growth in terms of corporate marketing videos that are being created and we see an enormous opportunity there.  3D and immersive and the rising

metaverse, that also, as Scott mentioned, this is a new format that's coming up. ***So a huge opportunity for us there as well in addition to the collaboration capability. So if you think about where we sit and how our file formats create a differentiated position for us in the Creative Pro base, we feel really good about it***.

***Now if you look at that second foundation in terms of how we're approaching creative—the creator economy and communicators in particular, a lot of the work that we've done over the last few years has led us to this moment***. We've generated over 400 million Adobe IDs through our mobile apps. We have—our mobile apps last year grew over 55% year-over-year. And then Creative Cloud Express and the launch of that really represents the aggregation point of all that learning and that technology in addition to the work that Scott and team have been doing around bringing some of the core capabilities and our flagship apps to web and mobile so that they can participate and be part of this really easy onboarding into this frictionless creation process for that.

117.    Belsky, in turn, represented that significant investment in the digital creative industry

validated Adobe's business thesis and only created more opportunity for the Company, electing, like

Wadhwani, not to directly describe competition from Canva and Figma (emphasis added):

I think the only couple of things I would just add as I think about competition from the—with the product lens, first of all, ***it is exciting that VCs see the same thing we're seeing***. And 5-plus years ago, you didn't see any material dollars going into creative tools. ***I think now everyone sees that everyone wants to stand out creatively. And so there's so many different approaches that entrepreneurs will take there***. And it's exciting. I mean, first of all, a lot of these are technologies that we can play with. A lot of these tools we're developing plugins for interoperability with and we imagine the future stacks of creativity being inclusive of that.

And I think that the fact that we have lots of customers using competitive video editors, like Final Cut leveraging Creative Cloud and Frame.io, especially for collaboration, is just an example of that. ***Best to market, better than first to market***. Also ***I really want to make sure that we're learning from all the signals as well as our own experiments*** that we've done over the years that led up to Creative Cloud Express to make sure that we can really win verb by verb, all the creative tasks people want to accomplish.

118.    These indirect answers prompted the analyst to ask about competition again, with the

analyst describing Canva and Figma as "someone to fight against":

**Aleksandr J. Zukin Wolfe Research, LLC - MD & Head of the Software Group**
Jonathan [Vaas] didn't like when I asked this question this way. But have they awoken a sleeping bear in the sense of like how fired up is the company to kind of

finally have someone to fight against and someone to challenge to galvanize both internal champions, product teams, dollars, investments?  Is that a thing?

119.    In response, Belsky spoke positively about competition in the industry, commenting favorably about the resulting opportunity and representing that it even "helps" the Company, as the following excerpt reflects:

> [L]egacy is a blessing and a curse, right? I mean we have an incredible legacy.  We have these ubiquitous file formats, et cetera.  And there's always a risk that a company can rest on laurels, right?  And for the last few years, we've seen the TAM explosion, we've been very awakened to the opportunity.  But all of this helps. I mean the company, I feel like our strategy is more sound than it's ever been. People are galvanized.

120.    Wadhwani's and Belsky's statements regarding competition downplayed the risk to Adobe and failed to reveal that Figma was dominating market share vis-à-vis XD, which had failed to succeed.  Rather, by then, Adobe management viewed Figma as a prominent competitive threat, causing the Company to scramble to develop an all-in-one digital design tool that could effectively compete with Figma.

### i.    The 2021 Form 10-K, filed January 21, 2022

121.    On January 21, 2022, Adobe publicly filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 3, 2021 ("2021 Form 10-K").  In the 2021 Form 10-K, Adobe referenced XD alongside its flagship and other product offerings and described updates to these applications, while representing that the Company would "continue to introduce new features and solutions": "We continue to introduce new features and solutions in our products, such as auto-masking and new and improved neural filters in Photoshop, auto-captioning in Premiere, adjustment layers and perspective grids in Adobe Fresco and additional motion features in Adobe XD."  The 2021 Form 10-K also contained the same materially misleading risk factor statements regarding competition as the 3Q21 Form 10-Q.

122.    By October 2021, however, Adobe had decided to wind down XD—reassigning the engineering resources required for introducing "new features and solutions" to the nascent Project Spice—and by December 2021, Adobe was on the cusp of (internally) conceding defeat to Figma. During 2022, Adobe staffed fewer than 20 employees on XD and viewed it as having reached its end of life—a path management set it on no later than 2021. Perhaps this is why, in contrast to the 2020 Form 10-K, the 2021 Form 10-K did not mention Figma at all, as a competitor to XD or otherwise. This change suggests that Defendants recognized Figma could not accurately be characterized as merely a "point" offering.

123.    As the signature page to the 2021 Form 10-K recited, Adobe "caused" Durn, the "Principal Financial Officer" as Adobe's CFO, to sign the SEC filing, which he did, "[p]ursuant to the requirements" of the Exchange Act. Durn and CEO Narayen also signed the 2021 Form 10-K, and they signed as attorney-in-fact for others, including Adobe founder/director John Warnock. Additionally, Durn and Narayen signed Certifications, attached to the 2021 Form 10-K, attesting that they had "reviewed" the filing and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" therein.

124.    In this respect, Durn and Narayen vouched for the accuracy, completeness, and truthfulness of the information set forth in the 2021 Form 10-K, including the statements, detailed above, regarding competition, market share, and the development or enhancement of existing products. In truth, however, the 2021 Form 10-K was false and materially misleading because it failed to disclose material information that grossly undermined and contradicted those statements. Accordingly, the Certifications were also false and materially misleading.

###### j.    The March 22, 2022 1Q22 Earnings Conference Call

125.    On March 22, 2022, Adobe issued a press release, included as an attachment to a Form 8-K, reporting its financial results for the 2022 first fiscal quarter ("1Q22") ended March 4, 2022. Durn signed the Form 8-K as CFO. That same day, the Company held a conference call for investors and analysts. Defendants Narayen, Durn, Wadhwani, and Vaas participated in the call, joined by Chakravarthy. Ten analysts covering Adobe attended the call.

126.    During the question-and-answer session, analysts again inquired about competition. As before, Defendants responded in a misleading way that concealed the true threat Figma posed, as the following excerpt of an exchange with Wadhwani illustrates (emphasis added):

**Saket Kalia Barclays Bank PLC, Research Division - Senior Analyst**
Okay. Great. David, maybe for you. Great to see the Creative Cloud Express launch recently. I guess the question for you is, ***how do you feel the product differentiates from some of the competition out there***? And maybe without going too deep, how do you plan on investing in that product specifically to continue your lead?

**David Wadhwani Adobe Inc. - President of Digital Media Business**
Yes, thanks for the question. We're very excited about the launch of CCX. But just to up-level for a minute, and as a reminder for everyone on the call, we've been talking about the communicator segment for years, both as it relates to non-pros and as it relates to the creator economy. We've talked about in the past that our mobile and desktop apps have hundreds of millions of registrations, which is clearly going beyond our Creative Pro base.

And we've built a significant business. In fact, we believe that we're the largest provider of creative tools in the world when measured by revenue across all of our segments: pros, communicators and consumers. ***The introduction of Creative Cloud Express though represents a lot of our learning over the last few years, starting with the business model. It's a freemium business model. It's predominantly web and mobile. So it's zero friction for onboarding customers***, and users are seeing success in minutes, not hours.

*    *    *

And the last thing I'll say here is that don't forget the opportunity here is to drive millions of new users into our franchise. But the opportunity is also to drive high engagement and usage within our core CC base and take what has already been a

- 52 -

very, very strong retention curve there and continue to drive engagement and retention of our CC users as well.

127.    Contrary to the implications of Wadhwani's representations, Figma already leveraged a freemium model quite effectively since its introduction, which meant that Creative Cloud Express had actually adopted Figma's business model to some degree—a tacit concession that Figma had succeeded where XD had failed.  When asked for color on Adobe's "pricing changes in the context of the competitive landscape," moreover, Narayen denied that competition played any role and said the pricing approach was "all really about . . . delighting customers" (emphasis added):

**<u>Tyler Maverick Radke Citigroup Inc., Research Division - VP & Senior Analyst</u>**
Just going back to the price increase and pricing changes.  Obviously, I'm sure you'll be sharing a lot more specifics as we go forward.  But philosophically, just how are you thinking about the pricing changes at the high end versus the kind of entry-level Creative products?  And particularly, ***just curious how you're evaluating those pricing changes in the context of the competitive landscape***.

**<u>Shantanu Narayen Adobe Inc. - Chairman & CEO</u>**
So I think philosophically, the way we are looking at it, I'll repeat what I said earlier, which is we haven't done a comprehensive look at that in multiple years.  And directionally, I think the significant value that we've added has to do with people, whether you're in businesses or whether you're a user of the entire apps.  I mean we continue to add new apps to the—what's called the CC All Apps platform.  And directionally, we're just saying that is the area where we have to look at all of the increased value that we have.

***This is not driven in any way, shape or form by any competitive response.  So let me be categorical about that.***  This is raised by—we continue to attract billions of people to the platform in terms of the interest.  And with all of the new offerings that we have, again as David said, across web, across mobile, across the browsers, we just want to make sure that as we continue to expand the offerings, we're looking at the pricing in a good way.  So the value that we've added to whether you're in Teams with collaboration or whether you're businesses continues to be a motivator for us to look at the prices as well on all the new apps that we've added.  So hopefully, that gives you color.

Let me also back up and say ***this is, for us, all really about customers and delighting customers***.  But because we had an earnings call, we said as this gets rolled out, we at least want to give you some heads up because otherwise, some of you would say, why didn't you at least allude to it?  As David said, this doesn't have an impact in Q2 really.  It's a pretty small impact.  But that was the rationale and thinking associated with it.  And we will certainly roll this out with customers first, and then we will

share with you more of what the impact is.  But that's the way we look at how we move the business going forward.

128.     A BMO Capital Markets Equity Research analyst later asked whether competition had affected Adobe's subscriber growth in the creative business, presenting the question as follows: "Shantanu [Narayen], in the past, you've said that in the Creative side, new subscribers was the most significant contributor to growth.  And I just wanted to try to understand, given more competition perhaps in the lower end of the market, is that still true?"  Narayen responded: "the unit growth is being driven by single apps, which is new subscribers and driving to it. So that trend, in terms of continuing to drive single unit, is definitely part of how we think about it."

129.     Truthfully, competition from and loss of market share to Figma played a role in the Company's development of collaborative functions for its creative digital tools, and—contrary to Narayen's "categorical" denial—Figma's ability to convert and retain users with its own freemium business model did influence the Company's pricing decisions.  It was materially misleading for Defendants to continue to downplay the impact of competition on Adobe's business, particularly when analysts had repeatedly asked about it.

### k.     The 1Q22 Form 10-Q, filed March 30, 2022

130.     On March 30, 2022, Adobe publicly filed with the SEC its Form 10-Q for the first fiscal quarter ended March 4, 2022 ("1Q22 Form 10-Q").  The 1Q22 Form 10-Q contained the same materially misleading risk factor statements regarding competition as the 3Q21 Form 10-Q.  As the signature page to the 1Q22 Form 10-Q recited, Adobe "caused" Durn, the "Principal Financial Officer" as Adobe's CFO, to sign the SEC filing, which he did, "[p]ursuant to the requirements" of the Exchange Act.  Additionally, Durn and Narayen signed Certifications, attached to the 1Q22 Form 10-Q, attesting that they had "reviewed" the filing and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in

light of the circumstances under which such statements were made, not misleading with respect to the period covered" therein.

131.    In this respect, Durn and Narayen vouched for the accuracy, completeness, and truthfulness of the information set forth in the 1Q22 Form 10-Q, including the statements, detailed above, regarding competition, market share, and the development or enhancement of existing products.  In truth, however, the 1Q22 Form 10-Q was false and materially misleading because it failed to disclose material information that grossly undermined and contradicted those statements. Accordingly, the Certifications were also false and materially misleading.

### l.    The April 8, 2022 Bernstein Conference Call

132.    On April 8, 2022, analyst firm Sanford C. Bernstein & Co., LLC ("Bernstein") hosted a fireside chat, which Durn and Vaas attended on behalf of Adobe.  During the call, an analyst asked about the size of acquisitions under consideration, inquiring: "How does your prior experience affect or impact your style in thinking about acquisitions?  And are they big acquisitions?  Are they little is your approach there?"  Durn's response focused on "organic growth," implying that the Company had no inclination or need to pursue large deals (emphasis added):

> Yes. ***So rather than classify them by size, I would say that we're going to make smart acquisitions at this company.  What I mean by that is, is grow—and so I'm going to be oriented towards growth***.  The opportunity set in front of us is large, it's enormous. So the engine of innovation is second to none at this company.
>
> This company is unbelievably innovative, delivers an incredible amount of value, executes well and adds a tremendous amount of value to our customers.  So when you take that engine of innovation and you expose it to large growing market opportunities, ***the highest value form of growth is organic growth.  We are oriented towards organic growth***.
>
> So by definition, ***when you think about M&A and layering in M&A, inorganic growth to complement that, the bar for those transactions is going to be high because the organic growth opportunities are so attractive***.  But where we see an opportunity to accelerate our strategy, further our leadership position, accelerate time to market and do it in a value-accretive way for shareholders, we'll burn calories to acquire those assets.

133.     In fact, Durn referenced the relatively small Frame.io acquisition—valued at $1.275 billion and completed in 2021—as the "perfect example" of the type of transaction Adobe would consider, which would allow it to leverage its existing technologies and facilitate development:

> Frame is a perfect example of that. Frame is a great business that's performing incredibly well, but it's also got a collaboration engine and technology that we can use to accelerate the proliferation of collaborative capabilities across our entire product set. We've got a great road map. This will just accelerate the development of that road map and making those collaboration capabilities more pervasive across the product set. That's a great example of a transaction that's going to add a lot of value over time.

134.     In this respect, Durn led investors to believe that the Company might seek out smaller acquisitions capable of adding value, but would focus above all else on organic growth in its product portfolio. In fact, later on the call, he said "I don't think there's a company out there that can touch the position that we have in the market." These representations engendered a materially misleading portrayal of Adobe's merger plans and competitive position. Indeed, just 12 days later, Wadhwani and Belsky met with Figma CEO Field to discuss "the possibility of Adobe acquiring Figma," and within a few weeks, Adobe and Figma had signed a confidentiality agreement to allow them to share nonpublic information to facilitate negotiations.

135.     During the call, Durn also spoke positively about Creative Cloud Express, claiming "there's a richness and robustness in the market that very few people will be able to compete with. And so we feel great about the positioning." Again, these representations concealed vulnerabilities in Adobe's competitive position that Defendants themselves privately identified and appreciated and sought to mitigate with the Figma acquisition—a transaction then under serious consideration.

### m.     The May 23, 2022 Bloomberg Interview of Narayen

136.     On May 23, 2022, Bloomberg Technology interviewed Narayen. He represented that "a number of companies that are single-product companies that may not have the depth and the

breadth of the kinds of offerings that the larger tech companies like Adobe have will be shaken up," noting market conditions presented "opportunities" for the Company. When asked about "increasing competition from Canva" and others, and how Adobe "plan[ned] to hold off some of that potential market share gain to some of these competitors," he said that Adobe's status as "the largest company in [the creative] space," coupled with "the breadth of our offerings and . . . depth of our technology and understanding of these trends," differentiated it from the competition.

137.    On the topic of Adobe's M&A plans, Narayen referenced market turmoil affecting smaller companies, claiming that because of "what's happened in the market, there will be a number of companies" for Adobe to consider. He then discussed two acquisitions Adobe completed in 2020 and 2021, respectively—Workfront, for $1.5 billion, and Frame.io, for $1.275 billion—as examples of its M&A activity. He added: "we're always looking," but are "very pleased with the portfolio of products that we have and the depth . . . ."

138.    These representations misleadingly downplayed the competitive threat from Figma, when, in truth, Adobe was in talks to acquire Figma because its existing offerings could not compete effectively against Figma in the creative design space.

**n.    The June 16, 2022 2Q22 Earnings Conference Call**

139.    On June 16, 2022, Adobe issued a press release, included as an attachment to a Form 8-K, reporting its financial results for the 2022 second fiscal quarter ("2Q22") ended June 3, 2022. Durn signed the Form 8-K as CFO. Later that day, the Company held a conference call for investors and analysts. Defendants Narayen, Durn, Wadhwani, and Vaas participated in the call, joined by Chakravarthy. Twelve analysts covering Adobe attended the call.

140.    During the question-and-answer session, an analyst again asked for detail on Adobe's pricing approach, noting that Creative Cloud Express offered what "would be considered typically

premium features." Wadhwani substantially reiterated his comments from the 1Q22 earnings call, on March 22, 2022, emphasizing the freemium pricing of the product offering:

> Where we see Express filling in is that Express is additive and broadens the reach in that new communicator base because of exactly what you're saying, the freemium business model, the zero-friction onboarding. It's clearly showing that we're able to attract millions of new users into the franchise. And we're able to do it very efficiently by optimizing how we onboard customers from search terms that typically were not ones that we focused on in the past. We also look at the ability to onboard those users and differentiate the offering with the integration of these amazing features that we get from the desktop applications like Adobe Magic. And all of this helps differentiate what we're doing with Express.
>
> And if we take a step back and look at it from a business perspective, we feel very confident that Adobe Express and the way we actually pull people into that funnel is additive to the market opportunity that we're playing. So we are really emphasizing the ability to add more capabilities there and differentiate there.
>
> I do also want to remind folks that Express is also available to core Creative Cloud customers. And by integrating some of those features into Express, we're enabling workflows between the core Creative Cloud products and also Express, and we believe that's going to have a strong retentive value on the core base. And we just had, in fact, a great quarter with very strong retention for Creative Cloud as well.

141.    Wadhwani's statements were false and materially misleading for the same reasons that his comments on the 1Q22 earnings call were: Figma's ability to convert and retain users with a freemium business model undoubtedly influenced the Company's pricing decisions and Wadhwani's omission of this information falsely conveyed otherwise.

142.    An analyst then asked Narayen for detail on the Company's merger plans, focusing on "large strategic M&A": "with respect to the strategic approach to M&A and kind of what's on the horizon given the changing valuation paradigms in the market, how important is either a large strategic M&A to the growth profile of the business versus tuck-ins?" As the following excerpt reflects, Narayen again denied that any plans for large acquisitions were on the horizon using talking points similar to those he used in the May 23, 2022 *Bloomberg* interview (emphasis added):

> Clearly, valuations, to your point, have changed quite a bit. And the first thing I'll start off by saying is ***we're really pleased with our portfolio***. If you look at some of

the new initiatives, and we've touched on that, whether it's Adobe Express, whether it's the Real-Time CDP, Customer Journey Analytics, what we are doing with things on the web, including PDF, *we feel really good*.  I do feel, Alex, that *there are going to be a number of small single-product companies that are probably not going to survive what's happening.  And the valuation sort of multiple changing is actually, I think, good for a larger company like Adobe*.

*So it doesn't feel like we need anything*, but we'll always be on the lookout for things that are additive, that are adjacent and that will provide great shareholder value.  And our metrics associated with ensuring great technology, great cultural fit and adjacency remain.  *But we have so much going on within the company that we're excited about our current portfolio.  Clearly, things will be more reasonable in terms of M&A as well*.

143.    Narayen's representations regarding Adobe's M&A plans were false and materially misleading, given that the Company was then actively negotiating the Figma acquisition—a deal that Narayen later described as "transformative"—and management had internally recognized the need to acquire Figma to effectively compete in the UI/UX market for all-in-one design software.  In fact, the Company's SEC filings related to the merger revealed that just three days after these statements, Adobe offered to buy Figma "for $20 billion in total acquisition consideration," with "approximately 50% of the acquisition price . . . payable in cash and the remainder in Adobe equity securities."

**o.      The 2Q22 Form 10-Q, filed June 29, 2022**

144.    On June 29, 2022, Adobe publicly filed with the SEC its Form 10-Q for the second fiscal quarter ended June 3, 2022 ("2Q22 Form 10-Q").  The 2Q22 Form 10-Q contained the same materially misleading risk factor statements regarding competition as the 3Q21 Form 10-Q. As the signature page to the 2Q22 Form 10-Q recited, Adobe "caused" Durn, the "Principal Financial Officer" as Adobe's CFO, to sign the SEC filing, which he did, "[p]ursuant to the requirements" of the Exchange Act.  Additionally, Durn and Narayen signed Certifications, attached to the 2Q22 Form 10-Q, attesting that they had "reviewed" the filing and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in

light of the circumstances under which such statements were made, not misleading with respect to the period covered" therein.

145.    In this respect, Durn and Narayen vouched for the accuracy, completeness, and truthfulness of the information set forth in the 2Q22 Form 10-Q, including the statements, detailed above, regarding competition, market share, and the development or enhancement of existing products.  In truth, however, the 2Q22 Form 10-Q was false and materially misleading because it failed to disclose material information that grossly undermined and contradicted those statements. Accordingly, the Certifications were also false and materially misleading

### p.    The August 25, 2022 *CNBC* Statements

146.    On August 25, 2022, long after Adobe realized Photoshop was losing market share to competitors like Figma and Adobe had essentially discontinued XD, an Adobe spokesperson told *CNBC* just the opposite:

> "We do not see an impact to the Photoshop business resulting from players in the product design category," the spokesperson said.  "We developed and have evolved Adobe XD to address the needs of our core design customers, who are designing marketing experiences for screens, rather than the distinct category of product design and development."

147.    These statements, which were flatly untrue, preceded Adobe's announcement of the Figma acquisition—and the concomitant exposure of the truth—by only three weeks.  Indeed, these statements contradicted Adobe's own internal documents and conclusions, which the CMA would later emphasize in its November 2023 Report.

### q.    The September 15, 2022 Press Releases, Presentation and Earnings and Merger Conference Call

148.    On September 15, 2022, Adobe issued a press release, included as an attachment to a Form 8-K, reporting its financial results for the 2022 third fiscal quarter ("3Q22") ended September 2, 2022.  Durn signed the Form 8-K as CFO.  In the 3Q22 earnings press release, Narayen referenced

Adobe's proposed acquisition of Figma, disclosed in a separate press release that day, commenting: "With the announcement of our intent to acquire Figma, we believe we have a unique opportunity to usher in a new era of collaborative creativity."

149.    Adobe attached the merger press release to a Form 8-K which General Counsel Rao signed.  As attachments to Form 425, Adobe also filed publicly with the SEC written presentation materials regarding the merger and excerpts of the 3Q22 conference call script, as well as articles, blog posts, and comments on the merger.  These materials ranged from congratulatory social media posts, to substantive tweets from Belsky and even Adobe XD itself (discussed below), to a Greylock post regarding Figma's path to the merger.

150.    These materials did not reveal that Defendants had long ago begun to wind down XD and that XD was essentially a zombie program without any direction or prospect of development. Rather, they noted Figma was "[e]xpected to add ~$200 million of ARR [annual recurring revenue] in 2022, and to surpass $400 million ARR exiting fiscal year 2022," "with gross margins of ~90 percent," "~850 employees," and a "[t]hriving developer ecosystem . . . ."  The materials also noted that "Figma userbase extends across the product design process," as this excerpted slide illustrates:



### Figma userbase extends across the product design process

151.    Later that day, Adobe held a conference call for investors and analysts to discuss its 3Q22 results and the merger.  Defendants Narayen, Durn, Wadhwani, and Vaas participated in the call, joined by Chakravarthy.  Ten analysts covering Adobe attended the call.

152.    In his opening remarks, Narayen represented that "[t]he combination of Adobe and Figma will significantly expand our reach and market opportunity while making the creative process more accessible, and productive to more people."  Wadhwani's comments mirrored the importance of Figma to Adobe's business, noting "Figma has built an incredible product and an outstanding business" and "is expected to add approximately $200 million in net new ARR this year, surpassing $400 million in total ARR exiting 2022 with greater than 150% net-dollar retention rate."  He added: "With the total addressable market of $16.5 billion by 2025, Figma is just getting started."

153.    In turn, Durn offered insight into the financial ramifications of the transaction, noting: "In year 1 and 2 after closing, the transaction will be dilutive to Adobe's non-GAAP EPS, and we expect it to breakeven in year 3 and accretive at the end of year 3."  He also explained that Figma would improve Creative Cloud's functionality, noting "Figma's innovative technology platform will accelerate our R&D roadmap, including the delivery of our Creative Cloud technologies on the web which will allow Adobe to focus and manage our future R&D investments."

154.    In response to an analyst's question, Narayen addressed "why we believe this is a fundamentally transformative move for Adobe," explaining: "this is going to be an incredible value and a way to attract a whole bunch of new customers to the combined platform."  Another analyst probed further, however, asking if the merger "seems more reactive versus proactive" and inquiring about the condition of "Adobe's organic-innovation engine" and ability to capture "trends," as the following exchange reflects (emphasis added):

> **Brad Alan Zelnick Deutsche Bank AG, Research Division - Head of Software Equity Research and Senior US Software Research Analyst**
> This is obviously a big moment for Adobe.  It's pretty clear what Figma brings to the table in terms of innovation, collaboration and communities.  And I appreciate the comments about Figma helping to further webify core Adobe products.  But ***what do you say to the perspective that this $20 billion acquisition seems more reactive versus proactive***?  And perhaps more importantly, ***how do we get comfortable that Adobe's organic-innovation engine is alive and well*** for capturing the trends and opportunities that lie ahead in Creative?

**Shantanu Narayen Adobe Inc. - Chairman & CEO**
Brad, it's a good question. And ***I understand that in these markets, in particular, acquisitions and maybe large ones are viewed with some skepticism***. We certainly believe, and I'll talk about it, that ***Figma will be a transformative deal*** for the customers and industries. And it dramatically increases our TAM. We can deliver great value to an increasing set of customers. But I also want to reassure all of you, and if you look at our results, ***this in no way changes our focus or our excitement on our current portfolio***.

We're growing well, and we're demonstrating strength across all of our 3 cloud offerings, and ***we continue to execute against our current initiatives***. And so if you look at the multiple internal businesses that are achieving velocity, whether it's Adobe Experience Platform and the apps that are built natively on top of it, what's happening with 3D and Immersive, what's happening with Acrobat Forms, what's happening with Frame.io. ***This is additive***.

***And when opportunities like this present themselves, Brad, I think it's the great companies that look at it and say, are you going to focus on the here and now only?*** Or are you going to seize on the opportunity that really positions Adobe for the next few decades? And so it's a great question. We understand that there'll be questions associated with valuation. We certainly believe that it provides valuation to our shareholders as well. ***When you look at what this means for us, but in no way diminishes my excitement around our current portfolio***.

155.    Narayen's admissions that the transaction was transformative and evidently necessary because Adobe could not compete effectively against Figma exposed the Company's vulnerabilities, contradicting and undermining his June 16, 2022 representations that: (a) Adobe had no plans to pursue large, strategic M&A deals; (b) the condition of the markets, and the associated valuation of other companies, somehow benefited Adobe; and (c) the Company's current portfolio of products positioned the Company to compete effectively.

156.    Underscoring analysts' concern and confusion about Adobe's plans to acquire Figma, which contradicted Defendants' Class Period representations, another analyst asked why Adobe felt the need to acquire Figma when the Company had its own offering in the space, Adobe XD. Again, this analyst expressed concern that Adobe's proposed acquisition of Figma broke from Narayen's

earlier statements and the Company's past practices in opting not to pursue large M&A deals, as the following excerpt reflects (emphasis added):

> **Brent John Thill Jefferies LLC, Research Division - Equity Analyst**
> Shantanu—everyone's admired your ability to stay disciplined on M&A over the last decade. And I guess *many are kind of feeling like you broke the mold on this*. And I think everyone just wants to hear on the multiple, even if revenue doubled again, it'd be over 25x ARR. So what was it that was so special? And if you think about *in the last few years, you've always said XD could carry you, why—what happened with XD—what happens with XD now as this scales?*
>
> **Shantanu Narayen Adobe Inc. - Chairman & CEO**
> So 2 things to that, Brent. The first is I understand that what you're saying in effect is some people will say, hey, show me how this value is accruing to Adobe shareholders as well. And we certainly believe that otherwise we wouldn't be doing it. And we do believe that it will be value-generating for the Adobe shareholders. *I think as it relates to XD and as it relates to Figma, I mean, we certainly, for designers, we're targeting what needed to happen as it related to screen design with the desktop product.*
>
> *I think the much newer market that emerged, which Figma effectively both addressed and pioneered was the ability to do this in a collaborative way and dramatically increase the scale.* And they, over the last decade, have really invested in and solve some of the hard technical problems that existed to make this happen on the web friction-free. So from our perspective, *the Creative products continue to be strong*, the ability to really tie the designers and developers is really where there's this unique opportunity as well as to create new markets.

157.     This exchange confirmed the public's lack of awareness that Adobe had effectively discontinued XD and was abandoning further development of the product, which Defendants had not yet publicly disclosed and would not do so for days after announcing the merger. This exchange also confirmed Defendants' lack of confidence in Adobe's existing product portfolio as a means to position the Company for the future. Statements like these made clear that Defendants viewed the purchase of Figma—in an extraordinary transaction, at extraordinary cost—as the only true means of competing effectively against Figma and repositioning Adobe's portfolio to satisfy user demand for innovative and collaborative products in the creative space.

158.     The rest of the conference call further emphasized these points.  When an analyst asked Narayen whether he was "suggesting perhaps that there's something in their DevOps . . . that may lead ultimately to a material change in Adobe's product release cadence or product packaging," he responded: "for the Creative, we really believe that this is one of the key pieces of technology that we're getting . . . ."  Wadhwani also noted that Figma would "allow us to reimagine what . . . content creation should look like in the future" by integrating Adobe's technology with Figma's.

2.     **Adobe Misleadingly Promoted XD as a Viable and Developing Product During the Class Period Despite Defendants' Decision to Disinvest and Knowledge It Could Not Compete With Figma**

159.     During the Class Period, Defendants promoted Adobe XD as a viable and developing product despite the Company's plans to wind down the application no later than October 2021.

160.     As shown herein, for example, Adobe's December 16, 2021 presentation materials portrayed XD as an integral part of the Creative Cloud suite of programs, grouping XD together with Photoshop and Illustrator and describing how these "flagship applications" continued to connect creators.  Additionally, tweets entering the public domain from Adobe XD's official Twitter (now known as "X") account (verified by blue checkmark) )—sometimes several per day, in fact—and official social media accounts of employees and other representatives with specialized access to, and knowledge of, XD, contributed to the misleading impression that Defendants created of XD as a viable and developing product.

161.     On August 24, 2021, Elaine Chao, a product manager working on Adobe XD, issued a tweet about the status of XD, promising that "some [fire emoji] new features [are] in the pipeline [and] coming soon"—a tweet XD's official account reposted, as this excerpt reflects:



162.    On that same date, she responded to an XD user who criticized a lack of transparent communication about new features, representing that  XD's "priorities . . . haven't changed" and that it was "currently working to deliver on the areas we've been talking about," as follows:



163.    On September 2, 2021, the official Adobe XD account (verified with blue checkmark) issued a tweet referencing a "guide" on a trending topic of interest—"how AI fits into the UX design process"—stating: "Understanding the basic principles of good information architecture is essential for designers that want to practice user-centered design":



164.    On October 26, 2021, the official Adobe XD account (verified with blue checkmark) issued a tweet referencing an update, advising the public that "[t]he latest release of Adobe XD has

everything you need to make your prototypes MOVE," and directing the public to a hyperlink to "[s]ee what's new":



165. On that same date, Jonathan Pimento, XD's Senior Project Manager, issued a tweet responding to user complaints about XD's functionality, assuring "better asset management and search + collab features coming early next year," as the following excerpt reflects:



166. On January 11, 2022, the official Adobe XD account (verified with blue checkmark) issued a tweet announcing that "[t]he latest version of Adobe XD is live, with new features to make your prototypes more dynamic than ever," directing readers to a link to "[s]ee what's new":



167.    On May 13, 2022, the official Adobe XD account (verified with blue checkmark)

reposted a tweet from a recently named XD ambassador, who wrote that she was "thrilled to produce

more Adobe XD content" and told the public to "[s]tay tuned," as the following excerpt reflects:



168.    On August 25, 2022, as noted above, an Adobe spokesperson told *CNBC* that the

Company "do[es] not see an impact to the Photoshop business resulting from players in the product

design category," representing: "We developed and have evolved Adobe XD to address the needs of

our core design customers . . . ."  By then, however, Defendants had placed XD on a path to end of

life, diverted all resources necessary to further develop XD elsewhere, and privately did not view it

as a viable product or competitor to Figma.

169.    Additionally, Defendants were keenly aware of the threat that Figma—the market

leader in the "product design category"—posed to the Company's flagship products, Photoshop and

Illustrator.  Thus, it was false and materially misleading for an official Adobe spokesperson to deny

any "impact to the Photoshop business resulting from players in the product design category" or

describe XD as a continuing and viable product offering.

170.    In the morning on September 15, 2022, the date of the merger's announcement, the

official Adobe XD account (verified with blue checkmark) issued a tweet which suggested that XD

would survive the transaction, by expressing excitement that Figma was "joining us," "bringing all

sorts of new possibilities to the table," and commenting: "We look forward to the road ahead."  This

tweet was issued in response to one from Adobe's official account (verified with blue checkmark),

which announced the merger.  The relevant portion of these tweets, complete copies of which Adobe

filed publicly with the SEC on September 15, 2022 as attachments on Form 425 (with other

materials), is as follows:



171.    The official Adobe XD account (verified with blue checkmark) issued another tweet,

also filed publicly with the SEC as an attachment to Form 425 on September 15, 2022, with the same

message:



172.    The official Adobe XD account issued that tweet in response to an earlier tweet from

Adobe's official account (verified with blue checkmark), which was identical to the previous tweet

announcing the merger and also filed publicly with the SEC on September 15, 2022 as an attachment

to Form 425:

**Adobe (Default)** ✔
5h · 🌐
We're excited to share our intent to acquire Figma. Together, we will usher in a new era of collaborative creativity. Key info: https://adobe.ly/3BEzZ2n

173.    All of these public statements about Adobe XD were false and materially misleading when made, because they misrepresented and otherwise concealed what Defendants knew all along: Adobe XD was a "failure" that was unable to capture meaningful market share in 2020, 2021 and 2022 and was so beyond fixing that Defendants chose to discontinue it.

174.    The Individual Defendants were a knowing source of information disseminated in these communications and knowingly or recklessly sponsored, ratified and approved their language, content, and issuance.  Presentation materials and tweets tied to or otherwise discussing Adobe and Adobe XD would not have been issued or publicized without the Individual Defendants' personal awareness, knowledge, authorization, input or involvement in some respect.  Further, the Individual Defendants never corrected any of Adobe's presentation materials or Adobe and Adobe XD tweets, disavowed their content, or called for their retraction.  Instead, the Individual Defendants or their agents authorized the public filing of certain tweets with the SEC (discussed below), and Adobe's posting of the December 16, 2021 presentation on its official Investor Relations website, which, at all relevant times, was presumably under Vaas's direction and control.  All of these communications are, accordingly, attributable to the Individual Defendants.

**3.    SEC Filings that Described the Most Significant Risks Facing Adobe Falsely and Misleadingly Portrayed as Hypothetical Issues That Were Then Affecting the Company**

175.    Throughout the Class Period, Adobe's Forms 10-Q and 10-K made materially false or misleading representations about potential or hypothetical competitive risks when, in fact, those risks had already materialized.

176.    Every Form 10-Q filed during the Class Period—the Forms 10-Q filed on September 29, 2021 (3Q21 Form 10-Q, for the fiscal quarter ended September 3, 2021), March 30, 2022 (1Q22

Form 10-Q, for the fiscal quarter ended March 4, 2022), and June 29, 2022 (2Q22 Form 10-Q, for the fiscal quarter ended June 3, 2022)—contained the same purported risk warnings regarding the Company's competitive position and ability to attract and retain customers. The identical language was also set forth in: (a) the 2020 Form 10-K, filed on January 15, 2021; and (b) the 2021 Form 10-K, filed on January 21, 2022. Each Form 10-Q referred investors to the "risks described" in the earlier-filed Form 10-K, despite its vintage.

177.    The risk language included in the Forms 10-Q and 10-K framed all of the competitive risks facing Adobe in purely hypothetical terms that failed to reflect the current state of competition facing the Company (emphasis added):

> ***Our competitive position and results of operations <u>could</u> be harmed if we do not compete effectively***.
>
> The markets for our products and services are characterized by intense competition, new industry standards, evolving distribution models, limited barriers to entry, disruptive technology developments, short product life cycles, customer price sensitivity, global market conditions and frequent product introductions (including alternatives with limited functionality available at lower costs or free of charge). Any of these factors ***<u>could</u>*** create downward pressure on pricing and gross margins and could adversely affect our renewal and upsell and cross-sell rates, ***as well as our ability to attract new customers***. Our future success will depend on our continued ability to enhance and integrate our existing products and services, introduce new products and services in a timely and cost-effective manner, meet changing customer expectations and needs, extend our core technology into new applications, and anticipate emerging standards, business models, software delivery methods and other technological developments. Furthermore, some of our competitors and potential competitors enjoy competitive advantages such as greater financial, technical, sales, marketing and other resources, broader brand awareness and access to larger customer bases. As a result of these advantages, ***potential and current customers <u>might</u> select the products and services of our competitors, causing a loss of our market share***. In addition, consolidation has occurred among some of our competitors. Further consolidations in these markets may subject us to increased competitive pressures and may harm our results of operations.
>
> *        *        *
>
> The process of developing and acquiring new technology products and services and enhancing existing offerings is complex, costly and uncertain. ***<u>If we fail to anticipate customers' rapidly changing needs and expectations or adapt to emerging</u>***

***technological trends, our market share*** and results of operations ***could suffer***. We must make long-term investments, develop, acquire or obtain appropriate intellectual property and commit significant resources before knowing whether our predictions will accurately reflect customer demand for our products and services. ***If we misjudge customer needs in the future, our new products and services* may** not *succeed* and our revenues and earnings may be harmed.  Additionally, ***any delay in the development, acquisition, marketing or launch of a new offering or enhancement to an existing offering* could** result in customer attrition or impede our ability to attract new customers**, causing a decline in our revenue, earnings or stock price and ***weakening our competitive position***.

178.    The emphasized portions of the risk factors set forth above were false and materially misleading because they presented the significant risks that had already materialized as hypothetical risks that had not yet (and may never) come to fruition, including the following: (a) harm to or weakening of Adobe's competitive position; (b) loss of market share and customer attrition; (c) adverse effects to Adobe's ability to attract new customers; and (d) products and services failing to succeed.  In fact, as the CMA's November 2023 Report and Defendants' admissions in the CMA's proceedings confirm, Defendants knew that these risks had already come to pass:

a.    Adobe's competitive position in both the UI/UX design tools market, and the vector and raster editing markets in which its flagship Illustrator and Photoshop products primarily competed, was already weakening prior to and during the Class Period due to Figma's domination of the UI/UX design tools market.  Indeed, Adobe began to wind down its primary product serving this space, XD, in late 2021, effectively giving up on competing organically in the burgeoning UI/UX design tools market.  Further, Defendants recognized that Figma's strong position in the UI/UX design tools market made it an increasing threat to the continued success of flagship products Photoshop and Illustrator, because Figma already had vector and raster editing capabilities and because Adobe perceived the UI/UX design tools market as a point of disintermediation between how customers access its creative design products more widely.  Defendants' recognition of the weakening competitive position of flagship products Photoshop and Illustrator is further evidenced

by the fact that, in September 2021, Adobe commissioned studies of the threat from Figma—an unusual step that reveals Defendants' perception of Figma as a unique and emerging threat that was currently harming the Company's competitive position.

        b.    Adobe was already losing market share and customers to Figma prior to and during the Class Period.  Indeed, Adobe General Counsel Rao admitted after the Class Period that Adobe "had tried and failed" to compete in the UI/UX design tools market with XD, and that Adobe "ha[d] no share, and Figma's the leader, and we're out."  Adobe's loss of market share to Figma during the Class Period is also confirmed by, for example, the 2022 UX Tools survey, which shows that XD's share of the UI/UX design tools market was trending downwards—falling from near 25% at the beginning of the Class Period to closer to 15% by the end of the Class Period— while, at the same time, Figma's share in the same market was increasing, going from roughly 75% to over 85%. The CMA also examined the issue, concluding, based on submissions from Adobe and Figma, that XD had between 0% and 5% of market share in 2020, 2021 and 2022 based on booked revenue in the end-to-end product interactive product design software market, as compared to Figma's growing market share during that time, as the following excerpt of a chart from the November 2023 Report (portions of which the CMA redacted) reflects:

**Table 8.1: Share of supply estimates submitted by the Parties in end-to-end interactive product design software based on booked revenue, globally, 2020-2022**

| Provider | 2020 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Million USD | Share (%) | Million USD | Share (%) | Million USD | Share (%) |
| Figma | [✂] | [20-30] | [✂] | [40-50] | [✂] | [60-70] |
| Adobe | [✂] | [0-5] | [✂] | [0-5] | [✂] | [0-5] |

        c.    Figma was already adversely affecting Adobe's ability to attract and retain new customers prior to and during the Class Period—a conclusion corroborated by Adobe's loss or stagnant market share in the UI/UX industry, as compared to Figma's growing share (shown above). Additionally, an August 25, 2022 *CNBC* article reported that Figma had beaten Adobe in attracting product design business from important enterprise customers such as Microsoft, Google, Oracle,

Salesforce, Airbnb, Dropbox, Herman Miller, Stripe, and Twitter.  As the article related: "For Figma, getting traction inside big companies, particularly within Microsoft, has required going head-to-head with Adobe's competing XD program, and winning its fair share of deals. . . .  Benedikt Lehnert, a Microsoft product design director, told Friedman [a Microsoft vice president of design and research] that the company needed everyone on the same program, whether it was Figma or XD.  Microsoft chose Figma."  This loss of business is all the more surprising because Adobe and Microsoft were close business partners, with Adobe CEO Narayen publicly acknowledging their close and valuable relationship.  Figma's free pricing tier also attracted new customers away from Adobe products, as the CMA's November 2023 Report notes:

> A competitor in vector and raster editing stated that the tools a person used during their education would directly impact the tools the person uses as a professional designer.  It stated that Figma's expansion into different customer segments "was a huge threat for Adobe because they historically would get people coming out of graphic design degrees straight to Adobe.  It was just there, it was the only tool you had to use . . . but now, when you are coming out of university as a graphic designer, you are more likely to launch into Figma . . . ."

d.      Adobe's XD product was already not succeeding prior to and during the Class Period.  Indeed, the first risk statement quoted above was made on September 29, 2021, but XD was already failing so badly at this point that Defendants decided to "disinvest" in XD in October 2021, reassigning the vast bulk of its workforce; the Company then placed XD in "maintenance mode" in February 2022, signaling the product's end of life.  Moreover, in contradiction to their statements to investors that Adobe's "products and services may not succeed," Adobe repeatedly represented to the CMA that prior to Adobe's announcement of the planned acquisition of Figma, XD was a "failed product."  Adobe even told the CMA that "[t]he board's decision to acquire Figma conceded that defeat" and "Adobe has no organic path . . . ."  Adobe's General Counsel Rao also described XD's lack of success during the Class Period in stark terms in a January 9, 2024 article in *The Verge*, remarking that he "didn't even know it was still alive at the time" and "was just sort of dead to us":

We spent a lot of time, as you would imagine, before making the decision to go forward—thinking through the competition issues and what those would be and understanding, to the extent everyone understands the details of this, we had a product called Adobe XD that was a product design tool that we had started five to seven years ago.  Obviously, we were well aware of that.

[XD] was only making $15 million of standalone revenue. We hadn't invested it… Actually, at the executive team level, I didn't even know it was still alive at the time. We don't even talk about it.  It was just sort of dead to us, but it was on maintenance mode, and we were just serving out some enterprise customers who had already contracted for it.  So we just left it alone. . . .  It has no share, and Figma's the leader, and we're out and it's been dead.

179.    Notably, the risk factors section of the 2022 Form 10-K—filed in January 2023, after the Class Period—contained a significant change from the risk factors disclosed to investors during the Class Period.  Throughout the Class Period, Adobe began its substantive risk factors disclosures with the following language in bold and italics: "***Our competitive position and results of operations could be harmed if we do not compete effectively***."  In the 2022 Form 10-K, however, Adobe began that disclosure with this language: "***The markets in which we operate are intensely competitive, and if we cannot continue to develop, acquire, market and offer new products and services or enhancements to existing products and services that meet customer requirements, our operating results could suffer***."

180.    Removing reference to possible harm to Adobe's "competitive position" in the 2022 Form 10-K—which was framed only as a hypothetical risk in Class Period disclosures—suggests that Adobe's competitive position was, in fact, adversely affected during the Class Period.  That is, because the truth regarding Adobe's competitive position had already been disclosed before the 2022 Form 10-K was filed, Defendants knew there was no longer a need to warn about Adobe's failure to compete effectively against Figma by couching it as a mere possibility.  Indeed, analysts even took note of the new language, with Deutsche Bank featuring the change in its January 17, 2023 report.

181.    Accordingly, for all of these reasons, Adobe's purported risk factor disclosures were false and materially misleading because they described potential risks facing the Company rather than disclosing existing problems worsening throughout the Class Period that were affecting the very fabric of the business.  Put succinctly, these were current—not hypothetical or possible—problems, and representing otherwise, while omitting critical information on the materialization and current impact of these risks, was misleading.

### D.    Wadhwani's Involvement in Greylock Led to Adobe's Latest and Only Successful Offer to Acquire Figma, Elevating His Profile at Adobe While Offering Greylock Extraordinary Investment Returns

182.    Wadhwani initially joined Adobe in 2005 when it acquired Macromedia, Inc., where he was responsible for developer products.  From 2005 until his departure from Adobe in 2015, he led development of solutions for content publishers and application developers and oversaw creative products, attaining the positions of Senior Vice President and General Manager of the Digital Media business.  Reportedly, Wadhwani was instrumental in transitioning Adobe's Digital Media business from a perpetual license model to a cloud-based subscription model.

183.    In 2015, Greylock recruited Wadhwani to serve as CEO of AppDynamics, in which Greylock invested.  He remained at AppDynamics until 2016, when Cisco acquired it; he remained at Cisco until 2019.  Upon leaving Cisco, Wadhwani joined Greylock as a Venture Partner, where he identifies, negotiates and shepherds investments in the technology space for himself and Greylock.  During his tenure at Greylock, he led investments in Gem, Validere, and Cribl, raising nearly $600 million (with other investors) for these companies (other investments in which Wadhwani was or is involved are nonpublic, according to Greylock's website).  These companies all operate in the digital space, and Wadhwani—along with Greylock—remains involved in their operations even today.

184.    In June 2021, Adobe announced that Wadhwani had returned to assume the role of Chief Business Officer and Executive Vice President of Digital Media, reporting directly to CEO

Narayen.  In December 2021, Wadhwani was named President of Adobe's Digital Media business segment, in which role he continued to report to Narayen.  Before Wadhwani's return, Adobe had reached out to Figma twice in recent years—in early 2020, and in early 2021—about a potential transaction.  Figma rebuffed both advances.

185.    That all changed shortly after Wadhwani returned to Adobe.  According to reports, Wadhwani enlisted Greylock, which was an early and current investor in Figma, to connect him with Figma CEO Field.  Wadhwani and Belsky met with Field in late April 2022, just four months after Wadhwani took the helm of Adobe's Digital Media business—while simultaneously serving as a Venture Partner at Greylock.  This time, Figma was open to a potential transaction with Adobe, and negotiations regarding a sale to Adobe—which Wadhwani played a major role in handling—quickly progressed, successfully concluding by September 14, 2022.

186.    Before the NASDAQ opened on September 15, 2022, Adobe and Figma signed the merger agreement and publicly announced the transaction.  In connection with the merger, Adobe and Figma jointly prepared, and Adobe filed with the SEC, a Consent Solicitation and Prospectus, together with a Form S-4 Registration Statement (together, "Prospectus") associated with Adobe's registration and planned issuance of nearly 24 million shares of stock to fund roughly half of the $20 billion in total consideration offered for Figma.  The SEC declared the final Prospectus effective on January 11, 2023.

187.    Although the Prospectus described the April 2022 meeting between Wadhwani and Field, it did not reveal that Wadhwani met Field through Greylock or that Wadhwani remained a Venture Partner at Greylock.  In fact, Adobe did not, and still does not, clearly disclose Wadhwani's current affiliation with Greylock anywhere.  Indeed, Adobe's 2021 and 2022 Forms 10-K describe Wadhwani's background identically, reporting that he "rejoined Adobe in June 2021" and stating

that he "was" a Venture Partner at Greylock previously: "Prior to joining Adobe, he was a Venture Partner at Greylock Partners since October 2019."

188.    Wadhwani's lasting and current association with Greylock was and is exceedingly important.  Brokering the transaction—when Adobe previously could not—elevated his profile at Adobe tremendously, with media reports indicating that his widely-credited accomplishment earned him a spot as Adobe's next CEO.  Indeed, on October 31, 2022, *CNBC* even ran an article entitled "After leading $20 billion Figma deal, Adobe's David Wadhwani is in prime spot to be next CEO." As the article reported, Wadhwani "just spearheaded the purchase of Figma, [Adobe's] largest deal ever," and "is in the driver's seat to become the next CEO, a position strengthened internally by the Figma deal, some people close to Adobe said."  According to the article, Wadhwani had ambitions to attain the top spot at Adobe; reportedly, he "told colleagues when he left [the Company in 2015] that he wanted to be a CEO," and "[t]here was chatter [internally] that he'd come to see that he wouldn't be the next CEO of Adobe . . . ."

189.    But brokering the Figma transaction did not only elevate Wadhwani's stature; it also promised to provide an exceptional return on Greylock's investment in Figma—a windfall, in short. The Prospectus revealed that Greylock (and affiliates) held 60.7 million preferred shares in Figma, representing 24.5% of the preferred stock.  In the merger, each share of Figma preferred stock would be automatically cancelled and converted into the right to receive 0.045263 shares of Adobe stock and $22.4795 in cash.  Because Greylock held 60,716,278 shares of Figma preferred stock, it would have received 2,748,200 shares of Adobe common stock—valued at $1,038,352,406 using the 10-day average closing price of $377.83 per share for the stock as of September 13, 2022 (as the merger agreement provided)—and $1,356,871,571.30 in cash.  Thus, Greylock would have received cash and stock from Adobe valued at $2,395,223,977.30 in the merger.

190.    This stratospheric return would have been virtually unprecedented for an investment in a company like Figma, which was valued at about $10 billion in its June 2021 Series E funding round.  Just 14 months before that, Figma was valued at $2 billion.  Greylock was an early investor, reportedly leading Figma's $14 million Series A funding round in late 2015.  The following chart shows Figma's funding rounds:



191.    Although the magnitude of Wadhwani's financial entanglements with Greylock are not public, enabling this incredible return for Greylock would no doubt have elevated his stature (and possibly his financial stake) at Greylock.  Indeed, the transaction offered Adobe the chance to buy products it had failed to develop in Wadhwani's own business segment, while eliminating Adobe's most potent competition—Figma—and facilitating Greylock's lucrative investment exit. Wadhwani's lasting personal and professional relationship with Greylock infused inherent conflicts of interest in his involvement in the Figma acquisition on Adobe's behalf, dividing his loyalties between Adobe and Greylock and incentivizing him to withhold material information that would have publicly revealed Adobe's precarious competitive position and internal failings—including those relating to Adobe XD—during the Class Period.

192.    Concealing material information about Adobe's inferior competitive position, XD's failure and disinvestment, and the threat Figma posed to even Adobe's flagship products, ensured that the Company's stock price remained artificially inflated—benefiting interested parties on each

side of the merger.  For Adobe, the elevated stock price signaled the Company's health and appeased investors and analysts; and because it planned to fund roughly half of the merger consideration with stock, a higher stock price yielded a lower exchange ratio (determined by reference to the average 10-day closing price as of September 13, 2022).  For Greylock and its partners, the inflated stock price offered them a windfall and an exit to their Figma investment they could not find elsewhere. Simply put, withholding negative information about the Company offered a level of assurance that the merger would succeed.

193.    Accordingly, for all of these reasons, Wadhwani had a unique motive—and certainly had the opportunity—to conceal the nature and magnitude of Figma's competitive threat to Adobe's business while misrepresenting Adobe's own inability to organically forge a path in the all-in-one digital design software space that Figma dominated.

### E.    The Announcement of the Figma Transaction Exposes Adobe's Inability to Organically Compete with Figma and Figma's Competitive Threat to Adobe's Core Products, Decimating Adobe's Stock Price and Erasing Billions of Dollars in Market Capitalization

194.    The announcement of the merger on September 15, 2022 wreaked havoc on Adobe's stock price, as investors initiated a massive selloff when they realized the Company had been forced to expend an exorbitant amount to defensively acquire Figma in a bid to shore up its creative tools business and attain relevance in the all-in-one digital design market that Figma controlled.  Adobe's stock price decline was the worst it had experienced in over a decade, as the following chart from a *Bloomberg* article demonstrates:



195.    All told, the Company's stock price declined by $62.39 per share—or nearly 17%—on September 15, 2022 on extraordinarily high volume of over 27.8 million shares traded, erasing billions of dollars from the Company's market capitalization.  As the chart above demonstrates, this was Adobe's worst-performing trading day since 2010, making it the worst-performing company in the S&P 500 that day.  As detailed herein, Adobe's stock price continued to decline as the market digested information about the merger and what it meant for the business.  On September 16, 2022, for example, the stock price declined by $9.63 per share—an over 3% drop—on elevated volume of almost 15 million shares traded.

196.    Securities analysts, industry commentators, and members of the media and public expressed concern regarding the enormous price tag associated with the Figma deal—$20 billion, which then represented nearly 12% of Adobe's market capitalization, double Figma's valuation as of its 2021 funding round at the height of the tech bubble, and about 50 times Figma's annual recurring revenue.  The transaction also registered as the largest in Adobe's history, exceeding the value of its next-largest acquisition by four times.

> **1.    Analysts Viewed the Transaction as Adobe's Effort to Eliminate Competition from Figma and Compensate for a Lack of Organic Growth in the Market that Figma Dominated**

197.    Immediately after the merger announcement, analysts published reports expressing concern over Figma's lofty valuation and the implications of the transaction—which represented a dramatic departure from all of Adobe's prior M&A activity—as they recognized it would eliminate competition in the UI/UX design tools industry.  For example:

a.    Although Evercore observed that "the acquisition makes strategic sense," it offered a frank assessment that the deal was likely necessary because Adobe could not effectively compete with Figma, writing: "let's be honest—it feels like Adobe was losing some momentum to Figma and it was better to buy them out and combine forces vs. allowing them to create a bigger beachhead in the enterprise."  Noting that the merger "remove[d] the only real competitive threat to Adobe in the enterprise," Evercore acknowledged that the transaction represented a departure from Adobe's historically conservative M&A strategy, noting "this was not a cheap deal for a company that is usually pretty finicky on price" and "is going to be viewed as more defensive vs. offensive."

b.    BMO Capital Markets noted that the merger price—taking into consideration "$20 billion in cash/stock and an additional $6 million in restricted stock"—"is expensive even considering Figma's ~100% ARR growth this year."  It also viewed the deal as "[d]efensive," noting "Adobe's acquisition of Figma keeps the asset out of the hands of other software companies such as Microsoft."  In a separate report, the analyst commented that "the deal price, dilution and timing raise more questions about competition and durable growth potential of Creative Cloud."  While positive on Figma's growth, the analyst was still evaluating the merger's implications for Adobe's product portfolio, noting: "We are still exploring how much overlap there is between Figma and current Adobe assets such as XD, Frame, and Workfront."  As a result, the report noted the analyst's intent "to stay on the sidelines . . . as we evaluate the long-term potential of Adobe and Figma."

c.    Credit Suisse said the "transaction represents the highest revenue multiple ever paid for a scaled SaaS [software-as-a-service] company," noting that "[t]he deal price represents effectively double the $10 billion valuation Figma received in its last private funding round in June 2021." Credit Suisse also noted that Adobe's recent financial results and guidance, "combined with the expensive valuation paid for Figma," reinforced its view that "peaking net new Digital Media ARR . . . will result in decelerating revenue growth . . . ."

d.    Bank of America "view[ed] the proposed acquisition of Figma as a strategic LT [long-term] positive, expanding CC [Adobe Creative Cloud] into growing creative collaboration & development use cases," but wrote that "the steep valuation (50x C22 rev), suggests that Figma represents a formidable competitive threat stand[ing] alone." Downgrading its $450 price target to $350 per share "for deal uncertainty," the analyst explained: "we believe the proposed acquisition is likely to represent an overhang until deal close and the value of such a large acquisition (14% of market cap) becomes more clear."

e.    Acknowledging that Adobe departed from its historical M&A activity with the Figma deal, Jefferies recognized that the "$20B Figma acquisition is raising new concerns given its size (>4x next biggest M&A), high price (~50x ARR), and timing," observing: "While Figma may prove transformative as in past deals (e.g., Macromedia), payback period is years out on a record investment." Opining that Adobe's third quarter financial results and guidance were "Ok," Jefferies expressed concern that the high price of the Figma transaction—Adobe's "largest deal ever"—raised "questions about whether [Adobe] was compelled to make a defensive move due to cracks in the core," explaining (emphasis added, except for the lead-in sentence):

> **What we're watching: 1) $20B Figma acquisition raises lots of questions**. Figma is a privately held co that sells a web-native UI/UX & product design solution and a whiteboarding product (FigJam). ***Figma's core pdt competes with ADBE XD, though ADBE noted XD is a desktop pdt while Figma is web-based and has cracked the code on real-time collaborative design on the web***. While we agree

Figma is an attractive pdt with great traction, ***the price tag appears very high***. $20B is 50x est. '22-ending ARR (not revs) of ~$400M; assuming ARR doubles in '23 as it is expected to in '22, multiple would still be 25x. ***$20B is ADBE's largest deal ever, and >4x next biggest Marketo at $4.75B. The high price is raising questions about whether ADBE was compelled to make a defensive move due to cracks in the core and about how long it will take reach payback***. Figma is expected to be op mgn dilutive by 1-2 PPT in yrs 1-2, which works out to ~2-4% hit to EPS.

   f. Describing the price as "**eye-popping**," JMP noted "investors were stunned by the valuation that Adobe was willing to pay for Figma (~50x 2022 ending ARR of $400M+)," while quoting in its report favorable statements about the merger from Defendants Narayen, Wadhwani and Durn and identifying catalysts that likely prompted the deal, including the following (emphasis added except for non-bold italics):

   1) ***Adobe has been competing with two disruptive startups***, Figma and Canva, and ***while Adobe let Canva get away from it***, as Canva generated over $1B in ARR in 2021, ***the company seems determined not to make the same mistake with Figma***; 2) Figma is a design and visual collaboration tool with a web-based, multi-player architecture that Adobe CEO Shantanu Narayen described as "*an engineering marvel*" as it ***can support high scalability requirements*** and allow "*tens of millions of people*" to use Figma design and FigJam on the web; 3) Adobe sees a number of key benefits from Figma, including: a) ***Figma's web-based multiplayer platform should help accelerate the delivery of Adobe's Creative Cloud technologies*** on the web, thereby increasing Adobe's reach and addressable market opportunity; b) ***advancing the product design category as Adobe incorporates its capabilities into the Figma platform over time***; and c) a "*thriving*" community of designers and developers that Adobe can tap into . . . .

   g. Oppenheimer downgraded Adobe, noting "execution has been inconsistent for several quarters" and "the company overpaid for Figma, which indicates it was a defensive move"-- and "the deal adds another layer of execution risk over the next few quarters."  Noting "investors are likely going to be skeptical that a turnaround in business momentum will be a near-term event," the analyst said it would "move to the sidelines on Adobe" and identified the merger as a negative key point—noting that the $20 billion price tag "implies an ~50x ARR purchase price."

   h. RBC Capital Markets characterized Adobe's third quarter results as "solid," and the results and guidance as "in-line with what investors were looking for," but lowered its price

target by $75 per share and noted that "the pending acquisition of Figma, and more specifically the price, dominated sentiment and will continue to do so in the near-term." Noting "management feels bullish about its ability to penetrate untapped market opportunities by leveraging [Adobe's] global footprint to scale Figma, accelerate the delivery of Adobe's products to next-gen users, and jointly introduce new offerings," the analyst wrote that "investors remain skeptical about valuation with the acquisition being a significant premium to [Figma's] last funding round of $10B in 2011, and raises the question of being more reactive/defensive vs. proactive/offensive, especially in a recessionary environment."

       i.     In a report entitled "Better Late than To Not Arrive at All," Deutsche Bank noted: "Investors had been complacent with Adobe's distant leadership of the Creative tools market for close to a decade, up until the last year or so when disruptors such as Figma and Canva emerged more prominently and challenged this longstanding view." As it recognized, "[t]he negative market reaction (-17% T+1) reflects concerns around the core Creative business" (emphasis added):

> Adobe's F3Q business momentum, which by all accounts was roughly in line with lowered investor expectations, was overshadowed by its intent to acquire Figma for roughly $20bn in equity and cash. ***The negative market reaction*** (-17% T+1) ***reflects concerns around the core Creative business in light of the timing and multiple*** (~25- 30x '23 DBe ARR) being paid for Figma. Despite ***a fact pattern that appears more defensive than offensive***, we believe in the strategic rationale of this deal and in Adobe's ability to execute against it. Said differently, if Adobe announced it was acquiring Figma 1-2 years ago, we believe its shares would've traded up on the news, not down. And now with the stock losing more market cap in one day than the total deal value, we look forward to what lies ahead.

       j.     Mirroring many of the other analysts' observations, Cowen acknowledged that the price offered for Figma "was the highest M&A valuation we have ever seen, which breaks rank with ADBE's historic approach to paying relatively low multiples for acquisitions and is leading to the deal not begin accretive until year 3." Noting "this kind of transaction in this kind of env't came as a big surprise and raises some questions on organic growth trends," Cowen observed that the deal

"significantly reduces competitive risks & we think the value destruction of that would be worse at a later date." The price of the transaction led to Cowen's "initial reaction" that the deal reflects "a sign of saturating growth in CC [Creative Cloud]" or "Figma is a growing competitive threat [such] that ADBE needed to make this acquisition to address either one of these."

198.    Analysts continued to issue reports on the merger on September 16, 2022, prompting further declines in Adobe's stock price, detailed herein. For example:

      a.    While Evercore expressed support for "the strategic merits" of the Figma deal, the analyst noted: "it is difficult to justify the price (50x CY22 ARR) or level of dilution in a market where software valuations are dropping almost daily." Explaining that the acquisition likely put the Company's shares in a holding pattern, Evercore reduced its target price/base case from $475 per share to $350 per share.

      b.    J.P.Morgan wrote that "Adobe's pursuit of Figma is logical from a product capability standpoint . . . as it looks to expand its penetration in web and mobile based collaborative design tools," but noted—with the following emphasis—that "***investors may view the proposed deal as defensive in nature given the increasing competitive threat Adobe has faced at the lower-end of the market and the very high multiple paid at a time when Adobe's growth is decelerating***." The analyst also indicated—with additional emphasis—that investors were "***<u>digesting a mind-bendingly high multiple for the dilutive Figma acquisition, a move which is difficult to explain away</u>***." As the report further explained:

> Despite the complementary product fit and expansion potential for the combined entity, Adobe's $20B acquisition price, which we believe is among the very highest in a private-software deal to date, represents a steep premium at 50x FY22 ARR, which is particularly likely to draw investor skepticism. In addition, while Adobe expects to pay for the deal in half cash and half stock, the agreement also includes an additional ~6M RSUs to be granted to Figma's CEO and employees upon closing, bringing the total share dilution to ~32M, based on our calculations. Investors may also view the acquisition as fairly defensive in nature given Figma's increasing success at the lower-end of the market, where Adobe has continued to facing ongoing

competitive threats, including from Canva, coupled with some overlapping solutions aside Adobe's recent product innovations geared toward expanding its web and mobile-based applications.

      c.      In the title of its report, Morgan Stanley candidly acknowledged that Adobe was "Buying Growth, and It Doesn't Come Cheap," noting the Figma deal brought about "increased investor concerns on the trajectory of growth in the organic business & durability of industry high margins." Morgan Stanley wrote that "the acquisition of Figma raises a yellow flag on the durability of growth in the core business and . . . industry high margins," observing that the stock "traded down -17% today, or $30 billion in market cap on the back of the $20 billion acquisition, ascribing the company negative credit for the deal." Asking "**Figma—Competitive or Complementary Deal?**," the report indicated that "[i]nvestors questioned the competitive overlap of Figma and Adobe's XD and InDesign products." In the report, Morgan Stanley reduced its price target for Adobe from $362 to $337 per share.

      d.      In response to the merger announcement, Barclays downgraded Adobe and reduced its price target from $440 to $340 per share (or 23%), explaining that the deal "may push out our ex-deal EPS estimates by a year, primarily because of the $20B purchase price, half of which is being funded with stock . . . ."

199.      Subsequently, in a September 19, 2022 report, Wells Fargo acknowledged that the deal allowed Adobe to eliminate competition and a growth "bottleneck" while enabling Adobe to tap into the $16 billion addressable market opportunity, albeit characterizing "the price Adobe paid" as "the one major caveat" (emphasis added):

      a.      "*As Figma grew in scale and reach, it has become increasingly entrenched*, as it is typically where creative stakeholders store all of their assets and live day-to-day for all of their projects. *In our view, if Adobe did not acquire Figma, as time passed, this would have made it challenging for Adobe to take share in this segment of the market*, despite current efforts to

- 87 -

develop similar solutions for non-video workflows, built off of the Frame.io and Workfront acquisitions. This dependence, combined with the $20Bn price tag, lead us to believe the deal was competitive[.]"

b. "The combination of Figma + ADBE unlocks significant future growth opportunities, and ***eliminates what we believe could have been a bottleneck to future growth by accessing a net new $16Bn+ market tied to product design and collaboration***, with management suggesting meaningful synergies in both top line growth, and LT margin expansion/EPS growth."

200.    Accordingly, analysts expressed concerns regarding the lofty price of the transaction and saw the deal precisely for what it was: an attempt to eliminate competition from Figma.

### 2. Like Analyst Reports, Media Reports Also Confirm that Adobe Pursued the Merger Because It Could not Effectively Compete Against Figma and Sought to Insulate Its Flagship Applications

201.    Like analysts, the media publications also reported that Adobe sought to pursue the merger to overcome its inability to effectively compete against Figma. In the morning of September 15, 2022, for example, *TechCrunch* published an article entitled "Adobe snaps up Figma for $20B, taking out one of its biggest rivals in digital design." That article—which noted that Adobe timed the announcement of the deal "to coincide" with the release of third-quarter earnings—explained that the acquisition allowed the Company to leverage Figma's superior technology and web-based design applications, but raised questions about XD's future (emphasis added):

> ***Design and prototyping, for individuals and teams, executed in a very streamlined and modern, cloud-based environment, are Figma's product strengths, and it's amassed some 4 million users to date***. Adobe meanwhile has been building and acquiring a number of businesses in the wider world of digital creation, and that has taken it not just into the larger and more general reaches of design but also marketing and other areas adjacent to design in the longer creation chain. ***Adobe's DNA is in design, though, and it has built out iconic products in areas like imaging (such as Photoshop), fonts, illustration, video and 3D and more***.
>
> The idea now will be to create a seamless connection between these and Figma, essentially building it out as the native platform to bring them all together. ***Adobe, of***

*course, already had something like this, in the form of AdobeXD.  It's not clear what happens with that when this deal closes*.

202.     The article also tied the acquisition price to Adobe's (unstated) intention to eliminate Figma as competition in a "total addressable market" estimated to reach $16.5 billion by 2025: "A $20 billion price tag is a sizable jump for Figma, which was last valued at $10 billion in June 2021, when it raised $200 million.  But Adobe is doing more than just taking out a big competitor.  It's picking up a fast-scaling business."

203.     In a September 15, 2022 article entitled "Adobe Shrugs Off Sticker Shock From $20 Billion Deal for Figma," *Bloomberg* reported that Adobe stock "suffered [its] worst day since 2010" as "Wall Street panned the half-stock, half-cash purchase as too expensive," but that "Figma will help accelerate improvements to Adobe's main flagship applications" when "[i]nvestors have been increasingly skeptical about the future sales growth of Adobe's products for design professionals, which increasingly have been seen as cumbersome, expensive and outdated."  The article referenced a Citigroup analyst who acknowledged that "[t]he fact that Adobe bought one of its creative software competitors suggests a 'more compelling urgency, and a significant narrative change in M&A . . . .'"  The article also reported analyst Oppenheimer's criticism that Adobe "'overpaid for Figma, which indicates it was a defensive move . . . .'"

204.     Similar reports regarding the costly and defensive nature of the transaction emerged in the days following its announcement.  On September 16, 2022, for example, *Forbes* published a post, written by contributor (and consultant) Forrester, entitled "The Adobe-Figma Combination Bodes Well For Collaboration In And Beyond Design."  Noting that "Figma's main product is its design platform, which competes directly with Adobe XD," the post emphasized the importance to Adobe of acquiring Figma to stay relevant in the collaborative digital design tools industry:

**Enabling collaboration matters more than ever.**  Figma's most distinctive strength has always been how well it lets teams collaborate in real time.  It's been browser-

based from its inception and offers lots of "multiplayer" features specifically targeted at teams working together. Although Adobe entered that fray last year, with this acquisition it's recognizing that Figma was far ahead, and that joining forces was the best way to catch up.

205.     Under the heading "**Adobe Committed to Enable Collaboration, Too, But Figma Won**," the post stated that Adobe "recognize[d] the importance of browser-based collaboration" with its Cloud Spaces and Cloud Canvas applications, "but [that] Figma was already way ahead" because of its early adoption of a web-based platform and focus on collaboration. The post ultimately called the "$20 billion price tag . . . yet another signal of the exploding growth of the design industry . . . ."

206.     On September 18, 2022, *The Wall Street Journal* published an article entitled "Why Adobe Wants Figma and Why Some Investors Are Worried," reporting: "The $20 billion deal price spooked investors and raised questions among analysts about the health of Adobe's business." As an example, the article quoted senior Oppenheimer analyst Brian Schwartz, who said: "'The purchase is at such a nosebleed level that it raises concerns about what's happening under the covers with the core business[.]'" To that end, the article also reported on Belsky's comments—evidently from the September 17, 2022 article in *The Verge*—wherein he revealed that Adobe XD "didn't gain traction" and "has been largely wound down."

207.     A September 24, 2022 piece in the *Guardian*, entitled "Adobe can't Photoshop out the fact its $20bn Figma deal is a naked land grab," gave the transaction a harder look. Describing the merger price as "unconscionable" and "way above any rational valuation of Figma," the author characterized Figma as "a strategic threat in the making" for Adobe (emphasis added):

> So **why would Adobe want to lay out such a mountain of cash** to acquire this minnow? **The answer is that its leaders are thinking ahead and they see a strategic threat in the making**. In the networked world, more and more work is being done by geographically dispersed teams who have to collaborate online. And in that context, project management and the creation of workflows that are efficient, user-friendly and agile is moving centre stage. As James Carville, Bill Clinton's strategist, might have said: "It's the workflow, stupid!"

*And Figma, to all intents and purposes, already owns that workflow space, whereas Adobe only makes tools that people use*. As the veteran analyst Ben Thompson puts it in his newsletter, the reason why Adobe is both willing and has no choice but to spend so much is: "Figma is set to be the 'operating system for design', which means that *in the long run Adobe has to operate on Figma's terms, not the other way around*; to put it another way, Adobe is not only paying for long-run control of design but also its own independence. That alone is worth a whole bunch of money!"

208.    Consequently, for these reasons, the substantial price tag of the proposed merger—"Adobe's land grab for Figma"—reflected Adobe's vulnerability and its management's concerns that the Company could not effectively compete with Figma.

**F.    After Announcing the Merger, Defendants and Other Adobe Executives Reveal that Adobe Ceased Developing XD Long Ago and Confirm that It Had No Program to Compete With Figma, Causing Further Stock Price Declines As Defendants Try to Assuage Analyst and Investor Concerns**

209.    To assuage analyst and investor concerns—and lay the foundation to push through the transaction before regulators—Defendants and other Adobe executives engaged in a concerted and extended effort to extoll the merits of the transaction while arguing that it would have no adverse impact on competition in the industry. These representations, however, further confirmed what the deal's announcement already had conveyed: Adobe was already succumbing to competition from Figma during the Class Period and perceived Figma as a significant competitive threat to its portfolio of digital design applications going forward.

210.    These executives gave interviews to discuss the deal in which they revealed further information about the Company's precarious competitive position vis-à-vis Figma and disclosed that XD's death spiral began long ago. These admissions further revealed what Defendants had known throughout the Class Period: Adobe required Figma to provide the technology it had failed to build for itself, and XD was not—and never was—a viable substitute. These revelations caused Adobe's stock price to decline further, as the artificial inflation, introduced during the Class Period by the fraudulent scheme, dissipated.

211.    On September 17, 2022, *The Verge* published an article entitled "Adobe's Figma acquisition is a $20 billion bet to control the entire creative market." As the article reported, the deal would allow Adobe to acquire "Figma's popular design tools" while "taking a major competitor off the market and bringing it under its own umbrella . . . ." The article highlighted some previously-undisclosed facts concerning Adobe XD, featuring the following statements from Belsky:

> If anything, the earliest changes might be on Adobe's side. Adobe has been winding down its investment in Adobe XD, its competing design platform for things like apps and websites, and XD users could be nudged over to Figma in the future, according to Belsky. "It was never because we didn't think product design and development and this vertically integrated stack was a big opportunity," he said. Right now, Adobe has a "tiny team" supporting XD for its existing customers. "Once [the acquisition] closes, then we'll figure out how to serve those customers, likely with Figma," he said.

212.    As these statements reflect, Adobe "ha[d] been winding down its investment" in XD, and had reduced the resources available to support XD, even before pursuing the Figma acquisition. These statements revealed further vulnerabilities in the Company's portfolio of creative products and competitive position, causing the stock price to decline further as the market digested this news. For example, on September 19, 2022, the trading day after the *Verge* article (which was published on a Saturday), the stock price declined by $3.44 (or 1.15%) to close at about $296 per share. The price declined by another $5.00 (or 1.69%) to close at around $291 per share on September 20, 2022, and by $4.76 (or 1.64%) to close at about $286 per share on September 21, 2022.

213.    In that intervening period, however, there was still some confusion among investors and analysts regarding XD's vitality. In a September 19, 2022 report, for example, Wells Fargo wrote of the interplay between Figma and XD: "We also believe Adobe XD is a complementary product (non-overlap), as it targets a broader audience (designers to create logos vs developers + designers in a collaborative process) and does not have the same functionality that Figma delivers."

214.    On September 23, 2022, *Axios* published an article entitled "Adobe defends its $20 billion deal for Figma." The article featured an interview of Adobe General Counsel Rao, in which he spoke about the Company's reasons for pursuing the transaction and blatantly acknowledged that the Company could not compete against Figma. In fact, this is why, he claimed, the transaction was not anticompetitive. As the article reported, Rao conceded that "Adobe XD just wasn't cutting it" because it did not offer "cloud-based tools for real-time multi-user collaboration." As he revealed (emphasis added):

> ***After seven years of investment, Adobe XD was bringing in just $15 million in annual recurring revenue on a standalone basis***—a minuscule fraction of Figma's $400 million annual recurring revenue. (That, in turn, is a minuscule fraction of Adobe's overall annual revenue of $17 billion.)

> ***Adobe has essentially put XD on ice, assigning just 20 employees to the product in what it sees as "maintenance mode."*** Figma has more than 800 people.

215.    Significantly, the CMA's November 2023 Report explained that "maintenance mode is Adobe's terminology for the process for deprioritising products until they eventually become deprecated, lose their customer base, and are phased out."

216.    The *Axios* article also reported on Rao's comments that even the retooled version of Adobe Express could not position the Company to compete effectively, whereas Figma would "help the company fully reinvent itself":

> The Figma deal offers help with the longer-term challenge of "reimagining the whole thing," in Rao's words.

> Adobe Express is an early homegrown attempt, but Rao said Figma will help the company fully reinvent itself for the next era of design.

217.    Lastly, the *Axios* article reported on Rao's comments that "[e]ven though Figma has positioned XD as a key rival [on the Figma website] . . . the deal shouldn't raise antitrust worries," quoting a spokesperson who reiterated the Company's post-announcement position that "Adobe and Figma today are not meaningful competitors[.]"

- 93 -

218. In response to these revelations—which further confirmed how inferior Adobe XD was in the UI/UX digital design space and revealed Defendants' previously-concealed concerns that not even Adobe Express could position Adobe to compete effectively against Figma in the broader creative tools market—the stock price continued to slide. Indeed, on September 23, 2022, the price declined by $2.50 (or nearly 1%) to close at $284.56 per share, and on September 26, 2022 (the following trading day), the price dropped by another $7.60 (or 2.67%) to close at $276.96 per share.

219. As shown above, these declines coincided with continued disclosure of information which further revealed that XD was a failure and that the Company required Figma to position itself to compete effectively. The disclosure of this additional information caused the stock price to decline, as previously-concealed risks came to fruition in the Class Period and the exposure of the truth resulted in the dissipation of artificial inflation.

220. In a *Twitter Spaces* interview, an excerpt of which Adobe filed with the SEC as an attachment to Form 425 on September 26, 2022, Belsky reiterated that XD was practically inferior from the start because "[i]t was a desktop product" that did not have features other programs had, and simply did not evolve in a timely fashion (emphasis added):

> [W]hen the team saw Photoshopping used probably by people like you Dan, for a webpage design back in the early days of the web. ***Also we saw products like Sketch that were taking certain capabilities of Photoshop and just really simplifying radically, experience for UX/UI design***. And also adding interactive elements of prototyping capabilities were the early semblance of that stuff.
>
> That is also when Adobe said, "Okay, we should probably build a product that does that, much like we did with Lightroom." And so that's where XD started. ***XD though was built in the image of our other flagship products. It was a desktop product. It was before the time when we had any cloud platform at the company***, to really even be able to imagine bringing a web product, yet alone cloud documents to the surface for customers.
>
> ***And so let's just be candid. XD tried to meet the needs of screen designers in a better way than Photoshop could***. Then what ended up happening is we realized that there were some fundamental pillars of product design and development that were just becoming more and more not only nice to have, but ***the need to haves***.

- 94 -

221.    Similarly, in a question-and-answer session with Constellation Research, a transcript of which Adobe filed with the SEC on September 30, 2022, Ashley Still, Senior Vice President and General Manager, Creative Cloud and Document Cloud, confirmed what others had before her—that "Adobe XD is really in maintenance mode" and that although the Company was providing support for continuing users, "it's really not a meaningful competitor" to Figma.  As she explained: "Efforts that we made to bring collaboration to a desktop application really were not successful."

222.    As the CMA recognized, "there was no public reference to Adobe XD being 'put on maintenance mode' or 'disinvested'" before September 2022 (when the merger became public), and "[i]nternal documents show that Adobe continued to promote Adobe XD as an active product during that period . . . ."  Indeed, the CMA's investigation confirmed that consumers and investors alike were left in the dark about XD's obsolescence and abandonment before the announcement of the transaction:

> It was only at the time of the announcement of the Merger that Adobe for the first time announced publicly that Adobe XD had been 'a flop' and had been 'put on ice'. Adobe disclosed this in interviews in which Adobe's executives explained the decision to acquire Figma.  The announcement of the Merger gave rise to speculation amongst Adobe and Figma's customers in the public domain as to which product Adobe was going to keep and support (ie Adobe XD or Figma).   As there was no reference in these discussions that Adobe XD was no longer being developed, we take this to indicate that customers at the time were not aware of Adobe's decision to 'disinvest' in Adobe XD in October 2021 and place it on maintenance mode in February 2022.  [November 2023 Report (footnotes omitted)]

223.    The CMA further found that the Company did not disclose to users that it had placed XD in maintenance mode until it "updated its public Adobe XD support website on 31 August 2023"—almost a year after the Figma transaction's announcement—"to include the disclaimer that Adobe XD is in maintenance mode."  And yet Adobe placed XD in maintenance mode long before then—in February 2022, shortly before Wadhwani contacted Figma (several months after the start of the Class Period).  In short, Defendants concealed the dire state of XD during the Class Period to

bolster Adobe's favorable portrayal of its competitive position, and this information did not come out until the end of the Class Period.

### G.    The Artificially Inflated Stock Price Enables Insiders, Including Some Individual Defendants, to Reap Millions of Dollars in Benefits, As Adobe Plans to Fund Half of the Merger Price—$10 Billion—With Its Stock

224.    On July 23, 2021—the first day of the Class Period—Adobe's stock price closed at $625.87 per share.  On September 15, 2022, when Adobe announced the merger, the price closed at $309 per share—a $62.39, or nearly 17%, decline—after reaching an intraday low of $305.  The price continued to slide as the market digested material information regarding the merger and the Company's inability to compete against Figma, and on September 23, 2022—when the *Axios* article was published, after the last day of the Class Period—the price reached an intraday low of $280.70 per share, eventually closing at $284.56.  By September 26, 2022, the price had declined further, and that day it closed at $276.96—reflecting a $7.60, or 2.67%, drop.

225.    The disparity in these prices reflects the stark impact of the fraudulent scheme: embellishing Adobe's competitive position while concealing that it was losing ground to Figma—and lost the opportunity to establish itself as a leader in the digital design market long ago, resulting in the end of XD—artificially inflated the stock price and kept it elevated during the Class Period. The announcement of the merger and related disclosures at the Class Period's end removed this inflation, as investors learned that Adobe had to acquire its largest competitor in that space to obtain a leading position in the industry years after they thought it already had—in an outsized transaction with $10 billion in cash and $10 billion in stock as consideration, no less.  Investors also learned that the XD offering was no more—something the Company had not disclosed earlier.

226.    The fraudulent scheme also allowed insiders, including Adobe and certain Individual Defendants, to capitalize on the artificially inflated stock price in unique ways not available to public investors.  From the start, Adobe planned to acquire Figma with a combination of cash and stock in

roughly equal proportions.  Indeed, Adobe's first indication of interest to acquire Figma, conveyed on June 19, 2022, proposed a $20 billion price with 50% payable in cash and 50% in stock; Adobe stock was then trading at $360 per share.  This term remained intact throughout negotiations, with the stock price rising to $380 in early-July 2022 and above $400—and then $450—in August 2022. The rising stock price no doubt convinced Figma to accept a fixed exchange ratio with no collar for the stock portion of the consideration, calculated by reference to the average 10-day closing price as of September 13, 2022.

227.    The stock component of the merger consideration was especially important to Adobe because it expected to finance the cash portion with a combination of cash on its balance sheet and short-term debt instruments.  According to its September 28, 2022 Form 10-Q—relating to the quarter of the merger's announcement—Adobe had cash and cash equivalents of $3.9 billion as of September 2, 2022, but current liabilities of $7.4 billion and long-term liabilities of $12.4 billion.  At that point, Adobe already had $4.2 billion in debt securities (senior notes) outstanding.

228.    Insiders, including some Individual Defendants, also capitalized on the inflated stock price during the Class Period: they sold millions of dollars in stock at suspicious times and created circumstances under which they knew they would receive millions more in pecuniary benefits tied to elevated prices.  As reflected in the chart below, seven executives—including Defendants Narayen, and Belsky—generated aggregate proceeds of approximately $48.5 million from their Class Period stock sales:

| INSIDER SHARE SALES | | | | | |
|---|---|---|---|---|---|
| Name | Date | Capacity | Price | Shares | Proceeds |
| Belsky (Scott K) (Defendant) | 24-Sep-21 | Direct | $628.00 | 2,750 | $1,727,000 |
| | 20-Dec-21 | Direct | $545.61 | 2,750 | $1,500,428 |
| | 25-Mar-22 | Direct | $435.44 | 2,750 | $1,197,460 |
| | 25-Apr-22 | Direct | $410.18 | 2,710 | $1,111,588 |
| | 26-Jul-22 | Direct | $393.58 | 2,711 | $1,066,995 |
| | | | Belsky Total: | 13,671 | $6,603,471 |
| Chen (Gloria T) | 23-Jul-21 | Direct | $625.76 | 43 | $26,908 |
| | 25-Aug-21 | Direct | $659.63 | 42 | $27,704 |

| INSIDER SHARE SALES | | | | | |
|---|---|---|---|---|---|
| **Name** | **Date** | **Capacity** | **Price** | **Shares** | **Proceeds** |
| | 24-Sep-21 | Direct | $628.00 | 42 | $26,376 |
| | 25-Oct-21 | Direct | $644.47 | 42 | $27,068 |
| | 24-Nov-21 | Direct | $654.73 | 42 | $27,499 |
| | 23-Dec-21 | Direct | $568.96 | 42 | $23,896 |
| | | | **Chen Total:** | **253** | **$159,451** |
| **Garfield (Mark S.)** | 20-Dec-21 | Direct | $545.61 | 474 | $258,619 |
| | 24-Mar-22 | Direct | $425.79 | 463 | $197,141 |
| | 22-Jul-22 | Direct | $409.75 | 132 | $54,087 |
| | | | **Garfield Total:** | **1,069** | **$509,847** |
| **Lewnes Ann** | 30-Jul-21 | Direct | $619.03 | 1,164 | $720,551 |
| | 26-Oct-21 | Direct | $650.91 | 582 | $378,830 |
| | 25-Jan-22 | Direct | $511.96 | 100 | $51,196 |
| | 25-Jan-22 | Direct | $503.92 | 140 | $70,549 |
| | 25-Jan-22 | Direct | $513.21 | 300 | $153,963 |
| | 25-Jan-22 | Direct | $510.41 | 600 | $306,246 |
| | 25-Jan-22 | Direct | $509.24 | 640 | $325,914 |
| | 25-Jan-22 | Direct | $511.20 | 700 | $357,840 |
| | 25-Jan-22 | Direct | $504.92 | 778 | $392,828 |
| | 25-Jan-22 | Direct | $508.09 | 1,765 | $896,779 |
| | 25-Jan-22 | Direct | $507.06 | 2,290 | $1,161,167 |
| | 25-Jan-22 | Direct | $506.08 | 2,691 | $1,361,861 |
| | 2-May-22 | Direct | $400.00 | 793 | $317,200 |
| | 28-Jul-22 | Direct | $400.00 | 794 | $317,600 |
| | | | **Lewnes Total:** | **13,337** | **$6,812,523** |
| **Narayen (Shantanu) (Defendant)** | 24-Sep-21 | Indirect | $622.46 | 2,487 | $1,548,058 |
| | 24-Sep-21 | Indirect | $620.90 | 6,838 | $4,245,714 |
| | 24-Sep-21 | Indirect | $621.88 | 7,838 | $4,874,295 |
| | 24-Sep-21 | Indirect | $619.82 | 10,152 | $6,292,413 |
| | 24-Sep-21 | Indirect | $618.84 | 12,685 | $7,849,985 |
| | | | **Narayen Total:** | **40,000** | **$24,810,466** |
| **Rao (Pradhan/Dana)** | 27-Jul-21 | Direct | $621.71 | 488 | $303,394 |
| | 26-Oct-21 | Direct | $650.91 | 489 | $318,295 |
| | 28-Jan-22 | Direct | $507.25 | 5,300 | $2,688,425 |
| | | | **Rao Total:** | **6,277** | **$3,310,114** |
| **Warnock (John E)** | 24-Sep-21 | Indirect | $626.70 | 499 | $312,723 |
| | 24-Sep-21 | Indirect | $627.98 | 739 | $464,077 |
| | 24-Sep-21 | Indirect | $628.43 | 1,762 | $1,107,294 |
| | 19-Jan-22 | Indirect | $517.31 | 100 | $51,731 |
| | 19-Jan-22 | Indirect | $516.47 | 174 | $89,866 |
| | 19-Jan-22 | Indirect | $518.88 | 3,726 | $1,933,347 |
| | 14-Apr-22 | Indirect | $432.03 | 615 | $265,698 |
| | 26-Apr-22 | Indirect | $403.94 | 1,317 | $531,989 |
| | 26-Apr-22 | Indirect | $404.43 | 3,683 | $1,489,516 |
| | | | **Warnock Total:** | **12,615** | **$6,246,241** |
| | | | **GRAND TOTAL:** | **87,222** | **$48,452,113** |

229.    These individuals occupied high-level positions at Adobe during the Class Period that

exposed them to nonpublic information about its business and operations and competition facing the

Company, and many were involved in devising or directing corporate strategy: (a) Defendant Belsky was Chief Product Officer and Executive Vice President, Creative Cloud; (b) Gloria Chen ("Chen") was Chief People Officer and Executive Vice President, Employee Experience; (c) Mark Garfield ("Garfield") was Senior Vice President, Chief Accounting Officer and Corporate Controller; (d) Ann Lewnes ("Lewnes") was Chief Marketing Officer and Executive Vice President of Corporate Strategy and Development; (e) Defendant Narayen was CEO; (f) Rao was General Counsel, Executive Vice President, and Chief Trust Officer; and (g) John Warnock was a Co-Founder of Adobe.

230.    Additionally, insiders who received restricted stock units benefitted in another way: from the simultaneous "surrender" of shares, reported as a disposition (or sale), at artificially inflated trading prices to cover taxes associated with the stock grants.  These benefits were also substantial, totaling approximately $83 million and qualifying no less as proceeds generated from the sale of stock as ordinary open-market dispositions—proceeds that, in the aggregate, exceed those generated from open-market sales.  As reflected in the chart below, eleven executives—including Defendants Narayen, Wadhwani, Belsky, Durn, and Murphy—received financial benefits from the divestiture of stock at elevated prices to cover tax liabilities:

| SHARES SURRENDERED AND DISPOSED | | | | |
|---|---|---|---|---|
| **Name** | **Date** | **Price** | **Shares** | **Proceeds** |
| **Belsky (Scott K) (Defendant)** | 24-Jul-21 | $625.87 | 746 | $466,899 |
| | 24-Oct-21 | $643.58 | 804 | $517,438 |
| | 24-Jan-22 | $519.66 | 13,030 | $6,771,170 |
| | 24-Apr-22 | $408.67 | 1,034 | $422,565 |
| | 24-Jul-22 | $401.90 | 1,035 | $415,967 |
| | | **Belsky Total:** | **16,649** | **$8,594,038** |
| **Chakravarthy (Anil)** | 9-Jan-22 | $510.70 | 5,477 | $2,797,104 |
| | 24-Jan-22 | $519.66 | 1,196 | $621,513 |
| | 24-Apr-22 | $408.67 | 298 | $121,784 |
| | 24-Jul-22 | $401.90 | 298 | $119,766 |
| | | **Chakravarthy Total:** | **7,269** | **$3,660,167** |
| **Chen (Gloria T)** | 24-Jul-21 | $625.87 | 283 | $177,121 |
| | 30-Aug-21 | $665.99 | 111 | $73,925 |
| | 24-Oct-21 | $643.58 | 283 | $182,133 |
| | 30-Nov-21 | $669.85 | 111 | $74,353 |

| SHARES SURRENDERED AND DISPOSED | | | | |
|---|---|---|---|---|
| Name | Date | Price | Shares | Proceeds |
| | 24-Jan-22 | $519.66 | 4,528 | $2,353,020 |
| | 28-Feb-22 | $467.68 | 110 | $51,445 |
| | 24-Apr-22 | $408.67 | 482 | $196,979 |
| | 30-May-22 | $428.22 | 111 | $47,532 |
| | 24-Jul-22 | $401.90 | 482 | $193,716 |
| | 30-Aug-22 | $375.07 | 111 | $41,633 |
| | **Chen Total:** | | **6,612** | **$3,391,858** |
| **Durn (Daniel J) (Defendant)** | 15-Feb-22 | $479.50 | 1,901 | $911,530 |
| | 15-May-22 | $405.45 | 1,902 | $771,166 |
| | 15-Aug-22 | $451.02 | 2,008 | $905,648 |
| | **Durn Total:** | | **5,811** | **$2,588,344** |
| **Garfield (Mark S.)** | 24-Jul-21 | $625.87 | 17 | $10,640 |
| | 24-Oct-21 | $643.58 | 17 | $10,941 |
| | 3-Dec-21 | $616.53 | 931 | $573,989 |
| | 24-Jan-22 | $519.66 | 230 | $119,522 |
| | 2-Mar-22 | $471.18 | 234 | $110,256 |
| | 15-Mar-22 | $421.66 | 1,031 | $434,731 |
| | 24-Apr-22 | $408.67 | 66 | $26,972 |
| | 15-Jun-22 | $376.92 | 257 | $96,868 |
| | 24-Jul-22 | $401.90 | 67 | $26,927 |
| | **Garfield Total:** | | **2,850** | **$1,410,847** |
| **Lewnes (Ann)** | 24-Jul-21 | $625.87 | 571 | $357,372 |
| | 24-Oct-21 | $643.58 | 570 | $366,841 |
| | 24-Jan-22 | $0.00 | 9,284 | $0 |
| | 24-Apr-22 | $408.67 | 777 | $317,537 |
| | 24-Jul-22 | $401.90 | 778 | $312,678 |
| | **Lewnes Total:** | | **11,980** | **$1,354,427** |
| **Murphy (John Francis)** | 24-Jul-21 | $625.87 | 695 | $434,980 |
| | **Murphy Total:** | | **695** | **$434,980** |
| **Narayen (Shantanu) (Defendant)** | 24-Jul-21 | $625.87 | 2,149 | $1,344,995 |
| | 24-Oct-21 | $643.58 | 2,148 | $1,382,410 |
| | 24-Jan-22 | $519.66 | 82,050 | $42,638,103 |
| | 24-Apr-22 | $408.67 | 2,795 | $1,142,233 |
| | 24-Jul-22 | $401.90 | 2,797 | $1,124,114 |
| | **Narayen Total:** | | **91,939** | **$47,631,854** |
| **Parasnis (Abhay)** | 24-Jul-21 | $625.87 | 695 | $434,980 |
| | 24-Oct-21 | $643.58 | 695 | $447,288 |
| | 24-Jan-22 | $519.66 | 11,655 | $6,056,637 |
| | **Parasnis Total:** | | **13,045** | **$6,938,905** |
| **Rao (Pradhan/Dana)** | 24-Jul-21 | $625.87 | 478 | $299,166 |
| | 24-Oct-21 | $643.58 | 478 | $307,631 |
| | 24-Jan-22 | $519.66 | 7,803 | $4,054,907 |
| | 24-Apr-22 | $408.67 | 660 | $269,722 |
| | 24-Jul-22 | $401.90 | 660 | $265,254 |
| | **Rao Total:** | | **10,079** | **$5,196,680** |
| **Wadhwani (David) (Defendant)** | 14-Jun-22 | $370.82 | 3,583 | $1,328,648 |
| | 14-Sep-22 | $371.52 | 957 | $355,545 |
| | **Wadhwani Total:** | | **4,540** | **$1,684,193** |
| | **GRAND TOTAL:** | | **171,469** | **$82,886,294** |

231.     These individuals occupied high-level positions at Adobe during the Class Period that exposed them to nonpublic information about its business and operations and competition facing the Company and many were involved in devising or directing corporate strategy.  In addition to Belsky, Chen, Garfield, Lewnes, Narayen and Rao (described above), these individuals included: (a) Anil Chakravarthy, Executive Vice President and General Manager, Digital Experience; (b) Defendant Durn, CFO; (c) John Francis Murphy, Executive Vice President and CFO; (d) Abhay Parasnis, Executive Vice President and Chief Technology Officer; and (e) Defendant Wadhwani, President of Digital Media and, previously, Chief Business Officer/Executive Vice President of Digital Media.

232.     In total, insiders generated and received more than $131 million in financial benefits from the sale or disposition of Adobe stock at artificially inflated prices during the Class Period—a massive amount by any measure.  These transactions were also suspicious because they were timed to occur, scheduled or otherwise, when these insiders knew the truth regarding Adobe's precarious competitive position, inferior performance in the digital design market vis-à-vis Figma, and long-ago disinvestment of Adobe XD—developed solely to compete with Figma in the first place.

**H.      As Regulatory Scrutiny of the Merger Intensifies, Adobe Admits that It Could Not Compete with Figma, and XD Failed, During the Class Period**

233.     Shortly after Adobe announced its proposed acquisition of Figma, regulators around the globe expressed concern that the merger might harm competition and commenced investigations. These investigations involved regulatory authorities from the U.K., Europe, Japan and the U.S., with the CMA and DOJ leading the charge in assembling documentary and testimonial evidence.  During these proceedings, Adobe admitted that it could not compete with Figma in the UI/UX design space, XD was a failure that Adobe began winding down in late-2021, and Figma was taking market share away from Adobe's most established and successful products, including Photoshop and Illustrator— all of which flatly contradicted Defendants' Class Period representations.

1.      **The DOJ Conducts an Extensive Investigation as Rumors Swirl that It, and Possibly Also the FTC, May Try to Block the Merger**

234.    Shortly after the merger's announcement, news emerged that the DOJ was planning to investigate the transaction and that the DOJ and FTC might seek to block the deal.

235.    In a November 2, 2022 article entitled "DOJ takes aim at Adobe's $20 billion deal," *Politico* reported that the DOJ was "contacting customers and competitors of Adobe and Figma, as well as Figma's venture capital investors," and "issued civil investigative demands"—an "unusual move" so early in the probe.  The article indicated that the Antitrust Division of the DOJ and the FTC were active in "scrutinizing both current and past acquisitions" by large technology companies, quoting Tadhg McCarthy, chief design officer at digital product consultancy Elsewhen, who said: "It seems pretty clear to me that [Adobe] is trying to take a player off the board.  I expect less competition and less innovation. That's why everyone is concerned[.]"

236.    In late-February 2023, several media outlets reported that the DOJ was preparing to file suit to block the deal, with legal action expected the following month.  At that time, Adobe was meeting with DOJ representatives in a bid to push the deal through.

237.    Ultimately, neither the DOJ nor the FTC commenced public proceedings or pursued legal action to block the transaction.  Nevertheless, the DOJ conducted an extensive investigation (albeit not publicly disclosed), obtaining internal materials from Adobe and Figma and conducting sworn depositions of executives from both companies, including the following individuals (whose titles are derived from submissions in the CMA proceeding):

        a.      Adobe Chairman & CEO (Defendant Narayen);

        b.      Adobe President of Digital Media (Defendant Wadhwani);

        c.      Adobe Senior VP & General Manager, Creative Cloud & Document Cloud;

        d.      Adobe Senior VP, Digital Media Global Marketing;

e.      Adobe Senior VP, Adobe Express & Creative Cloud;

f.      Adobe Senior Director, Strategic Development, Design;

g.      Adobe Senior Director, Creative Cloud Product Marketing;

h.      Adobe Chief Product Officer of Creative Cloud;

i.      Adobe VP, Digital Imaging;

j.      Adobe VP, Creative Cloud;

k.      Adobe VP, Creative Cloud Web App;

l.      Adobe VP, Photoshop;

m.      Figma Co-Founder & CEO (Field); and

n.      Figma VP of Product.

238.    By December 2023, neither the DOJ nor the FTC had publicly (or officially) revealed plans to challenge the transaction.  But the DOJ's investigation continued.  In a December 15, 2023 article entitled "Adobe, Figma meet with DOJ antitrust leadership in bid to save deal," *Politico* reported that "[e]xecutives and lawyers for Adobe and Figma . . . met [the previous day] with senior Justice Department officials . . . ."  As the article reported, the meeting meant "the DOJ is strongly considering a challenge to the deal," and DOJ litigation counsel had joined the investigation.

239.    Within two days, on December 17, 2023, Adobe and Figma agreed to terminate the merger.  The next day, Assistant Attorney General Jonathan Kanter of the DOJ's Antitrust Division issued a statement hailing "[t]he decision to abandon this acquisition" for "ensur[ing] that designers, creators, and consumers continue to get the benefit of the rivalry between the two companies going forward."

### 2. The CMA's Investigation Proves that Adobe Misled Investors About Competition from Figma and the Status of Adobe XD

240.     On May 3, 2023, the CMA notified Adobe and Figma that it was considering whether the proposed transaction would substantially constrain competition within any market in the U.K. for goods or services.  The CMA then initiated its phase 1 investigation to provide an initial assessment. In conducting its investigation, the CMA "looked at a series of software tools" offered by Adobe and Figma that are "widely used in the creative industries sector," including: (a) screen design software for websites and applications; (b) vector graphics editing used to create content, like logos and icons; (c) pixel-based image editing known as raster editing; (d) video editing; and (e) motion design, used for visual effects.

241.     On June 30, 2023, the CMA completed its phase 1 investigation, concluding that the merger "could mean less choice for designers of digital apps, websites and other products."  As the CMA noted, "[s]creen design software is an increasingly essential tool that enables users to design digital products and services such as applications and websites," and "competition between Figma and Adobe has driven investment in updating and developing screen design software . . . ."  It further found that "Figma is an emerging competitive threat to Adobe" in "creative design software, where Adobe offers some of the leading tools for image, video, and animation content," and that "Figma is well-placed to expand its offering and provide increased constraint to Adobe."

242.     As a result of its phase 1 investigation, the CMA voiced concerns that "Adobe's plan to acquire Figma removes a leading player from the market and reduces both firms' incentives to invest in software development and compete against one another . . . ."  Before proceeding to its in-depth phase 2 investigation, however, the CMA gave Adobe and Figma the opportunity to propose "undertakings" designed to address these concerns.  On July 7, 2023, they told the CMA they would not do so, causing the CMA to open its phase 2 investigation.

243.    The phase 2 investigation was extensive, involving ample amounts of evidence which included: (a) the production of over 3 million internal documents from Adobe and Figma in response to the CMA's and DOJ's information requests; (b) written submissions by Adobe and Figma, as well as oral statements by representatives of Adobe and Figma at hearings, meetings, and presentations; (c) transcripts of depositions the DOJ conducted of several Adobe and Figma executives, including Wadhwani, in which they answered questions under oath; (d) quantitative analyses of market share and related metrics; (e) answers to third-party questionnaires by industry observers and participants; and (f) publicly available data and information, including public statements by Adobe and Figma and media reports about those companies.

244.    To represent them in the CMA proceedings, Adobe and Figma engaged no fewer than three internationally acclaimed law firms, including Skadden, Arps, Slate, Meagher & Flom LLP, Freshfields Bruckhaus Deringer, and Slaughter and May.  These firms prepared a joint response on behalf of Adobe and Figma, dated August 9, 2023 ("August 2023 Response"), to the CMA's July 26, 2023 Issues Statement, which set forth the scope of the phase 2 investigation and outlined potential theories of competitive harm resulting from the merger.

245.    In their August 2023 Response, Adobe and Figma jointly described their views of the evidence, including the testimony of their executives and the internal documents they produced.  In doing so, however, Adobe made admissions that expressly undermined and contradicted Defendants' Class Period representations—representations (even as late as August 2022) that portrayed XD as a successful application equipped to effectively compete with Figma, which Adobe described merely as a "point" player.  For example, Adobe admitted that:

a.    "XD is not an active market participant: it does not, and cannot, drive innovation and product development in product design."  As Adobe represented, "XD was a failed attempt to enter product design.  It was disinvested and had the vast bulk of its workforce reassigned

in October 2021" and then "placed in maintenance mode in February 2002." Adobe also said "XD is a failed product that never gained market traction" and "never achieved commercial success despite significant investments made over the course of eight years." Rather, "a[s] a failed product, XD did not drive market innovation but tried to catch the market and [Adobe] has ceased to make 'efforts or investments' since its [October 2021] disinvestment." Thus, Adobe noted, "[i]t is implausible and inconsistent with the evidence to conclude that XD is an active market participant" when "[t]he reality is that it is a product that is on an inevitable path to 'end of life' . . . ." In fact, "XD has been losing its paid customer base" and "started contracting as a result of Adobe's decision to no longer actively support XD's development."

b.    "Contemporaneous internal documents reflect the poor performance of XD," and "[t]hroughout 2019 and 2020, Adobe senior executives, including its CEO, questioned XD's performance." As a result, not only did Adobe "disinvest" XD in October 2021—which means that Adobe stopped dedicating resources to improving or further developing XD—but "since March 2022 [Adobe has] actively discourage[d] use of XD . . . ." Adobe also conceded that before the merger's announcement, it did not officially disclose that XD was disinvested or in maintenance mode. Instead, Adobe referenced public statements by its executives" in late-September 2002 "that XD is in maintenance mode" and purported "reports in December 2022 on Adobe forums that there was no longer a product page for . . . or promotion of XD."

c.    "XD stagnated as web-based rivals such as Figma grew exponentially. Adobe concluded it had lost the market in October 2021, and moved its engineers to other projects. Adobe no longer develops XD, having placed it in 'maintenance mode.'" Additionally, "XD achieved only USD 14.5 million in global revenues in FY2022" and, even before then, attributing XD's maximum 5% contribution to Creative Cloud All Apps revenue—that is, revenue generated from every app in the Creative Cloud bundle—meant "the product would have been significantly loss-making in 2020

and 2021." By contrast, "Figma's annual recurring revenue more than doubled"—to between $400 million and $500 million—in the 2021-2022 period, while "XD's growth has been essentially linear, coming from a negligible basis and after a long period of investment." "As a consequence, "Adobe XD is not a meaningful competitor to Figma in interactive product design" and "Adobe is not an effective or innovative competitor in this market."

    d. "Adobe has no plans to try to enter the product design space absent the Transaction." As Adobe explained: "With the failure of XD, Adobe has missed the market for product design. Adobe will not try to enter the market organically. It has no incentive to do so given Adobe has already committed its resources to key strategic priorities [elsewhere] . . . ." Adobe even claimed that "[t]he evidence demonstrates that Adobe has neither the technical capabilities nor the commercial incentives to enter the product design market organically." Adobe also depleted XD of resources, noting "[i]n February 2022, only approximately 18 employees were allocated to XD" and that Adobe has only "further reduced" that number since then. As Adobe explained: "The lack of investment is evidenced by the fact that, since February 2022, XD had only minor updates in October 2022, January 2023 and June 2023, relating to bug fixes and slight improvements," as "compare[d] to six substantive releases relating to Figma design over the same period . . . including a major new development . . . ."

    e. "Figma is Adobe's opportunity to acquire a phenomenally successful company in this space." Noting "Adobe's President of Digital Media"—*i.e.*, Wadhwani—provided a statement to the CMA on April 27, 2023, Adobe wrote: "The [Adobe] board's decision to acquire Figma conceded that defeat." Adobe also noted that XD's growth and performance not only trailed Figma's, but "XD's standalone growth also lags behind several other competitors such as UiIzard [sic], Lunacy and Galileo . . . [which were] experiencing very significant growth in the market. For

example, Uizard had more than 190,000 accounts created within six months of being launched out of beta in February 2021."

      f.    "Adobe Express . . . faced significant challenges in 2022 driven," in part, by "technical challenges" which "caused delays . . . ." "Adobe was facing time delays by building both Adobe Express (Project X) and Project Spice" at the same time, which placed pressure on available resources at Adobe. As a result, Adobe ultimately cancelled Project Spice and transferred resources to developing Adobe Express.

246.    On November 28, 2023, the CMA issued provisional findings based on the evidence, concluding that the proposed merger could "result in a substantial lessening of competition" in the global market for "all-in-one product design software for professional users" and vector and raster editing software. The CMA set forth the evidentiary bases and reasoning for its determination in its extensive November 2023 Report, spanning 460 pages, and published a notice of possible remedies.

247.    The November 2023 Report confirms the admissions that Adobe and Figma made in their August 2023 Response, but references additional information—including internal documents and testimony—that either reinforces those admissions or demonstrates that Defendants also misled investors during the Class Period about other material facts. For example, the CMA concluded that:

      a.    "Internal document evidence shows that before the Merger was announced Figma considered Adobe XD as one of its closest competitors and was consistently aware of the threat it posed, even after Adobe reduced its resourcing on Adobe XD."

      b.    Adobe conceived of Project Spice in 2020 as a product that could effectively compete with Figma because XD was failing. "In October 2021 and February 2022, Adobe reduced its engineering resourcing of Adobe XD and shifted these resources to Project Spice in order to accelerate its development." "Adobe intended for Project Spice to address Adobe XD's weaknesses relative to Figma," including XD's "weaknesses on collaboration . . . ." "Adobe reduced the scope

of Project Spice" in late-July 2022, however, one week after signing an exclusive letter of intent for the merger. On September 9, 2022, six days before announcing the deal, "Adobe cancelled Project Spice." "[T]he decision to cancel Project Spice was a consequence of the Merger . . . ."

c.    "Figma is already the strongest player by far" in the global market for all-in-one product design software. A web-based program, "Figma Design is the leading product design software accounting for over 80% of the market by revenue." By contrast, "Adobe has Adobe XD, a desktop-based product with a 5-10% share." Figma Design and Adobe XD both cover "all five main stages of product design," while "other types of software" from other developers—known as "point tools"—"only cover one or more, but not all, of these five stages."

d.    "[T]he document evidence shows that Adobe perceived Figma to threaten its core markets for vector and raster editing software, and its flagship apps Illustrator and Photoshop in particular." In fact, "Adobe undertook detailed analysis of the threat posed by Figma and concluded that Figma posed a risk"—a point confirmed by "internal documents," which "consistently show concerns by Adobe management over the threat from Figma in relation to professional users until August 2022," weeks before the merger's announcement. Adobe also "undertook actions to mitigate the threat from Figma"—including developing "web versions of Illustrator and Photoshop"—"which sought to defend Adobe's wider Creative Cloud suite." Project Spice and its "inclusion of vector and raster editing functionality . . . appear to have been a direct response to the threat from Figma."

e.    "Figma represents a particularly credible dynamic competitor to Adobe in vector and raster editing software for professional users, and this threat is already strong for product design and related digital use cases." Indeed, "Figma has the ability and incentive to develop vector and raster editing functionality and Adobe was concerned about this, saw Figma as a threat, and took actions to mitigate it." By contrast, "[t]here are very few competitors to Adobe in either vector or raster editing software and barriers to entry and expansion are significant."

248.    In response to the CMA's November 2023 Report and notice of possible remedies (which outlined options, including blocking the merger, designed to address the CMS's concerns), Adobe and Figma submitted a response, dated December 14, 2023, voicing their disagreement with the CMA's findings and proposed remedies.  After further communications with the CMA and DOJ (discussed below), however, Adobe and Figma terminated the merger.  Accordingly, on December 18, 2023, the CMA concluded its proceedings.

### 3.    The EC and JFTC Also Investigate the Merger's Possible Impact on Competition, With the EC Focusing on Adobe XD

249.    On February 15, 2023, the EC confirmed that it had accepted requests by members—namely, Austria, Belgium, Bulgaria, Cyprus, Czechia, Denmark, Finland, France, Germany, Iceland, Ireland, Italy, Luxembourg, the Netherlands, Norway, and Sweden—to assess the merger's potential impact on competition.  Noting that "the transaction threatens to significantly affect competition in the market for interactive product design and whiteboarding software, which is likely at least EEA-wide, and, therefore, in the referring countries," the EC confirmed that its investigation would focus, at a minimum, on Adobe XD and Figma's two flagship products, Figma Design and FigJam:

> Figma offers a web-based collaborative tool for product design, Figma Design, as well as a whiteboarding tool, FigJam. Adobe is a global software company offering, among others, an interactive product design tool, Adobe XD.

250.    Subsequently, the EC carried out an initial investigation designed to ascertain whether to open an in-depth investigation, cooperating with other regulators in the process.  In April 2023, the JFTC disclosed that it too was reviewing the merger.

251.    On August 7, 2023, the EC announced its "in-depth investigation" into the merger, again referencing Adobe XD but expanding its description of Adobe to encompass other products, such as Adobe Illustrator and Photoshop (all emphasis in original):

> **Adobe** is a global software company offering, among others, creative design software tools (e.g., Illustrator and Photoshop) and an interactive product design tool

(Adobe XD).  **Figma** is a provider of a web-based collaborative tool for interactive product design (Figma Design) as well as a whiteboarding tool.

252.    In that announcement, the EC expressed concern that the merger might "**allow Adobe to restrict competition in the global markets**" by constraining:

**Supply of interactive product design tools** given: (i) that Figma is the clear market leader and Adobe one of its largest competitors, that Adobe and Figma are close competitors and that the transaction would remove an important competitive force, and (ii) the unlikely timely and credible entry of other players in the market.

**Supply of digital asset creation tools** by: (i) eliminating Figma's current constraining influence over Adobe's digital asset creation tools, and (ii) preventing Figma's potential growth into an effective competitor to Adobe's asset creation tools, absent the transaction.

253.    The EC further expressed concern that the merger could "**foreclose rival providers** of interactive product design tools by bundling Figma with Adobe's Creative Cloud suite."

254.    Commenting on the investigation, Margrethe Vestager, Executive Vice-President in charge of competition policy, acknowledged that "Adobe and Figma are two leading providers of software for the creative community in the digital sphere.  Many users and businesses rely on their digital design tools to excel in their work."

255.    The EC said it would continue to cooperate with other competition authorities, noting it expected to complete its in-depth inquiry by December 14, 2023.  As Adobe's talks with regulators intensified around that time, however, the EC evidently postponed its determination.  After Adobe and Figma terminated the merger on December 18, 2023, the EC and JFTC closed their reviews of the merger without issuing formal findings.

## V.    ADDITIONAL SCIENTER ALLEGATIONS

256.    Defendants were responsible for, and had the authority to, disseminate information during the Class Period regarding Adobe's operations and products, and the Individual Defendants regularly spoke about these and other issues, with the authority to do so, on behalf of the Company.

At all relevant times, the Individual Defendants spoke about issues they would logically have reason to know about or otherwise had access to nonpublic and internal information about those issues that would enable them to speak in detail and intelligently about those issues. These issues involved the Company's competitive position, merger plans, market share, product development, and customer engagement or retention and attrition.

257. Specifically, during the Class Period, the Individual Defendants knew that: (a) Adobe XD, a desktop program, was failing because Figma's web-based products had superior functionality; (b) because XD was failing, Defendants had developed plans to divert resources from XD to Project Spice, which they designed as a direct competitor to Figma; (c) Figma was the leader in its market and was acquiring users from Adobe or that might otherwise use Adobe products; (d) Figma's success threatened Adobe's flagship products, such as Photoshop and Illustrator, as Figma possessed and continued to add new features and functionality that competed with those legacy programs; (e) a smaller, tuck-in acquisition would not adequately position Adobe to complete with Figma; and (f) acquiring Figma offered Adobe the only option to position the Company in the all-in-one digital design space and present Figma from threatening the Company's existing and future business.

258. Despite their intimate knowledge of these matters, the Individual Defendants—and Adobe itself—authorized, prepared and issued false and misleading statements regarding each issue:

a.      they represented that XD was a viable product under continuing development, despite internal plans to discontinue it;

b.      they claimed XD was sufficiently competitive with Figma, when they had already diverted resources away from it;

c.      they downplayed competition from Figma and claimed Adobe was the market leader in all product design categories, when they knew that was inaccurate;

d.      they portrayed Photoshop and Illustrator as immune from Figma, despite fears that Figma posed an existential threat;

e.      they led the public to believe that market turmoil benefited Adobe because it created favorable conditions for M&A, when, in fact, due to Figma's success and knowledge of the threat Adobe faced from Figma, Defendants were negotiating from a defensive position and Adobe would be forced to pay a premium to acquire Figma in the largest transaction in its history (and ever for a scaled SaaS company); and

f.      they conveyed that a large acquisition was not on the table, and that reduced valuations for acquisition targets allowed Adobe to identify smaller, tuck-in acquisitions in line with the nature and size of Adobe's historical acquisitions, when they secretly sought to acquire Figma in a $20 billion deal and had already entered into negotiations to do so.

259.    This knowledge is further substantiated by contemporaneous email and other internal correspondence, including communications in which the Individual Defendants addressed plans to disinvest and reallocate resources from XD in October 2021 and place it in maintenance mode in February 2022, as well as documents evidencing the Individual Defendants' awareness and concern over Figma's threat to Adobe's competitive prospects more generally, including with respect to flagship products Photoshop and Illustrator.  These and other communications (as detailed below and elsewhere herein), show that the Individual Defendants were all personally involved in Adobe's plans to scrap XD and were aware of the full scope of Figma's competitive threat.  The CMA's investigation and reports—and Adobe's own submissions to the CMA—confirm their knowledge of this information.

260.    Examples of these internal documents, as described in the CMA's November 2023 Report—which provides dates, the type of communication, and the title of the executives involved—include, but are not limited to:

a.      A July 2020 message involving Narayen, Wadhwani, and Belsky, which the CMA cited as "evidence that, among these threats to its Creative Cloud ecosystem, Adobe considered Figma's growing presence in the adjacent product design market to be a particular threat. Adobe perceived product design as a point of disintermediation between how customers access its creative design products more widely.  Adobe reacted to Figma's position in product design when considering its own vector and raster editing functionality . . . ."

b.      A November 20, 2020 message from Adobe's VP of CC Web App indicating that "Adobe's CEO considered Photoshop Web a response to a threat from Figma."

c.      A November 20, 2020 message from Adobe's VP of CC Web App to the Project Spice team, cited as evidence that "Adobe perceived Figma as a threat" prior to June 2021, indicating that Adobe's SVP of Adobe Express Creative Cloud Services had spoken to Narayen and understood that Narayen was "very aware and concerned . . . ."

d.      A September 2021 "document on web products" involving Wadhwani and Belsky, cited as evidence that "Adobe monitors different user segments within vector and raster editing, and that it regularly monitors which other applications (and to which extent) its users use. The segments appear to evolve over time but tend to consist of four categories . . . .  These segments are linked to how Adobe monitors competitive constraints . . . ."

e.      An October 2021 email involving Wadhwani and Belsky, "announcing the shift in resources," cited as evidence that "the rationale for merging the Adobe XD and CC Web (Project Spice) teams in October 2021 was to develop a new web-based product design tool," and that (brackets in original): "In October 2021, as Adobe moved [over 100] employees from Adobe XD to Project Spice ([over 100] of whom were working on the Adobe XD tool itself), internal documents show that the shift in resources was linked to developing product design features in

Project Spice, which was intended to improve Adobe's competitive position in product design by being web-based and improving on Adobe XD's collaboration capabilities."

      f.    A January 2022 email involving Wadhwani and Belsky, cited as evidence that "Adobe's competitive response to Figma included product development which would defend its whole Creative Cloud suite. This in turn would defend Adobe's flagship products (Illustrator and Photoshop) from competition."

      g.    A January 20, 2022 email involving Wadhwani and Belsky and setting out "the agenda for a meeting they have that day," "shows that in late January 2022 Adobe considered Project Spice to be a competitive response to Figma given Adobe XD's losses to Figma."

      h.    A January 20, 2022 conversation involving Wadhwani, evidently referenced in a document, which:

> indicates that in late January 2022 Adobe considered winning in product design to be important and considered both organic and inorganic growth as options to achieve this. Whilst the document shows an Adobe executive questioning whether Adobe is on a path to 'win' with Project Spice, it does not question the goals and objectives of Project Spice. Rather, it suggests that Adobe's goals and objectives may be better achieved via an acquisition of Figma if that was possible.

      i.    A presentation delivered at a February 2022 meeting which Wadhwani and Belsky attended "demonstrates that in February 2022, Adobe considered accelerating Project Spice to be its best option for winning in collaborative design (which includes product design), and that it therefore made sense to shift resources with product design experience from Adobe XD."

      j.    A note from a February 2022 meeting on Photoshop Web, which included Wadhwani and Belsky, cited as evidence that "Adobe's executive team and senior management expressed concerns about the threat from Figma around the same time as the two in-depth analyses (ie early 2022)."

k.    A note from a February 2022 "Photoshop-specific meeting held the following week" involving Narayen, Wadhwani, and Belsky, cited as evidence that "Adobe's executive team and senior management expressed concerns about the threat from Figma around the same time as the two in-depth analyses (ie early 2022)."

l.    A February 5, 2022 email from Belsky to Narayen and Wadhwani "shows that resources were shifted from Adobe XD in February 2022 to accelerate screen design in Project Spice, and port screen design features from Adobe XD to Project Spice, which was intended to be web-based and have improved collaboration capabilities."

m.    A video recorded on April 21, 2022 of an Adobe internal meeting involving Belsky indicates that "Figma is a threat to Adobe."

n.    An internal chat by Belsky at a May 2022 meeting involving Wadhwani and Belsky is cited as evidence that "Adobe reduced investment in Adobe XD to accelerate the development of Project Spice."

o.    Messages by Wadhwani and Belsky from a May 19, 2022 meeting "indicate that there was agreement amongst Adobe's business leaders in mid-May 2022 that Project Spice was a replacement for Adobe XD and would include its product design and prototyping feature set."

261.    Additionally, during the Class Period, Defendants controlled the dissemination of public information regarding the Company.  They authorized, prepared and issued statements to the media, analysts, investors, and actual and prospective product users, orally and in writing.  These modes of communication included official Adobe press releases, Twitter accounts associated with Adobe products, SEC filings, statements in analyst reports and the news media, and conference calls. The Individual Defendants reviewed, approved, ratified, and otherwise furnished information and language for inclusion in public statements by or on behalf of the Company during the Class Period.

## VI.    LOSS CAUSATION AND ECONOMIC LOSS

262.    As detailed herein, Defendants engaged in a scheme to deceive the market and a purposeful, if not reckless, course of conduct which artificially inflated the price of Adobe common stock and operated as a fraud or deceit on Class Period purchasers, including Menora and PPF.  As alleged further herein, when these misrepresentations and this fraudulent conduct were exposed and became apparent to the market, the trading price of Adobe common stock fell precipitously as the artificial inflation was removed.  Accordingly, as a result of their Class Period purchases, such Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

263.    Aspects of the truth regarding the fraud were revealed beginning with a corrective disclosure and materialization of concealed risk that occurred on September 15, 2022, when Adobe announced the merger.  Investors began to understand that the Company's precarious competitive position—including XD's inability to compete against Figma or capture meaningful market share—necessitated the Figma acquisition.  In response to this corrective disclosure, Adobe's stock declined substantially on extraordinarily high volume of over 27.8 million shares traded, as the artificial inflation caused by Defendants' unlawful conduct was removed from the stock price.  The decline was attributable to the market absorbing information that corrected and otherwise reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

264.    After September 15, 2022 and through September 23, 2022, additional information reached the market regarding issues that Defendants concealed during the Class Period.  These issues involved further information regarding Adobe's competitive position and the performance of XD.  As investors digested this news over a series of days, Adobe's stock price correspondingly declined on higher-than-normal trading volume—reflecting dissipation of the artificial inflation Defendants' fraud had introduced during the Class Period.

265.    Accordingly, Defendants' wrongful conduct directly and proximately caused losses and thus damages suffered by Class members, including Menora and PPF.

## VII.    A PRESUMPTION OF RELIANCE APPLIES

266.    A presumption of reliance applies under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims alleged are predicated upon omissions of material fact for which there was a duty to disclose, as alleged herein.

267.    Additionally, a presumption of reliance applies under the fraud-on-the-market theory of reliance because the market for Adobe common stock was efficient during the Class Period:

a.    Adobe common stock was listed and actively traded on the NASDAQ, an efficient and electronic stock market that reflected the prompt incorporation and reflection of information, throughout the Class Period;

b.    Adobe common stock traded at volumes during the Class Period that reflected the impact of available information and the trading price reacted promptly to publicly available news and information;

c.    Adobe filed periodic public reports with the SEC and otherwise regularly communicated with analysts and investors using established market communication mechanisms, including press releases; and

d.    Securities analysts and investors followed Adobe and issued reports on its prospects and performance, and information on Adobe regularly entered the marketplace and was reflected in the trading price of its common stock.

268.    As a result of the foregoing, the market for Adobe common stock promptly digested relevant information from publicly available sources and its trading price reflected such information. Under these circumstances, all purchasers of such securities during the Class Period suffered similar injury by purchasing at artificially inflated prices and a presumption of reliance applies.

## VIII.    NO PROTECTION INSULATES DEFENDANTS FROM LIABILITY

269.    The safe harbor for forward-looking statements under certain circumstances, and the bespeaks caution doctrine, do not apply to any of the materially false and misleading statements or omissions alleged herein.

270.    *First*, the materially false and misleading statements and omissions relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor.  Such false or misleading statements are not forward-looking because they: (a) relate to historical or current fact; (b) implicate existing conditions; and (c) do not contain projections of future performance or future objectives.  If any statements might be construed to touch on future intent, they are mixed statements of present fact and future intent and are not entitled to safe harbor protection with respect to the part that refers to the present.

271.    *Second*, any purported cautionary language was not meaningful and therefore was ineffectual because any risks warned of had already transpired and the language was boilerplate, was not specifically tailored to the risks at issue, did not change as risks evolved or conditions changed, and did not mention important factors of similar significance to those actually realized.

272.    *Third*, Defendants are liable for any forward-looking statement identified as such (or otherwise) because they knew the statement was false or misleading when made.  Additionally, any such statement was authorized or approved by a Defendant or executive officer who could bind any of Defendants and who knew the statement was false or misleading when made.  All such false or misleading statements are accordingly attributable to Adobe and/or the other Defendants, whether identified as forward-looking or otherwise.

## IX.    CLASS ACTION ALLEGATIONS

273.    This action is brought as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and entities who purchased or otherwise acquired the common

stock of Adobe during the Class Period (collectively, the "Class"). Excluded from the Class are Defendants and their families; officers, directors and affiliates of Defendants and members of their immediate families at all relevant times; legal representatives, heirs, successors or assigns of any of the foregoing; and any entity in which any Defendant has or had a controlling interest.

274.    The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, Adobe common stock was actively traded on the NASDAQ and millions of shares were publicly traded. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, there are likely hundreds, if not thousands, of members in the Class. Class members may be identified from records maintained by Adobe or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

275.    Common questions of law and fact exist as to all Class members that predominate over any questions solely affecting individual Class members, including: (a) whether Defendants violated the Exchange Act, as alleged; (b) whether Defendants misrepresented or omitted material information during the Class Period in violation of the Exchange Act; and (c) whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

276.    The claims asserted herein and brought by Menora and PPF are typical of the claims of the Class as all Class members were similarly affected by Defendants' violation of the federal securities laws. Menora and PPF will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in securities class actions.

277.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if

not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## X.    CLAIMS

### A.    COUNT ONE: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

278.    Each and every allegation set forth above is repeated, incorporated, and realleged as if fully set forth below.

279.    This claim is brought against Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  During the Class Period, Defendants knowingly or recklessly prepared, issued, or approved false and materially misleading statements without regard for the truth, and in doing so, they:

a.    employed devices, schemes, and artifices to defraud;

b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon all Class members who purchased common stock during the Class Period.

280.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements they issued, approved, or otherwise disseminated were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

281.    Additionally, as set forth elsewhere herein, Defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts, their control

over the allegedly materially false and misleading statements and omissions, and their access to non-public information.  Further, as detailed above, Defendants had a duty to disclose the material facts described herein and violated their duty to do so.

282.    All Class members, including Menora and PPF, have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for Adobe common stock. They would not have purchased the securities at the prices they paid, or at all, had they been aware that market prices had been artificially and falsely inflated by Defendants' false and materially misleading statements.

283.    As a direct and proximate result of Defendants' misconduct, all Class members, including Menora and PPF, suffered damages in connection with their Class Period purchases of Adobe common stock.

**B.    COUNT TWO: Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

284.    Each and every allegation set forth above is repeated, incorporated, and realleged as if fully set forth below.

285.    This claim is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).  During the Class Period, the Individual Defendants controlled a primary violator of the federal securities laws, including, but perhaps not limited to, Adobe.

286.    By virtue of their high-level positions as executives and/or directors, the Individual Defendants were privy to, and monitored, confidential and proprietary information about Adobe, its business, operations, performance, and future prospects.  They had regular access to nonpublic information about Adobe's business, operations, performance, and future prospects through access to internal corporate documents, information, and personnel.

287.    The Individual Defendants were controlling persons of Adobe within the meaning of Section 20(a), as alleged herein.  By virtue of their high-level positions, their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of statements by the Company and disseminated to the investing public, the Individual Defendants had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the allegedly actionable statements and omissions.  During the Class Period, the Individual Defendants issued statements on behalf of the Company.

288.    To the extent necessary, the Individual Defendants were culpable participants in the fraud alleged herein.

289.    As a result, the Individual Defendants are liable as control persons under Section 20(a).  As a direct and proximate result of such misconduct, all Class members, including Menora and PPF, suffered damages in connection with their Class Period purchases of Adobe common stock.

## XI.    PRAYER FOR RELIEF

WHEREFORE, based on the foregoing and all proceedings herein, the Court is respectfully requested to enter judgment against Defendants as follows:

A.    Determining that this action is properly brought as a class action and certifying the Class accordingly, designating Menora and PPF as Class representatives, and appointing Robbins Geller Rudman & Dowd LLP and Pomerantz LLP as Class Counsel;

B.    Awarding compensatory damages to the Class, including Menora and PPF, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with prejudgment interest thereon;

C.      Awarding to the Class, including Menora and PPF, reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.      Granting such other, further and/or different relief as the Court deems just and proper.

## XII.    JURY TRIAL DEMAND

A trial by jury is hereby demanded.

DATED:  February 23, 2024                    ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             SAMUEL H. RUDMAN
                                             ROBERT M. ROTHMAN
                                             JOSEPH RUSSELLO
                                             T. ALEX B. FOLKERTH (admitted *pro hac vice*)
                                             JOSHUA D. FORGY


                                                      */s/ Samuel H. Rudman*
                                             SAMUEL H. RUDMAN

                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)
                                             srudman@rgrdlaw.com
                                             rrothman@rgrdlaw.com
                                             jrussello@rgrdlaw.com
                                             afolkerth@rgrdlaw.com
                                             jforgy@rgrdlaw.com

                                             *Counsel for PPF and Co-Lead Counsel for the Proposed Class*

POMERANTZ LLP
JEREMY A. LIEBERMAN
EMMA GILMORE
VILLI A. SHTEYN
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

POMERANTZ LLP
ORLY GUY
EITAN LAVIE
HaShahar Tower
Ariel Sharon 4, 34th Floor
Givatayim, Israel 532004 7
Telephone: +972 (0) 3 624 0240
+972 (0) 3 624 0111 (fax)
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Menora and Co-Lead Counsel for the
Proposed Class*

# EXHIBIT A

<u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

Stichting Philips Pensioenfonds ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 22 ___ day of February, 2024.

Stichting Philips Pensioenfonds

By: _Jasper Kemme_
DCE1A5DB302E402...
Jasper Kemme, Managing Director

By: _Anita Joosten_
E8F464EDE3AD493...
Anita Joosten, Director Investments

ADOBE

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/03/2021 | 34,076 | $614.10 |
| 01/04/2022 | 271 | $554.00 |
| 02/09/2022 | 194 | $521.75 |
| 03/09/2022 | 251 | $450.87 |
| 04/01/2022 | 201 | $458.19 |
| 06/30/2022 | 1,869 | $366.06 |
| 08/05/2022 | 338 | $433.43 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 07/30/2021 | 2,639 | $621.63 |
| 07/30/2021 | 3,850 | $621.63 |
| 08/04/2021 | 2,027 | $625.68 |
| 08/04/2021 | 3,932 | $625.68 |
| 08/31/2021 | 3,214 | $663.70 |
| 10/29/2021 | 508 | $650.36 |
| 12/17/2021 | 2,610 | $556.64 |
| 01/31/2022 | 813 | $534.30 |
| 02/28/2022 | 3,624 | $467.68 |
| 03/16/2022 | 1,565 | $442.36 |
| 04/21/2022 | 1,398 | $417.48 |
| 04/22/2022 | 1,521 | $408.67 |
| 05/31/2022 | 2,330 | $416.48 |
| 06/07/2022 | 1,531 | $433.42 |
| 08/31/2022 | 192 | $373.44 |
| 08/31/2022 | 1,408 | $373.44 |
| 09/20/2022 | 2,886 | $291.06 |

Prices listed are rounded up to two decimal places.

*Opening position of 52,466 shares.