**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
─────────────────────────────────

**In re ADOBE INC. SECURITIES**
**LITIGATION**                          **23-cv-9260 (JGK)**

                                        **MEMORANDUM OPINION**
                                        **AND ORDER**


─────────────────────────────────


**JOHN G. KOELTL, District Judge:**

This case is an alleged securities action brought against
Adobe, Inc. ("Adobe") on behalf of a putative class of all
persons and entities who purchased or otherwise acquired Adobe
common stock between July 23, 2021, and September 22, 2022 (the
"Class Period"). The First Amended Complaint (the "FAC") names
Adobe as a defendant, as well as Shantanu Narayen, Adobe's
Chairman and Chief Executive Officer ("CEO"); John Murphy,
Adobe's former Chief Financial Officer ("CFO") and Executive
Vice President; Daniel Durn, Adobe's current CFO and Executive
Vice President of Finance, Technology Services & Operations;
Jonathan Vaas, Adobe's Vice President of Investor Relations and
Assistant General Counsel; David Wadhwani, President of Adobe's
Digital Media business segment; and Scott Belsky, Adobe's Chief
Strategy Officer and Executive Vice President of Design &
Emerging Products (collectively, the "Individual Defendants").

The lead plaintiffs Menora Mivtachim Insurance Ltd. and
Menora Mivtachim Pensions & Gemel Ltd. (collectively, "Menora")

and Stichting Philips Pensioenfonds ("PPF"), allege that the defendants fraudulently misrepresented the competitive threat that Figma, Inc. ("Figma")—the creator of a user-interface, user experience ("UI/UX") design tool called Figma Design—posed to various Adobe products, in violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The plaintiffs also allege control person liability under Section 20(a) of the Exchange Act, 15 U.S.C.§ 78t(a), against the Individual Defendants.

The plaintiffs primarily allege that the defendants' statements during the Class Period: (1) concealed the competitive threat that the defendants privately recognized Figma posed to Adobe; (2) promoted Adobe XD as a successful product despite the defendants' decision to deprioritize it in response to competition from Figma Design; and (3) downplayed the possibility that Adobe would pursue any major acquisitions. The plaintiffs further allege that in addition to threatening Adobe XD-the Adobe product in direct competition with Figma Design-Figma also threatened flagship Adobe products like Illustrator and Photoshop. Ultimately, the plaintiffs contend that the announcement of Adobe's proposed acquisition of Figma revealed Adobe's alleged misrepresentations to the market, causing Adobe's stock price to drop.

The defendants now move to dismiss the plaintiffs' First Amended Complaint ("FAC"). See ECF No. 57. For the following reasons, the defendants' motion to dismiss is **granted** and the FAC is **dismissed without prejudice.**

**I.**

Unless otherwise noted, the following facts are taken from the FAC and are accepted as true for purposes of the current motion.

**A. Background**

Adobe, a Delaware corporation, headquartered in California, is a software company that offers a line of desktop computer and mobile applications to creative professionals and businesses. FAC ¶ 24, ECF No. 46. Adobe's shares trade publicly on the NASDAQ exchange. Id.

Adobe's business is organized into three segments: (1) Digital Media, which provides products and services enabling users to create and publish content; (2) Digital Experience, which provides an integrated platform for businesses to manage customer experiences; and (3) Publishing and Advertising, which houses Adobe's legacy products and solutions. Id. ¶¶ 31-32. This motion relates to Adobe's Digital Media segment which generates approximately two-thirds of Adobe's revenue. Id. ¶¶ 33-34.

Many products fall under the Digital Media umbrella, but the plaintiffs' claims focus on Photoshop, Illustrator, and

Adobe XD. Id. ¶¶ 31–63. Photoshop is a raster-editing tool for digital imaging and design. Id. ¶¶ 4, 15. Illustrator is a vector graphics application used to create digital graphics and illustrations. Id. [1] During the Class Period, Adobe "controlled over 70% of the vector editing tools market with its Illustrator product and over 80% of the raster editing tools market with its Photoshop product." Id. ¶ 50.[2] By contrast, the plaintiffs allege, and the defendants agree, that Adobe XD struggled to maintain a foothold in the UI/UX design tool market.

Adobe XD is a UI/UX application that allows subscribers to build user experiences and interfaces when designing websites and mobile applications. Id. ¶ 38. Figma Design is a similar application but possesses increased real time collaboration functionality. Id. ¶¶ 38, 48–49. Although Adobe XD was one of the top three UI/UX applications during the Class Period, it nevertheless captured only around 5% market share in the UI/UX market. Id. ¶¶ 40, 91. By contrast, in 2021, Figma captured approximately 50% market share with its Figma Design product.

---

[1] Vector editing uses mathematical equations, lines, and curves with fixed points on a grid to create logos, icons, or other images digitally. FAC ¶ 50. Raster editing is used to create or edit images built of pixels. Id.

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

Id. ¶¶ 91, 178(b). Moreover, Adobe XD's annual recurring revenue of—at most—$17 million makes up just a fraction of Adobe's overall 2022 revenue of $17.6 billion. See McDonough Decl., Ex. 35 ("Adobe/Figma CMA Submission") at 19, ECF No. 58-35; McDonough Decl., Ex. 34 ("2022 Form 10-K") at 40, ECF No. 58-34.

Accordingly, in October 2021, the defendants allegedly decided to deprioritize Adobe XD in response to competition from Figma. FAC ¶¶ 7, 178(d). In February 2022, Adobe placed Adobe XD in "maintenance mode," signaling the end of its development. Id. ¶¶ 7, 178(d), 214-15. By 2022, only twenty Adobe employees were staffed on the XD product. Id. at 214.

Meanwhile, the plaintiffs allege that Adobe was privately concerned about the threat that Figma posed, not only to its direct competitor—Adobe XD—but also to other, more successful Adobe products like Illustrator and Photoshop. See id. ¶¶ 44-63. In particular, the plaintiffs point to a study that Adobe conducted in September 2021, to examine the competitive threat posed to Illustrator and Photoshop by Figma. Id. ¶ 58. Additionally, in 2020, Adobe began work on Project Spice, "a defensive move intended to address Figma's competitive threat not just to XD, but also to Illustrator and Photoshop." Id. ¶ 62. In October 2021 and February 2022, Adobe shifted engineering

resources from Adobe XD to Project Spice in order to accelerate Project Spice's development. Id.

In April 2022, against this backdrop, Adobe and Figma began to discuss a possible acquisition. Id. ¶¶ 6, 184–86. Defendant Wadhwani, Adobe's President of Digital Media, played a key role in brokering the contemplated acquisition of Figma. Id. The plaintiffs allege that Wadhwani enlisted Greylock, an investor in Figma and Wadhwani's former employer, to connect Wadhwani with Figma. Id. ¶¶ 183–85.

On September 15, 2022, Adobe and Figma executed a merger agreement pursuant to which Adobe agreed to purchase Figma "for $20 billion in total acquisition consideration," with "approximately 50% of the acquisition price payable in cash and the remainder in Adobe equity securities." Id. ¶¶ 9–10, 143. After Adobe announced the planned acquisition, Adobe's stock price dropped from $371.52 to $309.13—nearly 17%—on a significant volume of over 27.8 million shares traded. Id. ¶ 10. Adobe's stock price continued to drop over the following days and closed at $286.30 on September 21, 2022. Id. ¶ 13.

Analysts responded poorly to news of the planned acquisition, with some analysts observing that "the steep valuation [of Figma] . . . suggests that Figma was a formidable competitive threat" and that the deal "appears more defensive than offensive." Id. ¶¶ 11–12. Other analysts appeared concerned

with the $20 billion that Adobe agreed to pay for Figma, noting that "it is difficult to justify the price." Id. ¶ 12.

In the wake of the announcement, regulators expressed concern that the acquisition "might stifle competition in the market for digital design applications." Id. ¶ 15. In particular, the United Kingdom Competition and Markets Authority ("CMA") investigated and provisionally concluded "that the proposed transaction would harm competition in the global market for all-in-one product design software." Id. The CMA set forth its findings in a 460-page provisional report dated November 28, 2023 (the "CMA Report"). Id.

The plaintiffs rely heavily on the CMA Report to support their allegations. For example, the plaintiffs cite the CMA Report's conclusion that "Adobe perceived Figma as a threat to its core markets for vector and raster editing, and its flagship products Illustrator and Photoshop." Id. ¶ 55; see also McDonough Decl., Ex. 36 ("CMA Report") at 373, ECF No. 58-36. However, the CMA Report also found that although "Figma made several incremental improvements to its vector editing functionality over time," "its current functionality, relative to Adobe, remains limited." CMA Report at 334. Similarly, the CMA Report concluded "that Figma's raster editing functionality remains very limited." Id. at 335. Additionally, the report concluded that "Adobe's creative design products are considered

7

leaders in their respective markets. In particular in vector and raster editing, Adobe enjoys a long-standing unrivalled market position." Id. at 42.

On December 17, 2023, amid speculation that the Department of Justice might move to block the merger, Adobe and Figma terminated the proposed transaction. FAC ¶¶ 234-239. Adobe's stock price rose following news of the termination. See, e.g., McDonough Decl., Ex. 53 at 3, ECF No. 58-53 (showing that Adobe's stock price rose from $591.52 to $599.13 the day after the acquisition was terminated).

### B. Contested Statements

The plaintiffs' claims hinge on the contention that during the Class Period, the defendants made fraudulently misleading statements regarding the threat that Figma posed to Adobe and its products. The plaintiffs sort these statements into three categories: first, statements downplaying competition from Figma; second, false and misleading statements about the viability of Adobe XD; and third, false and misleading statements regarding Adobe's merger plans.

### 1. Statements Downplaying Competition From Figma

The plaintiffs first allege that the defendants made statements downplaying the threat posed by competitors like Figma. For example, on October 26, 2021, the Verge's Decoder Podcast broadcast an interview with Defendant Belsky, Adobe's

Chief Strategy Officer and Executive Vice President of Design & Emerging Products. FAC ¶ 69. During the podcast, the interviewer asked Belsky about competition from Figma—referring to it as the "elephant in the room." Id. ¶ 71. Belsky expressed no concerns about Figma and described Adobe as "a market leader" which focuses "on what the majority of [our] customers need, which is never something at the edge." Id. ¶ 72. With respect to competition between Figma Design and Adobe XD, Belsky contended that Adobe's users refuse to "trade performance and precision for ease of collaboration." Id.

Similarly, on January 5, 2022, Defendant Vaas, Adobe's Vice President of Investor Relations and Assistant General Counsel, participated in a conference call hosted by Evercore ISI. See id. ¶ 107. During the call, an analyst asked Vaas about Adobe's potential competitors, particularly Figma and Canva—another specialized design tool company. Id. In response, Vaas observed that the success of other companies "validate[s] the explosiveness of these markets that we're competing in." Id. At another conference held on January 11, 2022—just a few days later—Vaas characterized Canva and Figma as "point solution players"—i.e. "single product compan[ies] that[] [have] found a niche with a growing universe of users." Id. ¶¶ 109-10.

Subsequently, on January 20, 2022, at a conference hosted by Wolfe Research, Defendant Wadhwani answered a question about

"the competitive environment" in the creative tools market,
observing that "when you look at the fact that there are more
creative pros needed in companies than ever before, that's
obviously a big tailwind for us." Id. ¶¶ 113, 115–16. At the
same conference, Belsky characterized Canva and Figma's presence
in the market as helpful to Adobe, observing that "[b]est to
market, better than first to market" and stating that:

> [L]egacy is a blessing and a curse, right? I
> mean we have an incredible legacy. We have
> these ubiquitous file formats, et cetera. And
> there's always a risk that a company can rest
> on laurels, right? And for the last few years,
> we've seen the TAM explosion, we've been very
> awakened to the opportunity. But all of this
> helps. I mean the company, I feel like our
> strategy is more sound than it's ever been.
> People are galvanized.

Id. ¶¶ 117–19 (emphasis added).

Finally, the plaintiffs allege that during the Class
Period, the defendants filed Form 10-Qs and 10-Ks containing
disclosures that framed the threat of competition as a
hypothetical, future threat, "when, in fact, those risks had
already materialized." Id. ¶¶ 175–76. The relevant forms
disclosed that "[Adobe's] competitive position and the results
of operations could be harmed if [Adobe does] not compete
effectively." Id. ¶ 177.[3] The disclosures further provided that

---

[3] Every Form 10-Q filed during the class period contained
identical disclosure language regarding Adobe's competitive

"intense competition," among other factors, "could create downward pressure on pricing and gross margins and could adversely affect [Adobe's] renewal and upsell and cross-sell rates, as well as [Adobe's] ability to attract new customers." Id. The disclosures also observed that "[i]f [Adobe] fail[s] to anticipate customers' rapidly changing needs and expectations or adapt to emerging technological trends, [Adobe's] market share and results of operations could suffer" and that "any delay in the development . . . of a new offering or enhancement to an existing offering could result in customer attrition or impede [Adobe's] ability to attract new customers, causing a decline in . . . revenue, earnings, or stock price." Id.

The plaintiffs allege that the defendants made these statements downplaying the risk of competition from Figma while their private statements and actions demonstrated that they considered Figma to be a serious threat to Adobe's business.

## 2. Statements Regarding Adobe XD

The plaintiffs also allege that the defendants "misleadingly promoted [Adobe] XD as a viable and developing

---

position. See FAC ¶ 176. The 2020 and 2021 Form 10-Ks contained the same language. See id.

product despite their decision to wind it down no later than October 2021." Opp. Mem. of Law ("Opp. Mem.") at 13, ECF No. 61.

In particular, at the October 26, 2021 Adobe MAX Conference, Belsky emphasized Adobe XD's successes in his presentation, stating that "[f]rom Accenture to T-Mobile to Carnegie Hall, more and more organizations are designing compelling experiences with Adobe XD." FAC ¶ 75. At the same conference, Belsky praised Adobe XD, saying that it "keeps getting better and better," and another Adobe employee walked attendees through new Adobe XD features. Id. ¶ 76.

The plaintiffs next point to Adobe's December 16, 2021 fourth-quarter earnings presentation materials which grouped Adobe XD with Illustrator and Photoshop as Adobe's "flagship applications." See id. ¶¶ 36, 105–06.

**Continue to invest in Adobe magic across flagship applications**

- Accelerate imaging, video & design workflows through Adobe Sensei

- Drive immersive experiences with Premiere, Substance 3D & Aero

- Connect designers and stakeholders with XD, Photoshop web and Illustrator web

- Deliver creative system across desktop, web and mobile apps

Id. ¶ 105. Another page of the presentation listed Adobe XD as an application that contributed to Adobe Creative Cloud's success, along with Photoshop and Illustrator:



> **>600M**
> Non-CPro Free and paid MAU across mobile, web or desktop apps for CC and DC
> - Broad portfolio of category-defining apps: Photoshop, Illustrator, Premiere, InDesign, XD, Acrobat, Adobe Stock, Lightroom, Photoshop Express & Premiere Rush
> - Sensei-powered innovation
> - Mobile & web surfaces for creation
> - New Creative Cloud Express offering

Id. ¶ 103.

Subsequently, on August 25, 2022, an Adobe spokesman told CNBC that Adobe "do[es] not see an impact to the Photoshop business resulting from players in the product design category," representing that "[w]e developed and have evolved Adobe XD to address the needs of our core design customers." Id. ¶¶ 146, 168.

All these statements were made after or around October 2021, when Adobe allegedly decided to disinvest from XD. Id. ¶¶ 7, 178(d). The statement to CNBC was made after Adobe had already been placed in maintenance mode. Id. ¶¶ 7, 214-15

### 3. Statements Regarding Adobe's Merger Plans

Finally, the plaintiffs allege that during the Class Period, the defendants discussed mergers and acquisitions but

failed to speak truthfully about Adobe's acquisition plans. <u>See</u>
Opp. Mem. at 18.

For example, on an April 8, 2022 conference call, an
analyst asked Defendant Durn, Adobe's CFO and Executive Vice
President: "How does your prior experience affect or impact your
style in thinking about acquisitions? And are they big
acquisitions?" FAC ¶ 132. Durn replied:

> Yes. So rather than classify them by size, I
> would say that we're going to make smart
> acquisitions at this company. What I mean by
> that, is grow—and so I'm going to be oriented
> towards growth. The opportunity set in front
> of us is large, it's enormous. So the engine
> of innovation is second to none at this
> company. . . . [T]he highest value form of
> growth is organic growth. We are oriented
> towards organic growth. So by definition, when
> you think about M&A and layering in M&A,
> inorganic growth to complement that, the bar
> for those transactions is going to be high
> because the organic growth opportunities are
> so attractive. But where we see an opportunity
> to accelerate our strategy, further our
> leadership position, accelerate time to market
> and do it in a value-accretive way for
> shareholders, we'll burn calories to acquire
> those assets.

<u>Id.</u>

Later, on June 16, 2022, Adobe reported its financial
results for the 2022 second fiscal quarter. <u>Id.</u> ¶ 139. On an
earnings call with investors and analysts, an analyst asked
Narayen, Adobe's chairman and CEO: "with respect to the
strategic approach to M&A and . . . what's on the horizon given

14

the changing valuation paradigms in the market, how important is either a large strategic M&A to the growth profile of the business versus tuck-ins?" Id. ¶ 142. Narayen responded in relevant part:

> Clearly, valuations, to your point, have changed quite a bit. And the first thing I'll start off by saying is we're really pleased with our portfolio. If you look at some of the new initiatives, and we've touched on that, whether it's the Real-Time CDP, Customer Journey Analytics, what we are doing with things on the web, including PDF, we feel really good. I do feel, Alex, that there are going to be a number of small single-product companies that are probably not going to survive what's happening. And the valuation sort of multiple changing is actually, I think, good for a larger company like Adobe.
>
> So it doesn't feel like we need anything, but we'll always be on the lookout for things that are additive, that are adjacent and that will provide great shareholder value. And our metrics associated with ensuring great technology, great cultural fit and adjacency remain. But we have so much going on within the company that we're excited about our current portfolio. Clearly, things will be more reasonable in terms of in terms of M&A as well.

Id. The plaintiffs allege that three days after this statement, and only a few months after the April 8, 2022 conference call, Adobe offered to buy Figma for $20 billion. Id. ¶ 143.

### C. Procedural History

On October 20, 2023, the plaintiffs filed this action, alleging that the defendants made materially misleading

statements regarding the threat posed by Figma in order to inflate the value of Adobe's stock. The plaintiffs further allege that the announcement of Adobe's acquisition of Figma acted as a corrective disclosure, revealing the risk posed by Figma to the market and causing Adobe's stock price to plummet. See ECF No. 1.

The plaintiffs subsequently filed an Amended Complaint alleging the same, see ECF No. 46, which the defendants now move to dismiss, see ECF No. 57. The Court held oral argument on the motion on March 25, 2025.

## II.

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

To survive a motion to dismiss, the plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Federal Rule of Civil Procedure 9(b) and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The PSLRA adds, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id.

When presented with a motion to dismiss a complaint, the Court may consider documents attached to or referenced in the

complaint, documents that the plaintiff either possessed or knew about and relied on in bringing the lawsuit, or matters of which judicial notice may be taken. Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). The Court can take judicial notice of public disclosures that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law to be filed." Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

### III.

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); Lau v. Opera Ltd., 527 F. Supp. 3d 537, 556 (S.D.N.Y. 2021). In pleading these elements, the complaint must also satisfy both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). See ECA,

18

Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).

The defendants argue the following in support of the motion to dismiss: first, that the FAC fails to allege any actionable statements or omissions under Section 10(b); second, that the FAC does not adequately plead scienter, an essential element of a Section 10(b) claim; and third, that the FAC fails to allege loss causation. Finally, the defendants contend that the plaintiffs' claims for control person liability pursuant to Section 20(a) must be dismissed for lack of a primary violation of Section 10(b). The Court will address each argument in turn.

## A. Alleged Misstatements and Omissions

Claims brought pursuant to Section 10(b) of the Exchange Act require the plaintiff to plead a misstatement or omission of material fact. See Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007). Unlike a misstatement, an omission is actionable under federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Although Rule 10b-5 imposes no duty to disclose all material information, once a party chooses to speak, it has a "duty to be both accurate and complete." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002). "[E]ven an entirely truthful statement may provide a basis for liability if

material omissions related to the content of the statement make
it . . . materially misleading." In re Bristol Myers Squibb Co.
Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008). However,
corporations need not "disclose a fact merely because a
reasonable investor would very much like to know that fact." In
re Time Warner, 9 F.3d at 267.

A misstatement or omission is material if there is a
substantial likelihood that a reasonably prudent investor would
consider it important in making a decision. See Basic Inc. v.
Levinson, 485 U.S. 224, 231-32 (1988); TSC Indus., Inc. v.
Northway, Inc., 426 U.S. 438, 449 (1976) ("[T]here must be a
substantial likelihood that the disclosure of the omitted fact
would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made
available."); Feinman v. Dean Witter Reynolds, Inc., 84 F.3d
539, 540-41 (2d Cir. 1996). Materiality depends on all relevant
circumstances, and ordinarily a complaint should not be
dismissed based on lack of materiality "unless [the statements
or omissions] are so obviously unimportant to a reasonable
investor that reasonable minds could not differ on the question
of their importance." Ganino, 228 F.3d at 162; In re Morgan
Stanley Info. Fund. Sec. Litig., 592 F.3d 347, 360 (2d Cir.
2010) ("Because the materiality element presents a mixed

question of law and fact, it will rarely be dispositive in a motion to dismiss."); see also Goldman, 754 F.2d at 1067.

In this case, the plaintiffs point to statements that allegedly: (1) downplayed competition from Figma; (2) promoted Adobe XD as a successful and viable product; and (3) misled investors about the extent of Adobe's M&A plans. The plaintiffs contend that these statements are either false or are misleading in light of omitted facts. In response, the defendants argue that these alleged misstatements are wholly truthful and accurate, and, moreover, are statements of opinion, puffery, and corporate optimism.

### 1. Statements Downplaying Competition From Figma

The plaintiffs first contend that Figma posed a serious risk to both Adobe XD and to other, more successful Adobe products and that the defendants made misleading statements minimizing the risk of this competition. In their opposition brief, the plaintiffs narrow their focus to just four allegedly misleading statements. In those statements: (1) Belsky characterized Adobe as a "market leader" with customers that refuse to "trade performance and precision for ease of collaboration"; (2) Vaas observed that increased competition "validate[s] the explosiveness of these markets that we're competing in" and characterized Figma as a "point solution player[]"; (3) Wadhwani stated that "when you look at the fact

that there are more creative pros needed in companies than ever
before, that's obviously a big tailwind for us"; and (4) Adobe's
10-K and 10-Q used the qualifiers "if" and "could" to imply that
the risk of competition was a hypothetical future risk, rather
than a present risk.

However, the plaintiffs fail to allege plausibly that any
of these statements were false or misleading. In support of
their argument, the plaintiffs cite cases where district courts
have found that statements minimizing the risk of competition
constitute actionable, materially misleading statements. See
Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software,
Inc. ("Tableau"), No. 17-cv-5753, 2019 WL 2360942, at *2-4
(S.D.N.Y. Mar. 4, 2015); In re Acuity Brands, Inc. Sec. Litig.,
No. 18-cv-2140, 2019 WL 10246166, at *16-17 (N.D. Ga. Aug. 12,
2019); Rougier v. Applied Optoelectronics, Inc., No. 17-cv-2399,
2019 WL 6111516, at *9 (S.D. Tex. Mar. 27, 2019); Howard v.
Liquidity Servs., Inc., 177 F. Supp. 3d 289, 305 (D.D.C. 2016);
Backe v. Novatel Wireless, Inc., 642 F. Supp. 2d 1169, 1176
(S.D. Cal. 2009).

However, nearly all of those cases involved competition
that caused tangible and concrete harm to the defendant's
business, thereby rendering statements downplaying the threat of
competition misleading. For example, in Tableau, the plaintiffs
alleged that "rising competition caused some of the company's

22

customers to delay and cancel pending license orders," and
"[m]any deals were lost to emerging competitors, causing the
company's sales cycle to lengthen." 2019 WL 2360942, at *2.
Similarly, in Acuity, the court referenced, "the effect that
increased competition was having on Acuity's bottom line." 2019
WL 10246166, at *16; see also Howard, 177 F. Supp. 3d at 297
(describing "averments from multiple confidential witnesses that
the retail business was already experiencing deteriorating
margins due to heightened competition"); Backe, 642 F. Supp. 2d
at 1176 (addressing allegations that the defendant had lost
market share due to competition).

    By contrast, in this case, the plaintiffs plausibly allege
only that Figma presented a potential competitive threat to
Adobe—not that competition from Figma had caused Adobe any
concrete or tangible losses. Although the plaintiffs allege that
Figma threatened successful Adobe products like Illustrator and
Photoshop, the CMA Report relied on by the plaintiffs found that
Figma's vector and raster editing functionality "remains
limited." CMA Report at 334-35. The plaintiffs also allege that
the defendants took precautionary measures to prevent future
competition from Figma in the vector and raster editing market,
such as commissioning a study on the possible effects of
competition and developing a new product—Project Spice—to stave
off the effects of competition. However, these steps were taken

to dispel a potential future risk, not to address a present one. Moreover, the defendants expressly disclosed this potential risk in their Form 10-Qs and 10-Ks. See FAC ¶¶ 175-77 (disclosing that "intense competition" "could create downward pressure on pricing and gross margins and could adversely affect [Adobe's] . . . ability to attract new customers"). Meanwhile, the plaintiffs fail to allege that competition from Figma caused Adobe's premier products any lost sales or decline in revenue and the plaintiffs conceded at the argument of the current motion that they did not point to any concrete losses.

In light of the absence of tangible harm resulting from increased competition, it was not misleading or false for the defendants to characterize Adobe as a "market leader" or to contend that any increased competition in the market "validate[s] the explosiveness of the markets" in which Adobe competes. See id. ¶¶ 72, 107. Similarly, Wadhwani's characterization of competition as a "tailwind" was neither false nor misleading given the plaintiffs' failure to allege that competition had hurt Adobe's profits, revenue, or other markers of financial wellbeing. See id. ¶ 116. And Vaas's characterization of Figma as a "point solution player[]," is not materially false or misleading given the plaintiffs' own characterization of Figma as offering a "single application,"

24

not "a broad portfolio of content-creation applications like Adobe." See id. ¶¶ 66(a), 109.

Additionally, Adobe's SEC filing disclosure that Adobe's business could suffer if Adobe failed to respond to the threat of competition was not misleading. Courts have found such risk disclosures materially misleading where risks, framed as hypothetical, had already materialized at the time the disclosures were made. See In re Facebook, Inc. IPO Sec. & Derivative Litig., 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (concluding that "a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized"); In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996). By contrast, in this case, the disclosed risk had not materialized.

The plaintiffs also allege that Adobe XD—the only Adobe product in direct competition with Figma Design—faced competition from Figma. However, the plaintiffs point to no statements where the defendants specifically downplayed the threat that Figma Design posed to Adobe XD—in fact, in its 2021 third quarter-10-Q, Adobe acknowledged that "[c]ompetitors to Adobe XD include Figma, InVision and Sketch. Partnerships and integrations between these companies and third parties create an increasingly competitive landscape in this space." FAC ¶ 82.

Unlike the threat to more established Adobe products, the defendants did not frame the threat that Figma Design posed to Adobe XD as hypothetical. And "a securities fraud claim for misrepresentations or omissions does not lie when the company disclosed the very risks about which a plaintiff claims to have been misled." In re Dynagas LNG Partners LP Sec. Litig., 504 F. Supp. 3d 289, 308 (S.D.N.Y. 2020); In re Farfetch Ltd. Sec. Litig., No. 19-cv-8657, 2021 WL 4461264, at *9 (S.D.N.Y. Sept. 29, 2021); aff'd sub nom, IAM Nat'l Pension Fund v. Farfetch Ltd., No. 21-2752-cv, 2023 WL 2879304 (2d Cir. Apr. 11, 2023) (summary order).

Moreover, the statements that the plaintiffs highlight are mere expressions of opinion, puffery, or corporate optimism. Statements of opinion are actionable only when based on untrue facts or when not honestly believed. See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund., 575 U.S. 175, 182–86 (2015); see also Abramson v. Newlink Genetics Corp., 965 F.3d 165, 175 (2d Cir. 2020) (finding that under Omnicare, opinion statements are actionable (1) when not honestly believed; (2) when they contain embedded factual statements that can be proven false; or (3) when they imply facts that can be proven false); In re Lottery.com, Inc. Sec. Litig., 715 F. Supp. 3d 506, 533 (S.D.N.Y. 2024) (same).

Meanwhile, statements constitute unactionable puffery when they are "too general to cause a reasonable investor to rely upon them" or are "merely generalizations regarding [a company]'s business practices." ECA, 553 F.3d at 206. The puffery exception permits companies "to operate with a hopeful outlook" because "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); In re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 420 (2d Cir. 2023); Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).

The plaintiffs allege that the defendants' statements were overly optimistic and minimized the risk that competitors like Figma posed to Adobe's core business. However, the defendants' statement that increased competition "validate[s] the explosiveness of these markets that we're competing in" and that "when you look at the fact that there are more creative pros needed in companies than ever before, that's obviously a big tailwind for us" are plainly statements of subjective opinion that do not rely on untrue facts. See FAC ¶¶ 107, 116. Statements of opinion need not be qualified with the language "I think" or "I believe" to constitute mere opinions. See In re

27

<u>Philip Morris</u>, 89 F.4th at 418 ("[L]anguage like 'we believe' or 'we think' is <u>sufficient</u>—not <u>necessary</u>—to render a statement one of opinion rather than fact.") (emphasis in original).

The plaintiffs also have not met the high bar to show that the defendants contemporaneously disbelieved their statements of opinion. Although the plaintiffs cite emails included in CMA Report as evidence of Adobe's contemporaneous concerns regarding the threat Figma posed to Illustrator and Photoshop, these emails have been so heavily redacted that neither the parties nor the Court can independently verify the CMA Report's conclusions. <u>See</u> CMA Report at 298, 311, 326; <u>see also</u> <u>Amorosa</u> <u>v. Gen. Elec. Co.</u>, No. 21-cv-3137, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022) ("Courts generally do not consider . . . parroted allegations for which counsel has not conducted independent investigation."). Furthermore, Adobe's investigation into possible competition from Figma also does not demonstrate that the defendants contemporaneously disbelieved that increased competition validated the importance of Adobe's market.

Moreover, certain of Adobe's alleged misstatements are plainly puffery. For example, the defendants' characterization of Adobe as a "market leader" and of competition as a "tailwind" and as "validat[ing] the explosiveness of these markets that we're competing in" are plainly vague expressions of corporate optimism that are too general to induce reliance. <u>See</u> FAC ¶¶ 72,

107, 116. And the Individual Defendants were "not required to take a gloomy, fearful or defeatist view of the future," merely because they harbored some concerns about future competition. Rombach, 355 F.3d at 174.

Accordingly, the FAC fails to identify any actionable misstatements regarding the threat of competition from Figma.

### 2. Statements Regarding Adobe XD

The plaintiffs next point to statements that they allege misleadingly painted Adobe XD as a viable product despite Adobe's alleged decision to deprioritize and ultimately discontinue Adobe XD. In their opposition brief, the plaintiffs narrow their focus to a few allegedly materially misleading statements. Those include: (1) an Adobe presentation grouping Adobe XD with Photoshop and Illustrator as a flagship application; (2) a public presentation that listed Adobe XD as an application that contributed to Adobe's success along with Photoshop and Illustrator; (3) statements made at the Adobe MAX conference to the effect that "[f]rom Accenture to T-Mobile to Carnegie Hall, more and more organizations are designing compelling experiences with Adobe XD" and "Adobe XD keeps getting better and better"; and (4) a statement by Adobe to

CNBC, representing that Adobe "developed and ha[s] evolved Adobe XD to address the needs of [its] core design customers."

The plaintiffs contend that these public representations were materially false and misleading because at the time the statements were made Adobe had already decided to phase out Adobe XD.[4] The defendants respond that the statements were not false, were immaterial, or else were inactionable statements of opinion, puffery, and corporate optimism.

The defendants correctly contend that, to the extent the statements represented facts, the statements were truthful and accurate. For example, the plaintiffs do not contest the accuracy of the defendants' statement that Accenture, T-Mobile, and Carnegie Hall used Adobe XD for design projects. See FAC ¶ 75. Similarly, the plaintiffs do not dispute that, prior to placing Adobe XD in maintenance mode, Adobe had added new features and made improvements to Adobe XD. See id. ¶ 76 ("Adobe XD keeps getting better and better."). Instead, the plaintiffs contend that omissions rendered these statements misleading and that statements are "measured not by literal truth, but by the ability . . . to accurately inform rather than mislead"

---

[4] Adobe allegedly made the decision to deprioritize Adobe XD in October 2021. FAC ¶ 7. Certain of the contested statements were also made in October 2021. Id. ¶ 75-76. However, the defendants do not dispute that the decision to phase out Adobe XD preceded the statements.

investors. <u>McMahan & Co. v. Wherehouse Ent., Inc.</u>, 900 F.2d 576,
579 (2d Cir. 1990). However, companies need not "depict facts in
a negative or pejorative light or draw negative inferences."
<u>Singh v. Schikan</u>, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015); <u>see
also</u> <u>Solow v. Citigroup, Inc.</u>, No. 10-cv-2927, 2012 WL 1813277,
at *4 (S.D.N.Y. May 18, 2012)("[A defendant is] not obligated to
characterize its performance or future outlook in negative
terms, speculate on future negative results or paint themselves
in the most unflattering light possible."), <u>aff'd</u>, 507 F. App'x
81 (2d Cir. 2013) (summary order). The securities laws did not
require Adobe to remove Adobe XD from the Creative Cloud lineup
or to refrain from promoting an existing product, merely because
Adobe had internally decided to allocate resources elsewhere.

    Moreover, the statements cited by the plaintiffs are
statements of opinion, puffery, or corporate optimism. Although
the statements at issue are not prefaced by the words "I think"
or "I believe," such qualifying language is not necessary to
render a statement an opinion. <u>See</u> <u>In re Philip Morris</u>, 89 F.4th
at 418. For example, Adobe's statement that Adobe XD "keeps
getting better and better" and that Adobe's core customer base
was "never willing to trade performance and precision for ease
of collaboration" are statements of subjective opinion even
without qualifying opinion language. Moreover, the plaintiffs
fail to allege plausibly that these statements contained

31

embedded untrue facts or that the defendants subjectively disbelieved these statements when the statements were made. See Omnicare, 575 U.S. at 182-86.

Finally, inclusion of Adobe XD among other Creative Cloud applications—including more successful, "flagship" applications—in public presentations is the sort of vague, promotional statement that "a reasonably prudent investor would [not] consider . . . important in making a decision." In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005) (citing Basic, 485 U.S. at 231).

The parties spend much of their time disputing the materiality of Adobe's statements regarding Adobe XD. Although Adobe XD only contributed approximately 0.1% of Adobe's 2022 revenue,[5] the Court of Appeals for the Second Circuit has rejected the use of specific thresholds in assessing materiality. Ganino, 228 F.3d at 162-63 ("[W]e have consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation."); Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 96 (2d Cir. 2016) (rejecting an argument that asked the court "to consider quantitative factors only in the narrowest light . . . and to otherwise ignore qualitative

---

[5] Adobe XD's annual recurring revenue of approximately 17 million makes up just a fraction of Adobe's overall 2022 revenue of approximately $17.6 billion. See Adobe/Figma CMA Submission at 19; 2022 10-K at 40.

factors"); Strougo v. Barclays PLC, 105 F. Supp. 3d 330, 349, 349 n.119 (S.D.N.Y. 2015) (finding that the plaintiff alleged materiality even where the numerical threshold was 0.1%). However, "[w]hile Ganino held that bright-line numerical tests for materiality are inappropriate, it did not exclude analysis based on, or even emphasis of, quantitative considerations." ECA, 553 F.3d at 204. Still, materiality presents a "mixed question of law and fact" and, on a Rule 12(b)(6) motion, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." See Ganino, 228 F.3d at 162. Thus, it is unnecessary to rely on the lack of materiality as a basis for dismissal in this case in view of the other grounds for dismissal.

Because the statements at issue are truthful and accurate, and, in any event, are inactionable statements of opinion or puffery, the FAC fails to identify any actionable misstatements regarding the success of the Adobe XD product. That Adobe made the business decision to deprioritize Adobe XD did not render its choice to continue to promote an existing product misleading.

33

### 3. Statements Regarding Adobe's Merger Plans

Finally, the plaintiffs allege that statements regarding Adobe's merger and acquisition plans misleadingly implied that Adobe would pursue organic growth rather than large strategic mergers, even while Adobe was actively negotiating its planned $20 billion acquisition of Figma. See Vladimir v. Bioenvision Inc., 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009) ("If a public company elects to speak publicly about mergers or acquisitions . . . it must speak truthfully and completely"), aff'd sub nom, Thesling v. Bioenvision, Inc., 374 F. App'x 141 (2d Cir. 2010) (summary order). The plaintiffs again narrow their focus to just a few alleged misstatements.

First, on April 8, 2022, an analyst inquired about the size of any planned acquisitions and Durn responded:

> Yes. So rather than classify them by size, I would say that we're going to make smart acquisitions at this company. What I mean by that is grow—and so I'm going to be oriented towards growth. The opportunity set in front of us is large, it's enormous. So the engine of innovation is second to none at this company. . . . [T]he highest value form of growth is organic growth. We are oriented towards organic growth. So by definition, when you think about M&A and layering in M&A, inorganic growth to complement that, the bar for those transactions is going to be high because the organic growth opportunities are so attractive. But where we see an opportunity to accelerate our strategy, further our leadership position, accelerate time to market and do it in a value-accretive way for

34

> shareholders, we'll burn calories to acquire those assets.

FAC ¶ 132. Subsequently, on June 16, 2022, an analyst asked whether Adobe had any "large strategic M&A" plans and Narayen responded:

> Clearly, valuations, to your point, have changed quite a bit. And the first thing I'll start off by saying is we're really pleased with our portfolio. If you look at some of the new initiatives, and we've touched on that, whether it's the Real-Time CDP, Customer Journey Analytics, what we are doing with things on the web, including PDF, we feel really good. I do feel, Alex, that there are going to be a number of small single-product companies that are probably not going to survive what's happening. And the valuation sort of multiple changing is actually, I think, good for a larger company like Adobe.
>
> So it doesn't feel like we need anything, but we'll always be on the lookout for things that are additive, that are adjacent and that will provide great shareholder value. And our metrics associated with ensuring great technology, great cultural fit and adjacency remain. But we have so much going on within the company that we're excited about our current portfolio. Clearly, things will be more reasonable in terms of in terms of M&A as well.

Id. ¶ 142. Both Durn and Narayen's statements were made after Adobe had already begun to pursue its acquisition of Figma—with the latter statement being made only three days before Adobe allegedly made a formal offer to acquire Figma for $20 billion. See id. ¶ 143.

The defendants reply that, far from being misleading, these statements explicitly acknowledged the possibility that the company would pursue acquisitions. See id. ¶ 132 ("[W]here we see an opportunity to accelerate our strategy, further our leadership position, accelerate time to market and do it in a value-accretive way for shareholders, we'll burn calories to acquire those assets."); Id. ¶ 142 ("[W]e'll always be on the lookout for things that are additive, that are adjacent and that will provide great shareholder value.").

The plaintiffs contend that the Court's reasoning in Buxbaum v. Deutsche Bank, A.G., No. 98-cv-8460, 2000 WL 33912712, at *16 (S.D.N.Y. Mar. 7, 2000) supports the conclusion that the defendants' statements regarding possible merger activity were materially misleading. In Buxbaum, a representative of Deutsche Bank was asked whether Deutsche Bank had discussed the acquisition of another bank—Bankers Trust. See id. at *16. The representative responded "[i]n this business, everybody talks to everybody. But there was no talk of a takeover." See id. at *16. The Court concluded that—in light of the advanced stage of Deutsche Bank's acquisition discussions with Bankers Trust—the plaintiff had plausibly alleged that the statement by Deutsche Bank's representative was false or misleading. See id. at *18. However, in that case, Deutsche Bank's representative issued a flat denial of any talk of a

36

merger with a specific bank, when in fact such discussions had occurred. See id. at *16. By contrast, in this case, the defendants emphasized organic growth while also noting that where acquisitions appeared beneficial, "we'll burn calories to acquire those assets" and "we'll always be on the lookout for things that are additive." See FAC ¶¶ 132, 142.

Courts examine alleged misstatements of material fact in context. See, e.g., San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 810 (2d Cir. 1996) (observing that the defendant's "declaration that the company would emphasize profit over market share is qualified by the context of the rest of the paragraph, the first sentence of which states that [the defendant] intends to increase [its product's] market share"). And at least one court in this District has concluded that equivocation regarding the possibility that a company will pursue a merger, does not constitute an actionable misstatement. See In re Farfetch, 2021 WL 4461264, at *11 (concluding, in the context of Securities Act claims, that "[i]n light of [the] express disclaimer of the exact risk that Farfetch might use IPO proceeds to make future acquisitions at any time at their discretion, no reasonable

investor could be misled into thinking that Farfetch would not be acquiring new targets after the IPO.").

In this case, although the defendants endorsed organic growth, they declined to rule out M&A activity—whether large or small—even going so far as to declare that they would "burn calories to acquire those assets" that they considered valuable and worthwhile. See FAC ¶ 132. Accordingly, the plaintiff has not plausibly alleged that Adobe "stated its intention to adhere exclusively to a particular strategy and then changed its strategy without informing investors." In re Farfetch, 2021 WL 4461264, at *12 (quoting Friedman v. Endo Int'l PLC, No. 16-cv-3912, 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018)). Thus, the FAC fails to identify any actionable misstatements regarding Adobe's merger strategy.

## B. Scienter

Lack of scienter provides an independent reason to grant the defendants' motion to dismiss. The scienter required to support a Section 10(b) claim is an "intent to deceive, manipulate, or defraud; or at least knowing misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551

U.S. 308, 321–322 (2007). An inference of scienter is strong "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Therefore, courts considering scienter must look not just to inferences favoring the plaintiff but also to "plausible, nonculpable explanations for the defendant's conduct." Id. at 323–24.

A "strong inference" of scienter can arise either from (1) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (2) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99.

First, motive and opportunity can give rise to a strong inference of scienter. "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (citing Novak, 216 F.3d at 307–08). The Second Circuit Court of Appeals has held that inadequate motives include "the desire for the corporation to appear profitable" and "the desire to keep stock prices high to increase officer compensation." Id. Instead, the "motive and opportunity element is generally met when corporate insiders

misrepresent material facts to keep the price of stock high while selling their own shares at a profit." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001).

"However, the mere fact that insider stock sales occurred does not suffice to establish scienter, . . ., [instead] [p]laintiffs must establish that the sales were 'unusual' or 'suspicious.'" In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009). In determining whether sales by insiders are unusual or suspicious, courts consider the following factors:

> (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants[] selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; and (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.

Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011); see also Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995); In re Gildan, 636 F. Supp. 2d at 270; In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97-cv-1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998).

By contrast, plaintiffs may demonstrate reckless scienter by showing "an extreme departure from the standards of ordinary

care" regarding a known or obvious risk. ECA, 553 F.3d at 198.

"Where the complaint alleges that defendants knew facts or had

access to non-public information contradicting their public

statements, recklessness is adequately pled for defendants who

knew or should have known they were misrepresenting material

facts with respect to the corporate business." In re Scholastic,

252 F.3d at 76. However, reckless disregard for the truth

"mean[s] conscious recklessness—i.e., a state of mind

approximating actual intent, and not merely a heightened form of

negligence." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d

98, 109 (2d Cir. 2009).

 In this case, the plaintiffs have failed to allege scienter

pursuant to either a motive and opportunity or a recklessness

theory. First, the plaintiffs contend that each of the

defendants possessed motive and opportunity to inflate Adobe's

stock price. The plaintiffs allege that Adobe itself would have

benefited from the stock price inflation because it sought to

acquire Figma and "[f]unding a transaction of this magnitude and

import provided a unique incentive to inflate the stock price by

misrepresenting Adobe's competitive position and merger plans."

Opp. Mem. at 24. However, the plaintiffs allege that Adobe

embarked on its scheme to inflate its stock price in July 2021—

long before the contemplated merger. See ECA, 553 F.3d at 201

(finding that "the fact that the alleged misstatements began

41

eight years before the acquisition and ended years afterward render[ed] any connection between the events dubious at best"). Moreover, "[s]uch generalized desires fail to establish the requisite scienter because 'the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired,' or to acquire another." Id. (quoting Kalnit, 264 F.3d at 141).

Meanwhile, the plaintiffs allege that the Individual Defendants benefited from high stock prices and therefore had motive to inflate the price of Adobe's stock.[6] Although, "[m]otives that are generally possessed by most corporate directors and officers do not suffice" to plead scienter, see Kalnit, 264 F.3d at 139, the plaintiffs contend that in this case, the Individual Defendants "misrepresented corporate performance to inflate stock prices while they sold their own shares," see id.[7] Such allegations may suffice to plead motive. See id.; see also In re Scholastic, 252 F.3d at 74.

---

[6] The plaintiffs also reference sales by non-defendants. See FAC ¶¶ 228, 230. However, these sales are not relevant to the resolution of this motion. The plaintiffs have not shown that any of those non-defendants was responsible for any of the alleged misstatements or omissions in this case.

[7] The plaintiffs do not allege that Defendant Vaas sold any Adobe stock during the Class Period, and therefore the plaintiffs have plainly failed to allege that he possessed motive and opportunity to inflate fraudulently the price of Adobe's stock. See FAC ¶¶ 228, 230.

However, the plaintiffs have not met their "burden of showing that any such sales [were] in fact unusual." In re Health Mgmt., 1998 WL 283286, at *6. First, and most importantly, the plaintiffs fail to allege any facts regarding the Individual Defendants' total Adobe stock holdings at the beginning and end of the Class Period. See In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) (observing that the plaintiff should have alleged "the percentage increase in each defendants' holdings during the class period"). The plaintiffs also fail to grapple with the fact that—as the plaintiffs conceded at oral argument—all of the Individual Defendants' Adobe stock holdings increased over the duration of the Class Period and that none of the Individual Defendants appear to have dumped their stock. See Mem. of Law, App'x B, ECF No. 59. The plaintiffs provide no reason that the Individual Defendants would have increased their stock holdings over the Class Period if they knew that Adobe's stock price had been artificially inflated by fraud.

Moreover, the sales themselves do not support an inference of motive. All of Durn, Murphy, and Wadhwani's sales were made to satisfy tax obligations, as were the majority of Belsky's and Narayen's sales. See FAC ¶¶ 228, 230; App'x B. Although, "in-kind and take-home cash sales affect the seller's bottom line equally," see Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.,

268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017), courts in this District have observed that "the disposition of shares to pay taxes do not demonstrate a defendant's motive to defraud." N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc., No. 15-cv-6034, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016). In this case, the plaintiffs have not met their burden to demonstrate why these sales made to satisfy tax obligations were unusual or indicative of fraud. Similarly, the fact that Belsky's remaining sales were made pursuant to his Rule 10b5-1 plan "undermines any allegation that the timing or amounts of the trades was unusual or suspicious." In re Gildan, 636 F. Supp. 2d at 272 (citing Fishbaum v. Liz Claiborne, Inc., No. 98-9396, 1999 WL 568023, at *4 (2d Cir. July 27, 1999) (summary order)).[8] In their opposition brief, the plaintiffs contend that whether the 10b5-1 trading plans were timed to exploit inflated prices presents a factual question inappropriate for resolution on a motion to dismiss. However, the plaintiffs have not met their burden to allege with particularity that the 10b5-1 trading plans or other sales were

---

[8] "A 10b5-1 plan is an agreement which allows corporate insiders to set a schedule by which to sell shares over time." Elam v. Neidorff, 544 F.3d 921, 928 n.3 (8th Cir. 2008). The sale of stock pursuant to a 10b5-1 plan can "raise an inference that the sales were pre-scheduled and not suspicious." Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003); see also In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007).

suspiciously timed. Indeed, the plaintiffs conceded at oral
argument that they do not contend that the timing of any
particular trade was suspicious.

The plaintiffs also advance an alternative motive theory,
unique to Wadhwani. They contend that Wadhwani "had ambitions to
attain the top spot at Adobe" and that brokering the planned
acquisition of Figma, "elevated his profile at Adobe
tremendously." FAC ¶ 188. They also note that Wadwhani formerly
worked at Greylock—a major investor in Figma—and that after his
departure from Greylock, Wadhwani accepted a position as one of
Greylock's Venture Partners. Id. ¶¶ 185, 187, 189. The
plaintiffs further allege that the Figma transaction "promised
to provide an exceptional return on Greylock's investment in
Figma." Id. ¶ 189. This windfall for Greylock "would no doubt
have elevated [Wadhwani's] stature (and possibly his financial
stake) at Greylock." Id. ¶ 191. However, the plaintiffs' theory
fails to account plausibly for why Wadhwani would pursue a
merger to the detriment of his substantial Adobe holdings merely
to increase his stature at his former employer, and "[w]here
[the] plaintiff's view of the facts defies economic reason, it
does not yield a reasonable inference of fraudulent intent."
Kalnit, 264 F.3d at 140-41 (quoting Shields v. Citytrust
Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)). For the
foregoing reasons the plaintiffs have failed to allege plausibly

45

that any of the Individual Defendants had an adequate motive to commit fraud.

The plaintiffs also fail to allege that the defendants recklessly engaged in securities fraud. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Id. at 142. In this case, the plaintiffs have not met the high bar to show "an extreme departure from the standards of ordinary care." See id.

The plaintiffs have failed to point to any actionable misstatements or omissions. The crux of the plaintiffs' argument is that the defendants publicly downplayed the risk that competition from Figma posed to core Adobe products like Illustrator and Photoshop while privately believing that Figma seriously threatened Adobe's flagship products. However, the CMA Report found that Figma does not currently possess the technological capability to challenge Adobe's vector and raster editing applications. See CMA Report at 333–34. The plaintiffs allege no financial harm caused by Figma's advances in the vector and raster editing space—only potential future harms. The plaintiffs have failed to point to any corporate documents that the defendants reviewed that contradicted their public statements. They also have not relied on any confidential

46

sources that supported any claims that the defendants knowingly made any false or misleading statements. Accordingly, the plaintiffs have failed to identify any false or misleading statements—let alone misstatements representing "an extreme departure from the standards of ordinary care." <u>Kalnit</u>, 264 F.3d at 142.[9]

### C. Loss Causation

Because the plaintiffs have failed to plausibly allege scienter or any materially misleading statements or omissions, it is unnecessary to reach the defendants' argument that the plaintiffs have also failed to allege loss causation.

### IV.

The plaintiffs' Section 20(a) claim for control person liability fails because the FAC does not plausibly allege a primary violation of Section 10(b) and therefore cannot allege culpable participation by any of the defendants. <u>See</u> <u>ATSI</u>, 493 F.3d at 108. Section 20(a) of the Exchange Act imposes liability on anyone who "controls any person liable under" certain other

---

[9] The plaintiffs cite <u>Tableau</u>, contending that it is highly instructive on the question of reckless scienter. 2019 WL 2360942, at *6. However, in that case, unlike in this one, the Court concluded that there were actionable misstatements that had been made recklessly and that two individual defendants were present at meetings where information contrary to public statements was discussed. By contrast, in this case, the plaintiffs have alleged no actionable misstatements or access to specific contrary information.

provisions, including Section 10(b). 15 U.S.C. § 78t. "To
establish a prima facie case of control person liability, a
plaintiff must show (1) a primary violation by the controlled
person, (2) control of the primary violator by the defendant,
and (3) that the defendant was, in some meaningful sense, a
culpable participant in the controlled person's fraud." ATSI,
493 F.3d at 108; see also In re Lions Gate Ent. Corp. Sec.
Litig., 165 F. Supp. 3d 1, 25 (S.D.N.Y. 2016).

The plaintiffs have failed to allege plausibly any
actionable claims pursuant to Section 10(b). Accordingly, the
plaintiffs' claims pursuant to section 20(a) must be dismissed.
See First Jersey, 101 F.3d at 1472.

### CONCLUSION

The Court has considered all of the parties' arguments. To
the extent not specifically addressed, those arguments are
either moot or without merit. For the foregoing reasons, the
defendants' motion to dismiss is **granted** and the FAC is
**dismissed without prejudice.**

The Clerk is directed to amend the official caption to
conform to the listing of the parties stated above and to close
all pending motions.

If the plaintiffs seek to file a second amended complaint,
they should file a motion to file such a complaint by **April 17,
2025,** attaching a copy of the proposed second amended complaint

48

and explaining how it resolves the defects noted in this Memorandum Opinion and Order. The defendants may respond 21 days thereafter and the plaintiffs may reply 10 days thereafter.

SO ORDERED.
Dated:    New York, New York
          March 27, 2025

_____
John G. Koeltl
United States District Judge