**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**In re ADOBE INC. SECURITIES**
**LITIGATION**                                    **23-cv-9260 (JGK)**

                                                  **MEMORANDUM OPINION**
                                                  **AND ORDER**

————————————————————————

**JOHN G. KOELTL, District Judge:**

     This is a proposed securities fraud action brought against
Adobe, Inc. ("Adobe") on behalf of a putative class of all
persons and entities who purchased or otherwise acquired Adobe
common stock between July 23, 2021, and September 22, 2022 (the
"Class Period"). In a Memorandum Opinion and Order dated March
27, 2025, this Court granted the defendants' motion to dismiss
the First Amended Complaint ("FAC") for failure to state a
claim. See In re Adobe Securities Litig., No.23-cv-9260, 2025 WL
936416 (S.D.N.Y. Mar. 27, 2025) ("Adobe I"). The plaintiffs now
move pursuant to Federal Rule of Civil Procedure 15(a)(2) for
leave to file a Second Amended Complaint ("SAC"). See ECF
No. 73.

     The SAC names Adobe as a defendant, as well as Shantanu
Narayen, Adobe's Chairman and Chief Executive Officer ("CEO");
John Murphy, Adobe's former Chief Financial Officer ("CFO") and
Executive Vice President; Daniel Durn, Adobe's current CFO and
Executive Vice President of Finance, Technology Services &

Operations; Jonathan Vaas, Adobe's Vice President of Investor
Relations and Assistant General Counsel; David Wadhwani,
President of Adobe's Digital Media business segment; Scott
Belsky, Adobe's Chief Strategy Officer and Executive Vice
President of Design & Emerging Products; Andrew Chan, Adobe's
former Program Manager of Investor Relations; and Ann Lewnes,
Adobe's former Chief Marketing Officer (collectively, the
"Individual Defendants").[1]

The lead plaintiffs Menora Mivtachim Insurance Limited and
Menora Mivtachim Pensions & Gemel Limited (collectively,
"Menora") and Stichting Philips Pensioenfonds ("PPF"), allege
that the defendants fraudulently misrepresented the competitive
threat that Figma, Inc. ("Figma")—the creator of a user-
interface, user experience ("UI/UX") design tool called Figma
Design—posed to various Adobe products, in violation of Section
10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and
SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.
The plaintiffs also allege control person liability under
Section 20(a) of the Exchange Act, 15 U.S.C.§ 78t(a), against
the Individual Defendants.

The plaintiffs primarily allege that the defendants'
statements during the Class Period: (1) concealed the

---

[1] All Individual Defendants were named in the FAC except
Defendants Chan and Lewnes.

competitive threat that the defendants privately recognized Figma posed to Adobe; (2) promoted Adobe XD as a successful product despite the defendants' decision to deprioritize it in response to competition from Figma Design; and (3) downplayed the possibility that Adobe would pursue any major acquisitions. The plaintiffs further allege that in addition to threatening Adobe XD-the Adobe product in direct competition with Figma Design-Figma also threatened flagship Adobe products like Illustrator and Photoshop. Ultimately, the plaintiffs contend that the announcement of Adobe's proposed acquisition of Figma revealed Adobe's alleged misrepresentations to the market, causing Adobe's stock price to drop.

For the reasons that follow, the plaintiffs' motion for leave to amend is **denied.**

## I.

The SAC repeats the bulk of the allegations from the FAC, which is described at length in <u>Adobe I</u>. <u>See</u> 2025 WL 936416, at *1-6. Familiarity with <u>Adobe I</u> is assumed. Unless otherwise noted, the following allegations are taken from the FAC and SAC. Where necessary, the summary below indicates which allegations are new additions contained only in the SAC.[2]

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

**A. Background**

Adobe, a Delaware corporation, headquartered in California, is a software company that offers desktop and mobile applications to creative professionals and businesses. SAC ¶ 32, ECF No. 75-1. Adobe's business is organized into three segments: (1) Digital Media, which provides products and services enabling users to create and publish content; (2) Digital Experience, which provides an integrated platform for businesses to manage customer experiences; and (3) Publishing and Advertising, which houses Adobe's legacy products and solutions. Id. ¶¶ 41-42. This case relates to Adobe's Digital Media segment, which generates approximately two-thirds of Adobe's revenue. Id. ¶¶ 43-44.

Several products fall under the Digital Media umbrella, but the plaintiffs' claims focus on Photoshop, Illustrator, and Adobe XD. Id. ¶¶ 41-64. Photoshop is a raster-editing tool for digital imaging and design. Id. ¶¶ 12, 23. Illustrator is a vector graphics application used to create digital graphics and illustrations.[3] Id. ¶ 23. During the Class Period, Adobe "controlled over 70% of the vector editing tools market with its Illustrator product and over 80% of the raster editing tools market with its Photoshop product." Id. ¶ 60.

---

[3] Vector editing uses mathematical equations, lines, and curves with fixed points on a grid to create logos, icons, or other images digitally. SAC ¶ 60. Raster editing is used to create or edit images built of pixels. Id.

Adobe XD is a UI/UX application that allows subscribers to collaboratively engage in "all-in-one digital product design." Id. ¶¶ 48-49. Figma Design is a similar application but possesses superior real-time collaboration functionality. Id. ¶¶ 48, 58-59. Although Adobe XD was one of the top three UI/UX applications during the Class Period, it nevertheless captured only around 5% of the UI/UX market. Id. ¶¶ 50, 118. By contrast, in 2021, Figma captured approximately 50% of UI/UX market share with Figma Design. Id. ¶¶ 118, 251(b). Moreover, Adobe XD's annual recurring revenue of, at most, $17 million constitutes a very small fraction of Adobe's overall 2022 revenue of $17.6 billion. Id. ¶ 10, McDonough Decl. Ex. 34, at 40, ECF No. 58-34.

In October 2021, the defendants allegedly decided to deprioritize Adobe XD in response to competition from Figma. SAC ¶¶ 15, 251(d). In February 2022, Adobe placed Adobe XD in "maintenance mode," signaling the end of its development. Id. ¶¶ 15, 251(d), 298-99. By 2022, only twenty Adobe employees were staffed on the XD product. Id. ¶ 298.

Meanwhile, the plaintiffs allege, Adobe was privately concerned about the threat that Figma posed, not only to its direct competitor, Adobe XD, but also to other, more successful Adobe products like Illustrator and Photoshop. See id. ¶¶ 54-74. In particular, the plaintiffs point to a study that Adobe conducted in September 2021 to examine the competitive threat

posed to Illustrator and Photoshop by Figma. Id. ¶ 68. Additionally, Adobe began working on "Project Spice," "a defensive move intended to address Figma's competitive threat not just to XD, but also to Illustrator and Photoshop." Id. ¶ 72. In October 2021 and February 2022, Adobe shifted engineering resources from Adobe XD to Project Spice in order to accelerate Project Spice's development. Id.

In April 2022, amidst this backdrop, Adobe and Figma began to discuss a possible acquisition. Id. ¶¶ 257-59. Defendant Wadhwani, Adobe's President of Digital Media, played a key role in brokering the contemplated acquisition of Figma. Id. The plaintiffs allege that Wadhwani enlisted Greylock, an investor in Figma and Wadhwani's former employer, to connect Wadhwani with Figma. Id. ¶¶ 256-58.

On September 15, 2022, Adobe and Figma executed a merchant agreement, pursuant to which Adobe agreed to purchase Figma "for $20 billion in total acquisition consideration," with "approximately 50% of the acquisition price payable in cash and the remainder in Adobe equity securities." Id. ¶¶ 17, 171. After Adobe announced the planned acquisition, Adobe's stock price dropped nearly 17%, from $371.52 to $309.13, on a significant volume of over 27.8 million shares traded. Id. ¶ 18. Adobe's stock price continued to drop over the following days and closed at $286.30 on September 21, 2022. Id. ¶ 21.

Analysts responded poorly to the news of the planned acquisition, with some analysts observing that "the steep valuation [of Figma] . . . suggests that Figma represents a formidable competitive threat" and that the deal "appears more defensive that offensive." Id. ¶ 20. Other analysts appeared concerned with the $20 billion that Adobe agreed to pay for Figma, noting that "it is difficult to justify the price." Id. ¶ 20.

In the wake of the announcement, regulators expressed concern that the acquisition "might stifle competition in the market for digital design applications." Id. ¶ 23. In particular, the United Kingdom Competition and Markets Authority ("CMA") investigated and provisionally concluded "that the proposed transaction would harm competition in the global market for all-in-one product design software." Id. The CMA set forth its findings in a 460-page provisional report dated November 28, 2023 (the "CMA Report"), see McDonough Decl., Ex. 36 ("CMA Report"), ECF No. 58-36.

The plaintiffs rely heavily on the CMA Report to support their allegations. For example, the plaintiffs cite the CMA Report's conclusion that "Adobe perceived Figma as a threat to its core markets for vector and raster editing, and its flagship products Illustrator and Photoshop." Id. ¶ 55; see also CMA Report at 373. However, the CMA Report also found that although

7

"Figma made several incremental improvements to its vector editing functionality over time," "it's current functionality, relative to Adobe, remains limited." CMA Report at 334. Similarly, the CMA Report concluded that "Figma's raster editing functionality remains very limited." Id. at 335. Additionally, the report concluded that "Adobe's creative design products are considered leaders in their respective markets. In particular in vector and raster editing, Adobe enjoys a long-standing unrivalled market position." Id. at 42.

On December 17, 2023, amid speculation that the Department of Justice might move to block the merger, Adobe and Figma terminated the proposed transaction. SAC ¶¶ 334-40. Adobe's stock price rose following news of the termination. See, e.g., McDonough Decl., Ex. 53, at 3, ECF No. 58-53 (showing that Adobe's stock price rose from $591.52 to $599.13 the day after the acquisition was terminated).

### B. Contested Statements

Like those in the FAC, the plaintiffs' claims in the SAC hinge on the contention that during the Class Period, the defendants made allegedly fraudulently misleading statements regarding the threat that Figma posed to Adobe and its products. As they did before, the plaintiffs sort these statements into three categories: (1) statements downplaying competition from Figma; (2) false and misleading statements about the viability

of Adobe XD; and (3) false and misleading statements regarding Adobe's merger plans. The plaintiffs recite exactly the same alleged false and misleading statements that they alleged in the first prior complaint-no more and no less-except they have added a new category of alleged false and misleading statements-namely statements relating to Creative Cloud's Total Addressable Market ("TAM").[4] Therefore, for all the reasons explained in Adobe I, as well as the additional reasons discussed below, the plaintiffs have failed to state a claim with respect to the first three categories of alleged false and misleading statements. And for the reasons stated below, the additional alleged false and misleading statements about TAM also fail to state a claim.

### 1. Statements Downplaying Competition From Figma

The plaintiffs first allege that the defendants made statements downplaying the threat posed by competitors like Figma. For example, on October 26, 2021, the Verge's Decoder Podcast broadcast an interview with Defendant Belsky, Adobe's Chief Strategy Officer and Executive Vice President of Design & Emerging Products. SAC ¶ 102. During the podcast, the interviewer asked Belsky about competition from Figma, referring to it as the "elephant in the room." Id. ¶ 104. Belsky expressed

---

[4] TAM refers to the "total potential revenue [Adobe] could generate in a given year if [it were] able to capture 100% of the market." SAC ¶ 210.

no concerns about Figma and described Adobe as "a market leader" that focuses "on what the majority of [our] customers need, which is never something at the edge." Id. ¶ 105. With respect to competition between Figma Design and Adobe XD, Belsky contended that Adobe's users refuse to "trade performance and precision for ease of collaboration." Id.

Similarly, on January 5, 2022, Defendant Vaas, Adobe's Vice President of Investor Relations and Assistant General Counsel, participated in a conference call hosted by Evercore ISI. See id. ¶ 134. During the call, an analyst asked Vaas about Adobe's potential competitors, particularly Figma and Canva—another specialized design tool company. Id. In response, Vaas observed that the success of other companies "validate[s] the explosiveness of these markets that we're competing in." Id. At another conference held on January 11, 2022—just a few days later—Vaas characterized Canva and Figma as "point solution players"—i.e. "single product compan[ies] that[] [have] found a niche with a growing universe of users." Id. ¶¶ 136-37.

Subsequently, on January 20, 2022, at a conference hosted by Wolfe Research, Defendant Wadhwani answered a question about "the competitive environment" in the creative tools market, observing that "when you look at the fact that there are more creative pros needed in companies than ever before, that's obviously a big tailwind for us." Id. ¶¶ 140, 142-43. At the

same conference, Belsky characterized Canva's and Figma's
presence in the market as helpful to Adobe, observing that
"[b]est to market, better than first to market" and stating
that:

> [L]egacy is a blessing and a curse, right? I
> mean we have an incredible legacy. We have
> these ubiquitous file formats, et cetera. And
> there's always a risk that a company can rest
> on laurels, right? And for the last few years,
> we've seen the TAM explosion, we've been very
> awakened to the opportunity. But all of this
> helps. I mean the company, I feel like our
> strategy is more sound than it's ever been.
> People are galvanized.

Id. ¶¶ 144-46 (emphasis added).

Finally, the plaintiffs allege that during the Class
Period, the defendants filed Form 10-Qs and 10-Ks containing
disclosures that framed the threat of competition as a
hypothetical, future threat, "when, in fact, those risks had
already materialized." Id. ¶¶ 248-49. But the relevant forms
disclosed that "[Adobe's] competitive position and the results
of operations could be harmed if [Adobe does] not compete
effectively." Id. ¶ 250.[5] The disclosures further provided that
"intense competition," among other factors, "could create
downward pressure on pricing and gross margins and could

_____

[5] Every Form 10-Q filed during the class period contained
identical disclosure language regarding Adobe's competitive
position. See SAC ¶ 249. The 2020 and 2021 Form 10-Ks contained
the same language. See id.

adversely affect [Adobe's] renewal and upsell and cross-sell rates, as well as [Adobe's] ability to attract new customers." Id. The disclosures also observed that "[i]f [Adobe] fail[s] to anticipate customers' rapidly changing needs and expectations or adapt to emerging technological trends, [Adobe's] market share and results of operations could suffer" and that "any delay in the development . . . of a new offering or enhancement to an existing offering could result in customer attrition or impede [Adobe's] ability to attract new customers, causing a decline in [Adobe's] revenue, earnings, or stock price." Id.

The plaintiffs allege that the defendants made these statements downplaying the risk of competition from Figma while their private statements and actions demonstrated that they considered Figma to be a serious threat to Adobe's business.

### 2. Statements Regarding Adobe XD

The plaintiffs also allege that the defendants "misleadingly represented the importance of Adobe XD for the Company's business, giving investors a false impression of the Company's commitment to the product." Mem. of Law in Supp. of Mot. to Amend ("Br.") 10, ECF No. 74.

In particular, at the October 26, 2021, Adobe MAX Conference, Belsky emphasized Adobe XD's successes in his presentation, stating that "[f]rom Accenture to T-Mobile to Carnegie Hall, more and more organizations are designing

12

compelling experiences with Adobe XD." SAC ¶ 108. At the same conference, Belsky praised Adobe XD, saying that it "keeps getting better and better," and another Adobe employee walked attendees through new Adobe XD features. Id. ¶ 109.

The plaintiffs next point to Adobe's December 16, 2021, fourth-quarter earnings presentation materials, which grouped Adobe XD with Illustrator and Photoshop as Adobe's "flagship applications." See id. ¶¶ 46, 132-33.



**Continue to invest in Adobe magic across flagship applications**

- Accelerate imaging, video & design workflows through Adobe Sensei

- Drive immersive experiences with Premiere, Substance 3D & Aero

- Connect designers and stakeholders with XD, Photoshop web and Illustrator web

- Deliver creative system across desktop, web and mobile apps

Id. ¶ 132. Another page of the presentation listed Adobe XD as an application that contributed to Adobe Creative Cloud's success, along with Photoshop and Illustrator:

Id. ¶ 130.

Subsequently, on August 25, 2022, an Adobe spokesperson told CNBC that Adobe "do[es] not see an impact to the Photoshop business resulting from players in the product design category," representing that "[w]e developed and have evolved Adobe XD to address the needs of our core design customers." Id. ¶¶ 175, 203.

All these statements were made around (or after) October 2021, when Adobe allegedly decided to disinvest from XD. Id. ¶¶ 15, 251(d). The statement to CNBC was made after Adobe XD had already been placed in maintenance mode. Id. ¶¶ 15, 298-99.

### 3. Statements Regarding Adobe's Merger Plans

The plaintiffs also allege that during the Class Period, the defendants discussed mergers and acquisitions but failed to speak truthfully about Adobe's acquisition plans. See Br. 12.

The plaintiffs point to an April 8, 2022, conference call, where an analyst asked Defendant Durn, Adobe's CFO and Executive

Vice President: "How does your prior experience affect or impact your style in thinking about acquisitions? And are they big acquisitions?" FAC ¶ 160. Durn replied:

> Yes. So rather than classify them by size, I would say that we're going to make smart acquisitions at this company. What I mean by that, is grow—and so I'm going to be oriented towards growth. The opportunity set in front of us is large, it's enormous. So the engine of innovation is second to none at this company. . . . [T]he highest value form of growth is organic growth. We are oriented towards organic growth. So by definition, when you think about M&A and layering in M&A, inorganic growth to complement that, the bar for those transactions is going to be high because the organic growth opportunities are so attractive. But where we see an opportunity to accelerate our strategy, further our leadership position, accelerate time to market and do it in a value-accretive way for shareholders, we'll burn calories to acquire those assets.

Id. (emphases added). Durn went on to reference Adobe's 2021 acquisition of Frame.io, valued at $1.725 billion, as a "perfect example" of the type of transaction that Adobe would consider. Id. ¶ 161.

Later, on June 16, 2022, Adobe reported its financial results for the 2022 second fiscal quarter. Id. ¶ 167. On an earnings call with investors and analysts, an analyst asked Defendant Narayen, Adobe's chairman and CEO: "with respect to the strategic approach to M&A and . . . what's on the horizon given the changing valuation paradigms in the market, how

important is either a large strategic M&A to the growth profile of the business versus tuck-ins?" Id. ¶ 170. Narayen responded in relevant part:

> Clearly, valuations, to your point, have changed quite a bit. And the first thing I'll start off by saying is we're really pleased with our portfolio. If you look at some of the new initiatives, and we've touched on that, whether it's the Real-Time CDP, Customer Journey Analytics, what we are doing with things on the web, including PDF, we feel really good. I do feel, Alex, that there are going to be a number of small single-product companies that are probably not going to survive what's happening. And the valuation sort of multiple changing is actually, I think, good for a larger company like Adobe.
>
> So it doesn't feel like we need anything, but we'll always be on the lookout for things that are additive, that are adjacent and that will provide great shareholder value. And our metrics associated with ensuring great technology, great cultural fit and adjacency remain. But we have so much going on within the company that we're excited about our current portfolio. Clearly, things will be more reasonable in terms of in terms of M&A as well.

Id. (emphasis added). The plaintiffs allege that three days after this statement, and only a few months after the April 8, 2022, conference call, Adobe offered to buy Figma for $20 billion. Id. ¶ 171.

#### 4. Statements Regarding Adobe's TAM

For the first time in the SAC, the plaintiffs also challenge statements regarding the total addressable market

available to Adobe's digital media segment. See id. ¶¶ 225. For example, the plaintiffs allege that on July 23, 2021, Vaas identified Creative Cloud TAM as $41 billion and Digital Media TAM as $62 billion. Id. ¶ 227. The plaintiffs allege that this statement, and similar statements by other defendants, materially overstated Adobe's TAM because Adobe XD could not meaningfully capture market share from Figma. See id. ¶¶ 210-47.

### C. Procedural History

On October 20, 2023, the plaintiffs filed this action, alleging that the defendants made materially false and misleading statements regarding the threat posed by Figma in order to inflate the value of Adobe's stock. The plaintiffs further alleged that the announcement of Adobe's acquisition of Figma acted as a corrective disclosure, revealing the risk posed by Figma to the market and causing Adobe's stock price to plummet. See ECF No. 1. The plaintiffs subsequently filed the FAC, relying on substantially the same allegedly false and misleading statements, see ECF No. 46, which the defendants moved to dismiss, see ECF No. 57. Following oral argument, the Court granted the defendants' motion and dismissed the FAC without prejudice. Adobe I, 2025 WL 936416, at *18.

On May 1, 2025, the plaintiffs filed this motion for leave to file the SAC. See ECF No. 70. The Court held oral argument on the motion on October 20, 2025.

17

## II.

Federal Rule of Civil Procedure 15(a) provides that courts should "freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, such leave need not be granted "[w]here a proposed amendment would be futile." Hill v. Curcione, 657 F.3d 116, 123-24 (2d Cir. 2011). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." In re Tribune Co. Fraudulent Conv. Litig., 10 F.4th 147, 175 (2d Cir. 2021).

The futility inquiry on a motion for leave to amend is "comparable to that required upon a [Rule 12(b)(6)] motion to dismiss." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 604 (2d Cir. 2005). In evaluating whether granting leave to amend would be futile, a court must consider both the proposed amendments and the original complaint, "accepting as true all non-conclusory factual allegations therein, and drawing all reasonable inferences in the plaintiff's favor." Pyskaty v. Wide World of Cars, 856 F.3d 216, 225 (2d Cir. 2017); see also Tribune Co., 10 F.4th at 174. The Court should not dismiss the amended complaint if the plaintiff has stated "enough facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Federal Rule of Civil Procedure 9(b) and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The PSLRA adds, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." <u>Id.</u> The PSLRA also requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>Id.</u> § 78u-4(b)(2).

19

**III.**

Section 10(b), as effectuated by Rule 10b-5, makes it
"unlawful for any person . . . [t]o make any untrue statement of
a material fact or to omit to state a material fact necessary in
order to make the statements made, in light of the circumstances
under which they were made, not misleading." 17 C.F.R.
§ 240.10b-5(b). To state a claim under Section 10(b) and Rule
10b-5, the plaintiffs must allege that "the defendant, in
connection with the purchase or sale of securities, made a
materially false statement or omitted a material fact, with
scienter, and that the plaintiff's reliance on the defendant's
action caused injury to the plaintiff." Ganino v. Citizens
Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); Lau v. Opera Ltd.,
527 F. Supp. 3d 537, 556 (S.D.N.Y. 2021). In pleading these
elements, the complaint must also satisfy both Rule 9(b) and the
PSLRA. See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP
Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).

In Adobe I, the Court concluded that the plaintiffs had
failed to allege plausibly that any of the challenged statements
were materially false or misleading. See 2025 WL 936416, at *8,
*10, *12, *14. The Court also concluded that the plaintiffs
failed adequately to allege scienter. Id. at *15-17. As
explained below, the plaintiffs have failed to cure these
defects in the SAC.

## A. Alleged Misstatements and Omissions

Claims brought pursuant to Section 10(b) of the Exchange Act require the plaintiff to plead a misstatement or omission of material fact. See Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007). Unlike a misstatement, an omission is actionable under federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Although Rule 10b-5 imposes no duty to disclose all material information, once a party chooses to speak, it has a "duty to be both accurate and complete." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002). "[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008). However, corporations need not "disclose a fact merely because a reasonable investor would very much like to know that fact." Time Warner, 9 F.3d at 267.

A misstatement or omission is material if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) ("[T]here must be a

substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). Materiality depends on all relevant circumstances, and ordinarily a complaint should not be dismissed based on lack of materiality "unless [the statements or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino, 228 F.3d at 162; Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996)

In this case, the plaintiffs point to statements that allegedly: (1) downplayed competition from Figma; (2) promoted Adobe XD as a successful and viable product; and (3) misled investors about the extent of Adobe's M&A plans. The plaintiffs contend that these statements are either false or are misleading in light of omitted facts. In response, the defendants argue that these alleged misstatements are wholly truthful and accurate, and, moreover, are statements of opinion, puffery, and corporate optimism.

### 1. Statements Downplaying Competition From Figma

In dismissing the FAC, the Court found that the plaintiffs had "plausibly allege[d] only that Figma presented a <u>potential</u> competitive threat to Adobe-not that competition from Figma had caused Adobe any concrete or tangible losses." <u>Adobe I</u>, 2025 WL

936416, at *9 (emphasis added). The plaintiffs claim that the SAC "amply addresses this issue." Br. 7.

The SAC sets forth in greater detail Figma's competitive strengths, including (1) that Figma's monthly pricing model provided more flexibility to customers than did Adobe's subscription-based model; (2) that Figma provided users with a more seamless collaborative experience compared to Adobe; (3) that Figma is a web-based application, while Adobe is a desktop application; and (4) that Figma appealed to a wider user base than did Adobe. See SAC ¶¶ 76-79, 85, 184, 190. The SAC also alleges that, because of its competitive strengths, Figma experienced faster growth during the Class Period than did Adobe's Digital Media Business. See SAC ¶¶ 78-79, 87-88, 251(c). The SAC also contains allegations that Adobe treated Project Spice as a response to Figma; according to the plaintiffs, this makes clear that the defendants themselves recognized that Figma was a competitive threat to Adobe XD.

But these new allegations do not disturb the conclusion that "the plaintiffs point to no statements where the defendants specifically downplayed the threat that Figma Design posed to Adobe XD." Adobe I, 2025 WL 936416, at *9. In fact, as discussed in Adobe I, Adobe acknowledged in a 2021 10-Q that "competitors to Adobe XD include Figma, InVision and Sketch." Id.; see also SAC ¶ 97. "Unlike the threat to more established Adobe products,

23

the defendants did not frame the threat that Figma design posed to Adobe XD as a hypothetical. And 'a securities fraud claim for misrepresentations or omissions does not lie when the company disclosed the very risks about which a plaintiff claims to have been mislead.'" Adobe I, 2025 WL 936416, at *9 (quoting In re Dynagas LNG Partners LP Sec. Litig., 504 F. Supp. 3d 289, 308 (S.D.N.Y. 2020)).

It is also useful to note that the revenue generated by XD was less than 1% of Adobe's total revenue. And while there is no cutoff for materiality, the plaintiffs have failed to explain how the failure to tout a competitor's product that competed with an insignificant Adobe product was a material misstatement.

Indeed, Adobe had no obligation to tout a competitor's product, see Gagnon v. Alkermes PLC, 368 F. Supp. 3d 750, 771 (S.D.N.Y. 2019) ("[A] business cannot be expected to advertise its competitors' products so long as its own statements are not false or misleading."), and the plaintiffs have failed to show that the specific statements Adobe representatives made were more than their efforts to promote the company's own product. See Rombach v. Chang, 355 F.3d 164, 167 (2d Cir. 2004) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data includes, they can be expected to be confident about their

stewardship and the prospects of the business that they manage.").

While the SAC does not add any new allegations of false and misleading statements about competition with Figma, the SAC contains new allegations purporting to show that Figma was an existing threat to Adobe's flagship products, Illustrator and Photoshop. See Br. 8. In particular, the plaintiffs point to a survey of "over 20 customers" by the United Kingdom Competition and Markets Authority that showed "[a] majority of surveyed customers listed Figma as an alternative to Illustrator and some listed Figma as an alternative to Photoshop." Id. (citing SAC ¶ 65). But the opinions of the two dozen or so respondents to the CMA survey are contrary to the preliminary conclusions of the CMA itself, which found that Figma's ability to compete with Photoshop and Illustrator was "very limited" even in November 2023-in other words, long after the Class Period was over. CMA Report 333-35. The plaintiffs also point to a study by the European Commission evaluating Adobe's proposed acquisition of Figma, but that study described Figma as a "potential successor product" to Illustrator and Photoshop. SAC ¶ 355(c)(ii). Even the plaintiffs' expert, Professor Sundararajan, opines that "it would have been natural to expect [Figma] to eventually encroach on Adobe's previously well-established markets." Sundararajan Decl. ¶ 38, ECF No. 75-4. As with the FAC, the SAC fails to

allege that competition from Figma caused Adobe's premier products any material lost sales or decline in revenue. Thus, the plaintiffs have again failed to allege plausibly that Adobe suffered any <u>tangible</u> harm from increased competition.

Given the absence of allegations showing tangible harm resulting from increased competition, it was not false or misleading for the defendants to characterize Adobe as a "market leader" or to contend that any increased competition in the market "validate[s] the explosiveness of the markets" in which Adobe competes. <u>See</u> SAC ¶ 134. Similarly, Wadhwani's characterization of competition as a "tailwind," <u>id.</u> ¶ 136, was neither false nor misleading given the plaintiffs' failure to allege that competition had hurt Adobe's profits, revenue, or other markers of financial wellbeing. <u>See</u> <u>Adobe I</u>, 2025 WL 936416, at *8 (reviewing cases where district courts found statements minimizing the risk of competition to be actionable, materially misleading statements and concluding that "nearly all of those cases involved competition that caused tangible and concrete harm to the defendant's business, thereby rendering statements downplaying the threat of competition misleading."). And Vaas's characterization of Figma as a "point solution player[]," was not materially false or misleading given the plaintiffs' own characterization of Figma as offering a "single

application," not "a broad portfolio of content-creation applications like Adobe." See id. ¶¶ 136-37.

The plaintiffs also largely fail to respond to the conclusion in Adobe I that the challenged statements are inactionable as "mere expression of opinion, puffery, or corporate optimism."[6] Adobe I, 2025 WL 936416, at *9. Relying on In re Dentsply Sirona, Inc., Securities Litigation, 665 F. Supp. 3d 255, 284 (E.D.N.Y. 2023), the plaintiffs argue that the challenged statements cannot be dismissed as puffery because they were made "in order to reassure investors." Br. 10. In making this point, the plaintiffs point only to one statement made by Narayen on a September 15, 2022, conference call regarding the proposed Figma merger. See id. When asked whether "Adobe's organic-innovation engine is alive and well", Narayen responded, in relevant part, "I also want to reassure all of you, and if you look at our results, this in no way changes our focus or our excitement on our current portfolio." SAC ¶ 187.

---

[6] Statements of opinion are actionable only when based on untrue facts or when not honestly believed. See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 182-86 (2015); see also Abramson v. Newlink Genetics Corp., 965 F.3d 165, 175 (2d Cir. 2020); In re Lotttery.com Sec. Litig., 715 F. Supp. 3d 506, 532-33 (S.D.N.Y. 2024). Statements constitute inactionable puffery when they are "too general to cause a reasonable investor to reply upon them" or are "merely generalizations regarding [a company's] business practices." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009).

Narayen's statement is plainly an expression of corporate optimism too general to induce reliance. As discussed in Adobe I, the defendants were "'not required to take a gloomy, fearful or defeatist view of the future,' merely because they harbored some concerns about future competition." Adobe I, 2025 WL 936416, at *10 (quoting Rombach, 355 F.3d at 174).[7]

Accordingly, the SAC fails to identify any actionable misstatements regarding the threat of competition from Figma.

## 2. Statements Regarding Adobe XD

Like the FAC, the SAC alleges that the defendants misleadingly painted Adobe XD as a viable product despite Adobe's decision to deprioritize and ultimately discontinue Adobe XD. As they did in their opposition to the defendants' motion to dismiss the FAC, the plaintiffs focus on two alleged misstatements: first, a December 16, 2021, earnings presentation in which Adobe XD is listed among the company's "flagship applications" in which it would "[c]ontinue to invest," see Br. 10; SAC ¶ 46, and second, Belsky's October 26, 2021, statement

---

[7] In Adobe I, the Court analyzed the challenged statements in each of the first three buckets and concluded that the challenged statements about competition from Figma and about Adobe XD failed to support a claim because, among other reasons, they were statements of opinion, puffery, or corporate optimism. See Adobe I, 2025 WL 936416, at *9-11. Because the challenged statements in the first three buckets are the same in both the FAC and the SAC, see Oral Argument Tr. 4:7-10, the Court's previous conclusion that those challenged statements are statements of opinion or puffery continues to be valid.

that "Adobe XD keeps getting better and better," see Br. 11; SAC ¶ 109.

In dismissing the FAC, the Court found that, to the extent the challenged statements regarding Adobe XD were factual, they were truthful and accurate, and that the statements were otherwise statements of opinion, puffery, or corporate optimism.

In an attempt to cure these defects, the plaintiffs now allege in the SAC that in 2022-after the Class Period-Adobe represented in a submission to the CMA that "Adobe's action in diverting the vast majority of resources away from XD clearly demonstrates a lack of belief in its viability." SAC ¶ 112. Thus, according to the plaintiffs, the challenged statements are "rendered misleading by Adobe's undisclosed belief that XD was neither successful nor viable." Br. 11.

The plaintiffs included substantially similar allegations in the FAC. For example, the FAC alleges that, in August 2023, Adobe represented to the CMA that "XD was a failed attempt to enter product design." FAC ¶ 245(a), ECF No. 58-1. And, for the reasons described in Adobe I, the plaintiffs' argument once again fails. Companies need not "depict facts in a negative or pejorative light or draw negative inferences." Singh v. Schikan, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015); see also Solow v. Citigroup, Inc., No. 10-cv-2927, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012) ("[A defendant is] not obligated to

characterize its performance or future outlook in negative terms, speculate on future negative results or paint themselves in the most unflattering light possible."), aff'd, 507 F. App'x 81 (2d Cir. 2013) (summary order). "The securities laws did not require Adobe to remove Adobe XD from the Creative Cloud lineup or to refrain from promoting an existing product, merely because Adobe had internally decided to allocate resources elsewhere." Adobe I, 2025 WL 936416, at *11. And, despite Adobe's statement to the CMA that XD was a "failed attempt" to enter product design, the CMA itself concluded in 2023 (i.e., after the Class Period was over) that XD was a viable competitor to Figma. See CMA Report 333-35.

Moreover, as discussed in Adobe I, the statements cited by plaintiffs are statements of opinion, puffery, or corporate optimism. See id. The plaintiffs argue that Adobe's August 2023 representation to the CMA shows that the defendants subjectively disbelieved the challenged statements. But this statement to the CMA, made after the Class Period, does not establish that the defendants subjectively disbelieved their opinion statements about Adobe XD at the time those statements were made.[8]

---

[8] The plaintiffs also newly allege that, after the Figma transaction was disclosed, an analyst asked, "[I]n the last few years, you've always said XD could carry you, why-what happened with XD?" SAC ¶ 245. The plaintiffs presumably include this allegation to insinuate that because an analyst asked about the defendant's prior statements about Adobe XD, the challenged

Because the challenged statements concerning Adobe XD are truthful and accurate, and/or are inactionable statements of opinion or puffery, the SAC fails to identify any action misstatements regarding the success of the Adobe XD product.

### 3. Statements Regarding Adobe's Merger Plans

As they did in the FAC, the plaintiffs allege that statements concerning Adobe's merger and acquisition plans misleadingly implied that Adobe would pursue organic growth rather than large strategic mergers, even while Adobe was actively negotiating its planned $20 billion acquisition of Figma. In dismissing the FAC, the Court found that the challenged statements about Adobe's merger plans were not false or misleading because "although the defendants endorsed organic growth, they declined to rule out M&A activity-whether large or small-even going so far as to declare that they would 'burn calories to acquire those assets' that they considered valuable and worthwhile." Adobe I, 2025 WL 936416, at *14 (quoting FAC ¶ 132). The plaintiffs' new allegations do not disturb this conclusion.

---

statements in this case cannot be dismissed as inactionable statements of puffery. See Mem. of Law in Opp. to Mot. ("Opp.") 12. But the fact that an analyst expressed a general interest XD does not support plausibly the inference that a reasonable investor would have relied on the vague statements about Adobe XD (for example, "Adobe XD keeps getting better and better," SAC ¶ 109) that the plaintiffs challenge in this case.

The plaintiffs contend that the SAC remedies the issues identified in Adobe I by "provid[ing] additional context making clear that [the defendants] indicated that Adobe might be open specifically to small 'tuck-in' acquisitions, such as Adobe's 2021 acquisition of Frame.io for $1.275 billion." Br. 13 (citing SAC ¶¶ 161-62). For example, the plaintiffs again focus on Durn's characterization of the Frame.io acquisition as "a perfect example" of the type of transaction that Adobe might pursue. See Br. 13; SAC ¶ 161. However, the plaintiffs now additionally allege that Durn's statement was misleading because it conveyed that Adobe would consider only acquisitions of similar size to Frame.io. See SAC ¶ 162 ("These representations engendered a materially misleading portrayal of Adobe's merger plans and competitive position by conveying that Adobe might consider acquisitions, if any, of similar size to Frame.io as it historically had." (emphasis added)). Similarly, the plaintiffs again highlight Narayen's statement that "it doesn't feel like we need anything, but we'll always be on the lookout for things that are additive," id. ¶ 170, but they now additionally allege that this was "tantamount to [a] denial that Adobe would pursue large M&A activity," id. ¶ 171.

The problem with the plaintiffs' new "allegations" is that they are, in reality, editorializations of statements already pleaded in the FAC. Importantly, the new allegations do not

change what the defendants actually said about Adobe's merger
plans. Although the plaintiffs attempt to argue to the
contrary-both in their motion papers and in the SAC itself-Durn
did not say that Adobe would pursue only Frame.io-size
transactions, <u>see</u> SAC ¶ 161 (describing Frame.io as "a great
example of a transaction that's going to add a lot of value"),
and Narayen did not rule out the potential of large mergers, <u>see</u>
SAC ¶ 170.[9] "It once again bears emphasis that § 10(b) and Rule
10b-5(b) do not create an affirmative duty to disclose any and
all material information. Disclosure is required under these
provisions only when necessary to make statements made, in light
of the circumstances under which they were made, not
misleading.'" <u>Macquarie Infrastructure Corp. v. Moab Partners,
L.P.</u>, 601 U.S. 257, 264 (2024).

As they did in response to the defendants' motion to
dismiss the FAC, the plaintiffs rely on <u>Buxbaum v. Deutsche
Bank, A.G.</u>, No. 98-cv-8460, 2000 WL 33912712, at *16 (S.D.N.Y.

---

[9] In the SAC, the plaintiffs also now include more extensive
allegations detailing Adobe's acquisition history, <u>see</u> SAC
¶¶ 287-92, to show that the Figma transaction "would have been a
transformative and extraordinary transaction for the Company,
both in terms of price (the largest ever in Adobe's history) and
how it would be integrated into Adobe," Br. 13. But, as the
defendants point out, the plaintiffs included similar
allegations in the FAC, <u>see</u> FAC ¶ 196 ("The transaction also
registered as the largest in Adobe's history, exceeding the
value of its next-largest acquisition by four times."),
Moreover, the new allegations do not show how any of the
statements by Adobe were false or misleading.

Mar. 7, 2000), to argue that the defendants' statements about possible merger activity were false or misleading. Br. 13-14. But, as explained in Adobe I, "in that case, Deutsche Bank's representative issued a flat denial of any talk of a merger with a specific bank, when in fact such discussions had occurred. By contrast, in this case, the defendants emphasized organic growth while also noting that where acquisitions appeared beneficial, 'we'll burn calories to acquire those assets' and 'we'll always be on the lookout for things that are additive.'" 2025 WL 936416, at *13. The new allegations in the SAC do not disturb this conclusion.

Because the plaintiffs have again failed to allege plausibly that Adobe "stated its intention to adhere exclusively to a particular [merger] strategy and then changed its strategy without informing investors," Farfetch, No. 19-cv-8657, 2021 WL 4461264, at *2 (S.D.N.Y. Sept. 29, 2021), the SAC fails to identify any actionable misstatements regarding Adobe's merger strategy.

### 4. Statements Regarding Adobe's TAM

In the SAC, the plaintiffs also include new allegations regarding the defendants' statements concerning Creative Cloud's total addressable market-the total potential revenue that Adobe could generate in a given year if it were able to capture 100% of the market. SAC ¶¶ 210-47. In essence, the plaintiffs argue

34

that Adobe's Creative Cloud TAM calculations were overstated
because they included the market in which Figma sold its
products. Br. 11-12. According to the plaintiffs, this was
misleading because Adobe knew that no portion of the market
controlled by Figma was actually achievable given XD's
capabilities. See SAC ¶ 216; see also Reply Mem. of Law in Supp.
of Mot. ("Reply Br.") at 6, ECF No. 79. Despite adding nearly 40
paragraphs of allegations regarding Adobe's TAM to the SAC, see
SAC ¶¶ 210-47, the plaintiffs spend little time explaining how
the TAM figures are false or misleading, see Br. 11-12. As the
defendants point out, and as the plaintiffs conceded at
argument, see Oral Argument Tr. 19:2-22, the SAC does not allege
whether any of the challenged TAM estimates included TAM related
to the UI/UX market in which Adobe XD and Figma competed.[10] See
SAC ¶ 215(a).

In any event, the plaintiffs' argument fails because it
erroneously assumes that Adobe's TAM estimates reflect the share
of the market that Adobe might actually capture. See, e.g., SAC
¶ 211 (describing Adobe's ability to "reasonably achieve" its
TAM). But the SAC describes TAM as the "total potential revenue
[Adobe] could generate in a given year if [it were] able to

---

[10] Moreover, the SAC alleges that Narayen admitted that the
proposed Figma merger would "dramatically increase [Adobe's]
TAM." SAC ¶ 241. Thus, the SAC itself appears to allege that
Adobe's TAM figures did not encompass the UI/UX market.

capture 100% of the market." SAC ¶ 210 (emphasis added).
Therefore, no reasonable investor would understand Adobe's TAM
figures to represent that share of the market that Adobe would
<u>actually</u> capture. As an illustration, in 2018, Adobe listed 2022
TAM for its entire business as $128 billion—more than ten times
its actual 2018 revenues of $9.03 billion. Opp. 11; McDonough
Decl. Ex. 57, at 35, ECF No. 77-3. No reasonable investor would
have understood Adobe to be representing that in just four
years' time,[11] Adobe would capture market share amounting to ten
times its current revenues.

In presenting its TAM figures for Creative Cloud, there was
no assertion by defendants that Adobe would (or could) capture
Figma's market, and no reasonable investor could have understood
the Creative Cloud TAM figures to represent the share of the
market that Adobe would actually capture. The plaintiffs have
therefore failed to allege that any statements regarding Adobe's
TAM were false or misleading.

### B. Scienter

Lack of scienter again provides an independent basis to
dismiss the complaint. The scienter required to support a
Section 10(b) claim is an "intent to deceive, manipulate, or
defraud; or at least knowing misconduct." <u>SEC v. First Jersey</u>

---

[11] The $128 billion figure refers to TAM in 2022 and was released
by Adobe in 2018. McDonough Decl. Ex. 57, at 35.

Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321-322 (2007). An inference of scienter is strong "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

A "strong inference" of scienter can arise either from (1) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (2) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007)., 493 F.3d at 99. Like the FAC, see Adobe I, 2025 WL 936416, at *15, the SAC fails to plausibly allege scienter pursuant to either theory.

The "motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001). "However, the mere fact that insider stock sales occurred does not suffice to establish scienter, . . . [instead] [p]laintiffs must establish that the sales were 'unusual' or 'suspicious.'"

<u>In re Gildan Activewear, Inc. Sec. Litig.</u>, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009). The SAC does not allege adequately that any of the Individual Defendants had an adequate motive to commit fraud. As an initial matter, the SAC does not include any new stock sales that were not pleaded in the FAC. Thus, once again, the plaintiffs have failed to grapple with the fact that-with one minor exception[12]-each of the Individual Defendants increased their stock holdings during the Class Period. <u>See</u> <u>Adobe I</u>, 2025 WL 936416, at *16.

The plaintiffs contend that the increases in stock holdings by the Individual Defendants were merely "passive acquisitions" of restricted stock units ("RSUs") and performance shares, not open-market purchases, <u>see</u> SAC ¶¶ 324-28; Br. 15, and that the Individual Defendants were barred from selling all of their shares by Adobe's stock ownership guidelines, <u>see</u> SAC ¶ 329; Br. 16. The plaintiffs thus argue that this explains why the Individual Defendants would have increased their stock holdings over the Class Period even if they knew that Adobe's stock price had been artificially inflated. Br. 16. But these additional allegations fail to allege motive because the Individual

---

[12] Lewnes's stock holdings decreased by approximately 3,000 shares (out of more than 26,000 shares) during the Class Period. <u>See</u> ECF No. 59-3, at 12-16. However, each of Lewnes's stock sales was made either pursuant to a Rule 10b5-1 plan or to cover a tax obligation. <u>See</u> <u>id.</u>

Defendants would not benefit from an inflated stock price unless they sold their shares before the alleged corrective disclosure decreased the value of the stock and there is no allegation that they did. It would make little sense for the defendants to increase their stock holdings if they knew Adobe's stock price was artificially inflated by fraud. See In re Biogen Sec. Litig., 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016).

Moreover, the sales themselves do not support an inference of motive. With the exception of a single,[13] all stock sales made by Individual Defendants during the Class Period were made either to satisfy tax obligations or pursuant to a Rule 10b5-1 plan. See Adobe I, 2025 WL 936416, at *16; see also N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc., No. 15-cv-6034, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) ("[T]he disposition of shares to pay taxes do[es] not demonstrate a defendant's motive to defraud."); Gildan, 636 F. Supp. 2d at 272 (fact that sales made pursuant to a Rule 10b5-1 plan "undermines any allegation that the timing or amounts of the trades was unusual or suspicious"). The plaintiffs argue that the SAC "contains new allegations that provide a factual foundation to challenge the timing of the

---

[13] The only non-tax, non-Rule-10b5-1 sale is a 2021 sale by Narayen, which is not tied to any allegedly false or misleading statement. See SAC ¶ 320(d).

sales." Reply Br. 8; accord Oral Argument Tr. 31:19-23. But the plaintiffs simultaneously concede that the sales made to cover tax liabilities were made "without any conscious or deliberate decision." SAC ¶ 324.

Put simply, the plaintiffs have not alleged a scheme wherein the Individual Defendants "misrepresent[ed] material facts to keep the price of stock high while selling their own shares at a profit."[14] Scholastic, 252 F.3d at 74.

The SAC also fails to allege that the defendants recklessly engaged in securities fraud. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be

---

[14] In Adobe I, the Court rejected the plaintiffs' unique theory of motive as to Wadhwani-namely, that Wadhwani brokered the planned acquisition of Figma in order to elevate his stature and financial stake at Greylock, his former employer and a major investor in Figma, and where Wadhwani was a "Venture Partner." 2025 WL 936416, at *16. The Court found that "the plaintiffs' theory fails to account plausibly for why Wadhwani would pursue a merger to the detriment of his substantial Adobe holdings merely to increase his stature at his former employer." Id. In the SAC, the plaintiffs now additionally allege that Wadhwani's dual roles at Adobe and Greylock implicated Adobe's Code of Business Conduct, SAC ¶ 267, and that the CMA and DOJ possibly investigated those roles, see id. ¶¶ 266-69. But these new allegations do not remedy the flaw in the plaintiffs' logic discussed in Adobe I, and thus the plaintiffs have again failed to allege motive as to Wadhwani. See Kalnit, 264 F.3d at 140-41 ("Where [the] plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent." (quoting Shields v. City Trust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994))).

correspondingly greater." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 142 (2d Cir. 2001). The plaintiffs have again "not met the high bar to show 'an extreme departure from the standards of ordinary care.'" <u>See</u> <u>Adobe I</u>, 2025 WL 936416, at *17 (quoting <u>Kalnit</u>, 264 F.3d at 142).

The plaintiffs again have failed to identify any actionable misstatements or omissions to support their central argument: that the defendants publicly downplayed the risk that competition from Figma posed to Illustrator and Photoshop while privately believing that Figma seriously threatened those products. And, critically, to establish recklessness, plaintiff must point to facts showing that the defendants were aware of the high likelihood that their statements were false or misleading and proceeded despite that knowledge. Conscious behavior is often shown by statements from confidential informants, <u>see</u> <u>Gimpel v. The Hain Celestial Grp., Inc.</u>, No. 23-7612, 2025 WL 2749562, at *15 (2d Cir. 2025), or the presence of documents reviewed by the defendants that showed their public statements were false or misleading. There are none of those allegations in the SAC.

The plaintiffs rely heavily on the CMA Report and now allege that the report is "an official public record reflecting factual findings," "which the Court must accept as true." Br. 18-19. But the problem for the plaintiffs is not whether the

contents of the CMA Report should be accepted as true; instead, it is that the CMA Report does not show that the defendants' statements were false or misleading. The CMA Report found that Figma does not currently possess the technological capability to challenge Adobe's vector and raster editing applications. CMA Report at 333-34. The SAC also includes new allegations reflecting the conclusions of the European Commission ("EC") and Korea's Federal Trade Commission ("KFTC") in response to the proposed merger between Adobe and Figma. See SAC ¶¶ 355-56. But the CMA Report, and the EC and KFTC conclusions, match the defendants' statements regarding Figma: that it was a competitor to Adobe XD, and that it might pose a future competitive threat to Illustrator and Photoshop. See SAC ¶ 355(c)(i)-(ii) (noting that the merger would result a "potential successor product" to Adobe XD and that absent a merger, Figma "is significantly likely to enter these markets and grow into an effective competitive force").

In the SAC, "the plaintiffs allege no financial harm caused by Figma's advances in the vector and raster editing space—only potential future harms." Adobe I, 2025 WL 936416, at *17. Moreover, the plaintiffs point to no corporate documents or confidential witnesses to support the claims that the defendants knowingly made any false or misleading statements. Accordingly, the plaintiffs have failed to identify any false or misleading

42

statements—let alone misstatements representing "an extreme departure from the standards of ordinary care." Kalnit, 264 F.3d at 142.

## CONCLUSION

The Court has considered all of the arguments of the parties.[15] To the extent not specifically addressed above, the arguments are moot or without merit. For the foregoing reasons, the plaintiffs' motion for leave to file an amended complaint is **denied**, and the action is **dismissed with prejudice**.

The Clerk of Court is respectfully directed to close all pending motions, to enter judgment dismissing this action with prejudice, and to close this case.

SO ORDERED.
Dated:    New York, New York
          November 7, 2025

                              _____
                                  John G. Koeltl
                          United States District Judge

---

[15] The plaintiffs' Section 20(a) claim for control person liability fails because the FAC does not plausibly allege a primary violation of Section 10(b) and therefore cannot allege culpable participation by any of the defendants. See Adobe I, 2025 WL 936416, at *17.